**Quintero Community Association, Inc.; Lyle P. Phillips; Peggy Phillips; Philips W. Upham II; Sondra R. Upham; Nowell C. Upham; Britton B. Upham; Tory H. Upham; Kenneth Nichols; George Benz; Karen Benz; George Benz and Sons, LLC; Theodore B. Benz; George M. Benz; Larry Hilcher; David Ostermeyer; Cathleen Ostermeyer,**

Plaintiffs,

v.

**Federal Deposit Insurance Corporation as Receiver of Hillcrest Bank; Robert Sperry; Jon Forgey; Jeffrey F. Wheeler; Nicole Davis; Wanda Holdeman; Dan Schwartzkopf; Scott I. Asner; Irwin Blitt; Robert J. Campbell; Jack N Fingersh; Paul S. Fingersh; Sue Gallatin; Gerald M. White; G. Richard Degen; Tim Gervy; Joel Richards; Thomas J. Davies; George A. Lieberman; Brian K. Schneider; Hillcrest Bancshares,**

Defendants.

**Case No. 04-11-CV-00893-DGK**

## Omnibus Petition

The plaintiffs Quintero Community Association, Inc., Lyle P. Phillips, Peggy Phillips, Philips W. Upham II, Sondra R. Upham, Nowell C. Upham, Britton B. Upham, Tory H. Upham, Kenneth Nichols, George Benz, Karen Benz, George Benz and Sons, LLC, Theodore B. Benz, and George M. Benz, Larry Hilcher, David Ostermeyer, and Cathleen Ostermeyer bring this Omnibus Petition for their consolidated actions and alleges as follows:

1

# Table of Contents

Parties ........................................................................................................................... 3

Venue & Jurisdiction........................................................................................................ 5

Underlying Breaches, Torts, and Wrongdoing .............................................................. 6

    A.  Plaintiffs v McClung & Quintero Golf Breach of Contract ............................... 6

Plaintiffs' Investments and Contracts............................................................................13

    B.  Plaintiffs v McClung & Quintero Breach of Fiduciary Duty, Fraud.....................19

    C.  McClung's Ongoing Fraud Known by the Board Members..................................32

    D.  Board Members Attempt to Cover Up and Thwart the Plaintiffs' Claims........33

    E.  The FDIC Investigation .........................................................................................34

**Count 1** QCA v Hillcrest Bank | Board Members

(*Consumer Protection, Breach of Fiduciary Duty, Invasion of Privacy*) ...........................36

**Count 2** Plaintiffs v Board Members

(*Interference with Contract Aiding & Abetting Interference with Contract*) ..................38

**Count 3** Plaintiffs v Board Members

(*Assisting Hillcrest Bank, Quintero Golf, McClung Breach of Fiduciary Duties*) ..............41

**Count 4** Plaintiffs v Board Members

(*Aiding & Abetting McClung's Torts*)................................................................................43

**Count 5** Plaintiffs v Board Members

(*Joint Enterprise and Conspiracy*) ....................................................................................51

**Count 6** Plaintiffs v Board Members

(*Breach of Fiduciary Duty | Aiding & Abetting Securities Fraud*) .......................................54

**Count 7** Hilcher & Nichols v Hillcrest Bank | Board Members

(*Conversion | Aiding & Abetting Conversion*) ..................................................................56

**Count 8** Plaintiffs v Board Members

(*Negligence | Aiding & Abetting Negligence*) ....................................................................57

**Count 9** Plaintiffs v Board Members

(*Aiding & Abetting Consumer Protection Violations*) ........................................................60

**Count 10** Plaintiffs v Hillcrest Bank

(*Intentional Interference with Business Relationship*)........................................................61

**Count 11** QCA v Hillcrest Bank

(*Breach of Contract*)..........................................................................................................62

**Count 12** QCA v Hillcrest Bank

(*Negligence*) ......................................................................................................................63

**Count 13** Plaintiffs v Hillcrest Bank

(*Aiding & Abetting McClung*) ............................................................................................64

**Count 14** Plaintiffs v Hillcrest Bank

(*Aiding & Abetting McClung's Fraud*)................................................................................66

**Count 15** Plaintiffs v Hillcrest Bank

(*Joint Enterprise Conspiracy Concerted Action by Agreement*)..........................................68

**Count 16** Plaintiffs v Hillcrest Bancshares

(*Intentional Interference with Contracts Aiding McClung's Tortious Activity*) ...............70

Jury Demand ...................................................................................................................72

## Parties

1. The plaintiffs Kenneth Nichols, Larry Hilcher, Britton and Nowell Upham are residents of Texas. The plaintiffs Lyle and Peggy Phillips are residents of Kansas.

2. The plaintiff Tory Upham is a resident of Florida. The plaintiff George Benz and Sons, LLC is a resident of Massachusetts. The plaintiffs George M. Benz and Theodore Benz are residents of Minnesota.

3. The remaining plaintiffs are residents of Arizona. The Quintero Community Association, Inc. (QCA) is an Arizona non-profit corporation.

4. The plaintiffs Quintero Community Association, Inc., Nichols, Hilcher, Benz, and Upham own property in the Quintero Golf and Country Club. The plaintiffs are members of the Quintero Community Association, Inc., or are affected adversely by the claims set forth in this complaint.

5. At the relevant times, Hillcrest Bank conducted continuous business in Missouri and has established bank offices in Missouri. The defendant Hillcrest Bancshares, Inc., (Hillcrest Bancshares) is a registered bank holding company, who owns and controls Hillcrest Bank, which was a state chartered nonmember bank, and a nonbank subsidiary. Hillcrest Bancshares conducts continuous business in Missouri and has committed torts in Missouri.

6. Gary and Leona McClung are residents of Jackson County, Missouri.

7. The defendant Robert Sperry ("Board Member") was an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares.

8. The defendant Jon Forgey ("Board Member") was an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares at 1100 NW South Outer Road, Blue Springs, Missouri 64015.

9. The defendant Jeffrey F. Wheeler ("Board Member") was an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 3309 W. 127th St. Leawood, KS 66209.

10. The defendant Nicole Davis ("Board Member") was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 705 Shiloh Drive Raymore, MO 64083.

11. The defendant Wanda Holdeman was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 10808 W 109th Street Overland Park, KS 66210.

3

12. The defendant Dan Schwartzkopf was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 753 NW Silver Ridge Lee's Summit, MO 64081.

13. The defendant Scott I. Asner was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 121 W 48th St. Apt 1703 Kansas City, MO 64112.

14. The defendant Irwin Blitt was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 9 Commodore Drive #313 Emeryville, CA 94608.

15. The defendant Robert J. Campbell was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 5604 NW 60th Kansas City, MO 64151.

16. The defendant Jack N Fingersh was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 4400 W 87th Place Prairie Village, KS 66207.

17. The defendant Paul S. Fingersh was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 8400 Briar Lane Prairie Village, KS 66207.

18. The defendant Sue Gallatin was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 1209 NW Fairway Circle Blue Springs, MO 64014.

19. The defendant Gerald M. White was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 1912 W. 6111 Terrace Mission Hills, KS 66208.

20. The defendant G. Richard Degen was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 10223 Catalina Overland Park, KS 66207.

21. The defendant Tim Gervy was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 30405 Crystal Aire Drive Grain Valley, MO 64029.

22. The defendant Joel Richards was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 9122 Allman Lenexa, KS 66219.

23. The defendant Thomas J. Davies was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 27180 W 199th Gardner, KS 66030.

24. The defendant George A. Lieberman was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 11504 Juniper Overland Park, KS 66211.

25. The defendant Brian K. Schneider was or is an officer, shareholder, director, or employee of Hillcrest Bank or Hillcrest Bancshares and resides at 961 Cullin's Rd. Rockwall, TX 75032.

26. First American Title Insurance Company is registered to do business in Missouri. The registered agent's name and address is: CSC-Lawyers Incorporating Service Company, 221 Bolivar, Jefferson City, Missouri, 65101. First American Title Insurance Company does continuous business in Missouri.

### Venue and Jurisdiction

27. Hillcrest Bank formerly did business in Jackson County in the State of Missouri; some of the fraudulent acts were committed in or from Jackson County and some or all of the contracts at issue may have been executed or last executed in Jackson County Missouri.

28. During the relevant events, the managing members of the McClung Entities were Gary and Lee McClung who are residents of Jackson County in the State of Missouri; some of the fraudulent acts were committed in or from Jackson County and some or all of the contracts at issue were executed or last executed in Jackson County Missouri.

29. During the relevant events, Hillcrest Bancshares controlled and had complete domination, not only of finances, but of policy and business practice of Hillcrest Bank and Hillcrest Bank had no separate mind, will or existence of its own and this control was used by Hillcrest Bancshares to commit fraud or wrong, to perpetrate the violation of statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights.

30. During the relevant events, all or some of the Board Members were shareholders in Hillcrest Bank or Hillcrest Bancshares and actively participated in, aided and abetted Gary McClung and the McClung Entities torts and fraud against the plaintiffs and violated statutory duties and caused or allowed Hillcrest Bank or Hillcrest Bancshares to be undercapitalized. The Board Members controlled and had complete domination, not only of finances, but of policy and business practice of Hillcrest Bank and Hillcrest Bancshares such that they had no separate mind, will or existence of its own and this control was used by Board Members to commit fraud or wrong, to

5

perpetrate the violation of statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights.

31. All of the torts alleged in this petition arise under and are governed pursuant to Missouri or Arizona tort law. The plaintiffs were injured in Arizona. The allegations indicate that Hillcrest Group participated, aided or conspired with McClung from Missouri while McClung was in Arizona and Missouri. The investment properties are located in Arizona while Gary McClung made communications both from Arizona and his Jackson County Missouri residence. The misrepresentations of the underlying torts were being committed in Arizona by Quintero, McClung, and the defendants themselves. As Hillcrest Bank was a foreign corporation doing business in Arizona, particularly as it related to the Arizona Department of Real Estate, it was subject to provisions of Arizona law.

## UNDERLYING BREACHES, TORTS, AND WRONGDOING

### A. UNDERLYING WRONGDOING: PLAINTIFFS V MCCLUNG & QUINTERO GOLF AND COUNTRY CLUB BREACH OF CONTRACT

32. The seeds of the failure of Hillcrest Bank's commercial real estate lending program (and with it, the failure of Hillcrest Bank) were planted in the early 2000s when Hillcrest Bank took on a risky strategy of large scale commercial real estate lending. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, White or their predecessors took Hillcrest Bank into speculative projects without any meaningful analysis of their economic viability and often with inadequate appraisals.

33. They repeatedly made loans with excessive "loan-to-value" ratios, meaning the loans were too large given the value of the projects. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler White failed to properly evaluate the creditworthiness of commercial loan borrowers and guarantors to ensure they could reliably repay their loans.

34. The volume of Hillcrest Bank's commercial lending grew too large for a bank that size, leaving it dangerously over-exposed to the volatile commercial market of that time. All of the defendant bank officials, rather than preserving capital and provide sufficient reserves to absorb losses that would inevitably result when its poorly underwritten commercial loans went bad, voted and agreed to deplete the bank's capital by making millions of dollars in dividend payments to Hillcrest Bank's holding company and paying generous incentive salaries and awards to certain of the bank management.

35. By 2005, each of the individual board member defendants knew or had strong

6

beliefs that their lending program was failing and threatening Hillcrest Bank's viability. In 2005, the FDIC and the Kansas Office of the State Bank Commissioner (ASBC) began to conduct onsite risk management examinations. As earlier as 2006 examiners were concluding that Hillcrest Bank had high levels of out-of-area lending and credit concentrations. By 2007, the real estate market was in serious decline. But instead of curtailing its lending, working out of troubled loans and preserving the bank's capital, the board of the bank moved from a strategy of willful blindness to recklessness. Initially, the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White attempted to close their eyes to the known risks. They attempted to engage in a willful blindness to the risks and imprudence of the loan decisions they voted for and ratified.

36. Regulatory authorities had repeatedly warned each of the board members of the dangers associated with the bank's concentration in out-of-area projects, its poor underwriting practices, their unwillingness to back out of bad investments and its over-concentration in commercial real estate. Rather than deal honestly with regulators, the board looked for ways to manipulate the books to give to the regulatory authorities an enhanced picture of well-being. Each of the board members defendant's abdication of responsibility rose to a new level of willful blindness when the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White were being warned by regulators about Hillcrest Bank's ineffective oversight, weak loan underwriting, disregard of prior criticism, improper interest reserves, risk profile, its out-of-territory loans, its own internal loan review process, and the high concentration in commercial real estate loans.

37. Board member Thomas J. Davies had second thoughts. He expressed misgivings about the conduct of the board to the board members. Davies anticipated that the Bank was on shaky ground, that the bank's accounting would come under greater scrutiny, or the collective management practices of the board would subject him to personal exposure. Davies resigned, requested a buyout, and received it by vote of the board. The buyout is believed to have required Davies to keep confidentiality about his knowledge of the wrongdoing or to prevent whistleblowing. The payoff might even be characterized as a kickback payment.

38. Despite their knowledge and the warnings from regulators and even some board members, the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, White, or their predecessors then made new loans and renewed and made additional loan advances on existing loans rather than defaulting the notes. This action would involve replenishing interest reserves which allowed borrowers to pay interest with more borrowed funds. And while Hillcrest Bank may have recognized non-cash income, its cash reserves, largely provided by

customer deposits, were used to fund the payment of dividends or buyouts, which further weakened the financial position of the bank.

39. Each of the individual board member's actions went from mismanagement to then collectively attempting not only to mask the bank's mounting problems but to take affirmative actions of doctoring the books to obscure losses on the Quintero loan – to provide a false appearance of financial well-being as to the development and the bank. Each of the board member defendants voted for affirmative actions to manipulate loans, specifically the Quintero Loan, and the bank's books to provide a false appearance of financial viability. Each of those defendant board members had so lost their way and their sense of responsibility that they each knowingly assisted McClung in his efforts to make the bank look like it was fully willing and capable of financing the golf course development and that the development itself was worthy of ongoing investments from the plaintiffs. This was a false appearance that each of the board member defendants was assisting McClung to accomplish.

40. Against this backdrop came Gary McClung. McClung had a plan to develop a private golf course in Peoria, Arizona. McClung solicited investors such as each of the plaintiffs to invest and become members of the golf course development. Quintero Clubhouse Villas, L.L.C., Quintero Clubhouse Suites, L.L.C., Quintero Golf and Country Club, L.L.C., Quintero Capital, L.L.C., Quintero Charter Properties L.L.C., Quintero Entrada, L.L.C., Crossover Capital, L.L.C., and Private Club Financial Management, L.L.C. (hereafter referred to as the "Quintero Entities" or "McClung Entities") were Arizona limited liability companies owned and operated by Gary McClung.

41. On May 24, 2004, The State of Arizona Department of Real Estate (ADRE) issued a Subdivision Public Reports for Founders Estates 1-3 Phase 1 to the developer Quintero Golf and Country Club, L.L.C., which was an Arizona limited liability company.

42. The ADRE requires that every developer of land is required to have a "Public Report" issued by the ADRE. When land is developed, the ADRE requires guaranteed financing of the work identified in the Public Report for the benefit of land purchasers through irrevocable letters of credit and escrow accounts.

43. In the Founder's Estates Public Reports, the following was stated:

Assurances for Completion of Subdivision Facilities: In accordance with the provisions of Arizona Administrative Code Section R4-28-A1211, the Subdivider has established an escrow account with an escrow company licensed in Arizona and entered into an agreement, pertaining to that account, which provides for a sufficient amount of funds assuring the completion of the various subdivision and master plan facilities described above for which the Subdivider is responsible.

44. The escrow company that is referred to in that Report was First American Title

Company.

45. McClung had begun the development utilizing financing from Kennedy Financial and Old Standard Life Insurance, and later Washington United Life Assurance Company (WULA). Those institutions later became financially insecure. When Old Standard Life Insurance publicly announced that it was unable to service its debt, McClung approached Washington United Life Assurance Company (WULA) and secured approximately 15 million dollars for the continuation of the Quintero development.

46. McClung began soliciting investors and when he received funds from new investors would divert the money to make returns on the prior investor monies. In March of 2004, WULA went into bankruptcy.

47. In June 2004, McClung personally, and as a representative of Quintero Golf & Country Club, began negotiating with Hillcrest Bank to procure a loan to complete the in-progress and contemplated improvements of the Quintero Community in Arizona. McClung approached Hillcrest for the Quintero funding because the institutions McClung had previously secured funding from were bankrupt or in financial distress.

48. Hillcrest Bank and each of the individual defendant board members knew about WULA's financial instability and the dealings McClung had with the prior funding institutions. Hillcrest, and its board members and officers, knew about the Washington State Insurance Commission investigating WULA.

49. The Hillcrest board told McClung that they needed to add other banks or lenders to share the financing burden in order to achieve the development goals of the Quintero Community, including construction of a clubhouse.

50. Hillcrest Bank, through the defendant officers and board members, assured McClung that it was able to obtain other participant banks to share in the costs so that Hillcrest would not engage in improper banking practices related to overextension of investments. Based upon this assurance, McClung began the loan documentation process of Hillcrest.

51. Hillcrest requested a budget proposal from McClung. McClung submitted numerous budgets to Hillcrest. Hillcrest demanded and McClung agreed that all amounts in the budget which were not funded in the final budget proposal in the form of a line of credit would be privately funded by McClung.

52. Hillcrest, with the defendant officers and board members, did not conduct its due diligence in accordance with the standard of banking practices to determine if the proposed development and sale of lots could support the anticipated debt service.

9

53. Hillcrest did not request any documentation from McClung which accompanied his application to Old Standard or WULA. Hillcrest did not request any information from McClung to explain WULA's chronic lateness in meeting loan draw payment dates.

54. Hillcrest knew that McClung was soliciting and receiving the plaintiff investors' money, repaying previous investors with that money, and failed to make loan payments to WULA.

55. Hillcrest and the defendant board members and officers all were aware of WULA and its financial difficulties. Rather than obtain participant banks to share in the financing as they had all represented to McClung, Hillcrest and the defendant board members and its officers decided to increase the budget for the Quintero project so that the line of credit was sufficient to cover the financial assurances necessary to satisfy the ADRE and pay off the WULA loan. Hillcrest did not obtain any such participant banks to share in the financing burden of the development.

56. On March 8, 2005, the defendant board members and officers finalized a line of credit to Quintero for 31 million dollars. This amount was calculated to pay off the WULA loan, fees to First American Title Company (FATCO) and other loans and fees.

57. McClung had made improper multiple payments from Quintero to himself amounting to at least four Hundred six Thousand five Hundred ninety one Dollars ($406,591.00) in contravention of his duties of loyalty and self-dealing. The notations regarding these payments in Quintero's transaction report state "repay interest on loan taken from personal account," "pay back short term loan" and "reimbursement for short term loan." These payments appear to have been made to Quintero from Quintero's Owners Equity account at Hillcrest Bank and to McClung from the Quintero checking account at Hillcrest Bank.

58. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White all knew McClung had made improper multiple payments from Quintero to himself. Despite this, they approved a line of credit from Hillcrest included paying off McClung's personal loan obligations as described above, ADRE financial assurances and an advance made on a loan to McClung. Pursuant to the requirements of ADRE, the Quintero development received guaranteed funding through irrevocable letters of credit and an escrow account in favor of the Quintero Community Association, Inc. who was the named beneficiary.

59. Under the financing with Hillcrest, a portion of all Quintero lot sales would be paid to Hillcrest to service the loan. A smaller portion was to be used by Quintero under the line of credit from Hillcrest.

60. In the Spring of 2005 through the Summer of 2006, construction on capital

10

improvements to Quintero properties began. Draws on the Letters of Credit were made and once draws on the line of credit depleted the amount available, any further draws were conditioned by Hillcrest to lot sales of Quintero properties. All draws from the Letters of Credit were required to be submitted to a company in Las Vegas, Nevada named Project Disbursement Group (PDG) by Quintero.

61. PDG was a third-party retained by Hillcrest for the purpose of conducting independent construction inspections to verify to Hillcrest that each phase of construction be completed satisfactorily before funds would be disbursed by Hillcrest for payment to the appropriate contractors.

62. An inspector was then required to verify what percentage of the improvements had been completed, verify construction invoices and waivers from the draw. Once completed the inspector would report to Hillcrest as to whether there were any issues to resolve.

63. Hillcrest reviewed the documentation and subsequently released monies according to the Letters of Credit. When those monies were released, a portion of the money was wired to FATCO as part of the process required by ADRE. FATCO would subsequently wire these monies to PDG. The other monies released on the construction draw were wired directly to PDG. Upon receipt of all the monies being released pursuant to the Letters of Credit, PDG would prepare checks which were then sent to Quintero for payment to the vendors and contractors. FATCO would then send a Title Endorsement to Hillcrest who then amended the Letters of Credit balance reflecting the draw down and remaining amount of guaranteed funds.

64. Hillcrest Bank, through its agent Robert Sperry, issued various irrevocable standby letters of credit. In all of the Irrevocable Standby Letters of Credit, the following is stated:

SPECIAL INSTRUCTIONS. ****BENEFICIARY MUST CERTIFY, UNDER OATH, THAT QUINTERO GOLF & COUNTRY CLUB LLC HAS EITHER ABANDONED ITS CONTRUCTION AND/OR INSTALLATION OF THE REQUIRED IMPROVEMENTS FOR THE RIDGE, AS CONTEMPLATED BY THE ARIZONA DEPARTMENT OF REAL ESTATE PUBLIC SUBDIVISION REPORT, DATED [date] (THE "IMPROVEMENTS"), OR FAILED TO COMPLETE THE CONSTRUCTION AND/OR INSTALLATION OF THE IMPROVEMENTS ON OR BEFORE [date] OR SUCH LATER DATE AS APPROVED BY THE ARIZONA DEPARTMENT OF REAL ESTATE,AND AS EVIDENCED BY AN AMENDED PUBLIC SUBDIVISION REPORT FOR THE RIDGE. BENEFICIARY MUST CERTIFY, UNDER OATH, THAT NO EXCEPTIONS OF TIME FOR COMPLETION OF THE IMPROVEMENTS HAVE BEEN GRANTED BY THE ARIZONA DEPARTMENT OF REAL ESTATE OTHER THAN THOSE SET FORTH IN ANY AMENDED PUBLIC SUBDIVISION REPORT.*****

65. In the Letters of Credit numbered 480, 481, 482, 483, 484, and 485, construction, installation, or improvement work was identified. As construction proceeded within the Quintero Property, contractors submitted draw requests which were processed through Quintero's construction manager, FATCO, Hillcrest and PDG.

66. The attorney for Quintero, Fred Davidson, communicated to McClung his concerns regarding falsehoods being represented to ADRE as to actual completion of improvements. Davidson stated that the completion dates being communicated to ADRE were being shown as being completed sooner rather than later.

67. In September 2006, the project related to the Water/Wastewater Treatment Facility was completed. Pursuant to an agreement with the City of Peoria, Arizona, the Facility was deeded to the City. This event allowed the Quintero Community Association (QCA) to begin establishing its dues and property assessments. There were numerous members of the QCA, including some of the plaintiffs, who owned properties. QCA employed a management agent and the assessments began in October of 2006.

68. On October 27, 2006, a draw from the Letter of Credit designated "Draw #HCHD-14" was submitted to Hillcrest for work that was performed by construction companies through the period of July, August, and September of 2006.

69. By this date, the majority of contractors had discontinued work on the Quintero projects due to being paid untimely or not being paid at all. At this time there was a One Million One Hundred Seventy-Seven Thousand Four Hundred Forty-Four dollar ($1,177,444) balance remaining in the Letter of Credit.

70. The Quintero Community Association, Inc. did not certify under oath to Hillcrest Bank that Quintero Golf & Country Club L.L.C. had abandoned its construction as referred to in the Irrevocable Standby Letter of Credit numbered 480, 481, 482, 483, 484, or 485. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White all knew that the Quintero Community Association had not certified under oath that the construction had been abandoned or completed.

71. In March 2007, McClung asked for the original Letters of Credit to be sent back to Hillcrest. Nothing in the communication stated that he was authorized by the QCA. The defendant Sperry said that Hillcrest would "free up" some funds in order to service the loan interest payment. This transaction did not include the Founder's Estates 2 (FE2), FE3, Founder's Estates 4 (FE4) or the Rees Jones Blvd projects because they were not completed improvements. No endorsements from FATCO were received. No amendments or other correspondence was received from Hillcrest. There was no final inspection requested or completion as was required.

72. The developer Quintero Golf and Country Club, LLC, failed to complete the internal paved roads by the specified completion date in the Public Report DM04-049029.

73. Arizona Revised Statutes ("ARS.") § 32-2181(A)(18) requires a subdivider to provide "A true statement of the nature of any improvements to be installed by the subdivider, the estimated schedule for completion and the estimated costs related to the improvements that will be borne by purchasers of lots in the subdivision."

74. Arizona Administrative Code R4-28-B1203 provides that a Developer shall notify the Department of a material change to a Subdivision Disclosure Report and shall amend that Subdivision Disclosure Report. Quintero Golf & Country Club failed to complete roads by the date stated in the Subdivision Disclosure Reports (Public Reports) as required by AR.S. § 32-2181(A)(18) and AAC. R4-9 28-B1203.

75. Quintero Golf & Country Club is not in compliance with the requirements for a Subdivision Disclosure Report (Public Report), as set forth in AR.S. § 32-2181(A)(18) and AAC. R4-28-B1203.

76. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White were each individually aware that:

   a) on December 1, 2006, through April 1, 2007 that all of the work identified in Public Report DM04-049029 had not been completed; and

   b) That as of March 1, 2007, Quintero Golf and Country Club, LLC, as the developer of Founder's Estates 4, Quintero Golf and Country Club Phase 1, failed to complete legal access to one or more properties by the specified completion date in the Public Report (DM04-049029) of the Arizona Department of Real Estate.

### The Plaintiffs' Investments and Contracts

77. Plaintiffs Lyle P. Phillips, Peggy Phillips, Philips W. Upham II, Sondra R. Upham, Nowell C. Upham, Britton B. Upham, Tory H. Upham, Kenneth Nichols, George Benz, Karen Benz, George Benz and Sons, LLC, George M. Benz, Theodore Benz, Larry Hilcher, David Ostermeyer, and Cathleen Ostermeyer loaned Quintero Golf and Country Club, L.L.C. (Quintero) various amounts of money under Revenue Producing Membership Collateral Certificates and Agreements and other documents with repayment pledged by McClung.

78. Phillips W. Upham II and Sondra Upham loaned the Quintero entities monies pursuant to a Revenue Producing Membership Collateral Certificate and Agreement and other contracts as follows:

13

| Phillips W. Upham II | | | | | | |
|---|---|---|---|---|---|---|
| Date | Description | Owner | Principal | Simple Interest | Interest Amounts | Balance 2010 |
| 12/6/2002 | CLUBHOUSE VILLAS | PWU ENT | $250,000 * $400,000 principal balance as of 2006 | 06-10 20% @4 yrs. | $320,000 | $720,000 |
| 11/21/2003 | RPD 0004 | PWU | $100,000 | 03-07 12% 08-10 16% | $48,000 $32,000 | $180,000 |
| 4/7/2005 | RPF 00076 | SRU/PWUII | $100,000 | 05-07 12% 08-10 16% | $24,000 $32,000 | $156,000 |
| 4/7/2005 | RPF 00076 | SRU/PWUII | $100,000 | 05-07 12% 08-10 16% | $24,000 $32,000 | $156,000 |
| 3/1/2007 | RPE 0096 | SRU/PWUII | $100,000 | 07 – 10 16% | $48,000 | $148,000 |
| 3/1/2007 | RPE 0097 | SRU/PWUII | $50,000 | 07 – 10 16% | $24,000 | $74,000 |
| 3/3/2008 | RPE 00101 | SRU/PWUII | $125,000 | 08-10 16% | $40,000 | $165,000 |
| 11/8/2007 | RPG 00114 | SRU/PWU | $50,000 | 07-10 16% | $24,000 | $74,000 |
| | | | | | | $1,673,00 |
| Sondra Upham | | | | | | |
| 12/1/2004 | RPF 0074 | SRU | $50,000 | 04-07 12% 08-10 16% | $18,000 $16,000 | $84,000 |
| 12/13/2005 | RPF 0080 | SRU | $50,000 | 05-07 12% 08-10 16% | $12,000 $16,000 | $78,000 |
| 2/15/2006 | RPG 0091 | SRU | $150,000 | 06-07 12% 08-10 16% | $18,000 $48,000 | $216,000 |
| | | | | | | $378,000 |

Case 4:11-cv-00893-DGK   Document 56   Filed 06/12/12   Page 14 of 72

79. On May 15, 2000, a Promissory Note Secured by Deed of Trust ("Promissory Note") was executed in which McClung and his wife Leona McClung, jointly and severally, promised to pay Quintero Capital, L.L.C. for the benefit of Lyle P. Phillips, as Trustee of the Lyle P. Phillips Revocable Trust, and Peggy L. Phillips, the amount of one million dollars ($1,000,000) at the rate of twelve percent (12%) interest per annum.

80. Monthly payments were due under the Promissory Note which were to be wired directly to City Bank and made directly payable for the account of Lyle P. Phillips, as Trustee of the Lyle P. Phillips Revocable Trust U/A, dated 4-18-89, A/C 1398-1014.

81. The Promissory Note was signed by Gary N. McClung, as Manager for Quintero Golf & Country Club, L.L.C. and was signed by Gary N. McClung, as Maker.

82. On November 28, 2001, Gary N. McClung sent a letter to Lyle P. Phillips summarizing the terms of the "loan to Quintero." Ex. 1. The letter stated "You also have my and Lea's personal guaranty for the life of the loan."

83. Quintero Golf & Country Club, L.L.C., Quintero Capital, L.L.C., Gary N. McClung, and Leona B. McClung breached their duties as set forth in the Promissory Note. The events requiring immediate payment of all amounts due occurred including Nonpayment when due of any payment due under this note, time being of the essence of this instrument; an assignment by Maker of the real property for the benefit of creditors; and default in the covenants and conditions of the deed of trust securing the Promissory Note.

84. On August 15, 2002, an agreement was entered into between Quintero Golf and Country Club, LLC, Quintero Capital, LLC, Gary N. McClung, Leona B. McClung, and Lyle P. Phillips, as Trustee of the Lyle P. Phillips Revocable Trust whereby the Lyle P. Phillips Revocable Trust acquired a four percent (4%) ownership in Quintero Clubhouse Villas, LLC. This 4% ownership was paid for by the terms of the amendment the Promissory Note dated May 15, 2000.

85. On August 15, 2002, Quintero Golf & Country Club, L.L.C., Gary N. McClung, and Leona B. McClung signed a document titled "Guaranty." In the Guaranty it was stated that in order to induce Lyle P. Phillips, as Trustee of the Lyle P. Phillips Revocable Trust, to enter into an Operating Agreement for Quintero Clubhouse Villas, L.L.C., dated May 2, 2002, and the Repurchase Option Agreement with Quintero Clubhouse Villas, L.L.C., that Quintero Golf & Country Club, L.L.C., Gary N. McClung, and Leona B. McClung promised to guarantee performance by Quintero Clubhouse Villas, L.L.C. of all the terms and conditions of the Repurchase Option Agreement.

86. The Guaranty induced Lyle P. Phillips to enter into the Operating Agreement for Quintero Clubhouse Villas, L.L.C. and the Repurchase Option Agreement. Quintero Clubhouse Villas, L.L.C., had a repurchase option to repurchase the Lyle P. Phillips Trust's membership interest in Quintero Clubhouse Villas, L.L.C.

87. Quintero Golf & Country Club, L.L.C., Gary N. McClung, and Leona B. McClung promised that Quintero Clubhouse Villas, L.L.C. would exercise the Repurchase Option during the Option term and that it would make payment to the Lyle P. Phillips Trust in order to repurchase the Lyle P. Phillips Trust's membership interest in Quintero Clubhouse Villas. The Guaranty promised that if either Quintero Clubhouse Villas or Gary N. McClung or Leona B. McClung fail to exercise the Repurchase Option, that the Lyle P. Phillips Trust would be entitled to pursue any claims arising out of the breach of the Guaranty agreement.

88. On September 1, 2003, the Repurchase Option Agreement was amended. Ex. 2. The Amended Repurchase Agreement stated that on May 15, 2004, Phillips will be owed $1,600,000 by Quintero Villas. On May 15, 2007, the Repurchase Option Agreement was amended. The Amended Repurchase Option Agreement stated that on May 15, 2004, that Quintero Villas will owe Phillips $1,600,000.

89. The May 15, 2007, Amended Repurchase Option Agreement extended the repurchase option for eighteen (18) months ending on November 15, 2008. The Amended Option Agreement also promised that Quintero Clubhouse Villas, LLC would pay interest on the principal amount at the rate of eighteen percent (18%) per annum, payable monthly. Quintero Clubhouse Villas, L.L.C. failed to exercise the Repurchase Option as promised.

90. On August 8, 2008, Quintero Golf and Country Club, L.L.C., and McClung agreed that the total amount of interest due Lyle Phillips as of August 31, 2008, was approximately $598,000 and that this amount would be paid no later than August 31, 2008. Quintero Golf and Country Club, L.L.C., and Gary McClung failed to pay the $598,000. In the Letter Memorandum, Quintero Golf and Country Club, L.L.C., and McClung also promised that the principle amount of $1,600,000 plus any unpaid interest must be paid in full no later than October 31, 2008.

91. Quintero Golf and Country Club, L.L.C., and McClung failed to pay Lyle and Peggy Phillips the $1,600,000 plus any unpaid interest. In the Letter Memorandum, Quintero Golf and Country Club, L.L.C., and McClung also promised to pay $200,000 by November 30, 2008. Quintero Golf and Country Club, L.L.C., and McClung failed to pay the $200,000 by November 30, 2008.

92. Quintero Golf and Country Club, L.L.C., and McClung breached their respective duties of the covenant of good faith and fair dealing to Phillips. The matter has been placed for collection and has incurred costs and attorney fees. Phillips has been damaged as a result of the breaches and failures of Quintero Golf and Country Club, L.L.C., and McClung.

93. George M. Benz and Theodore Benz loaned Quintero monies (each loaning $233,238.80) pursuant to a Revenue Producing Membership Collateral Certificate

16

and Agreement.

94. Nowell Upham loaned Quintero certain monies under a Revenue Producing Membership Collateral Certificates and Agreements as follows: Certificate F-71 | 50,000 with total due in interest in the amount of $78,010 as of March 3, 2010 and Certificate F-102 | $50,000 with total due in interest in the amount of $67,250 as of March 3, 2010. Tory Upham loaned Quintero certain monies under a Revenue Producing Membership Collateral Certificate and Agreement as follows: Certificate F-73 | 50,000 with total due including interest in the amount of $70,773 as of February 28, 2010.

95. On or about November 3, 1999, Karen B. Benz entered into a membership agreement with Quintero Golf and Country Club, L.L.C.  On or about November 21, 2000, an agreement was entered into between Karen Benz, Quintero Golf and Country Club, L.L.C., Gary McClung, and Lee McClung, that in consideration of a loan for $1,000,000, Karen Benz would receive a $300,000 reduction in price of any selected real estate at Quintero.

96. On August 15, 2002, Quintero Golf & Country Club, L.L.C., Gary N. McClung, and Leona B. McClung signed a document titled "Guaranty." In the Guaranty it was stated that:

> To induce you to enter into that certain Operating Agreement for Quintero Clubhouse Villas, L.LC., dated 12 May 2002, as amended by that certain Amendment to Operating Agreement, by and between you and Gary N. McClung and Leona B. McClung of even date herewith and to induce you to enter into that certain Repurchase Option Agreement, of even date herewith (collectively referred to as the "Agreements"), and in consideration thereof, the undersigned hereby jointly and severally guarantee the performance by Quintero Clubhouse Villas, L.L.C. ("Quintero Villas") of all the terms and conditions of the Agreement to be performed by Quintero Villas thereunder, and the undersigned hereby jointly and severally agree to indemnify and hold you and your successors and assigns harmless from and against all liability and expense, including reasonable attorney's fees, sustained by you by reason of the failure of the
> said Quintero Villas fully to perform and comply with tile terms and obligations of the
> Agreements. Further, the undersigned hereby jointly and severally guarantee that Quintero Villas shall exercise the Repurchase Option described in the Agreements, during the Option Term, during that term is defined in the Agreement, and to that end, make payment to you in the amount required under the Agreements, in order to repurchase your membership interest in Quintero Villas. Should either Quintero Villas or the undersigned fail to exercise the Repurchase Option as hereby required, you shall be entitled to pursue any claims arising out of the breach of this Guaranty by the undersigned.

17

97. On or about November 22, 2000, George Benz and Sons LLC loaned Quintero Capital LLC 1,000,000.00. Quintero Golf and Country Club, L.L.C., Gary McClung, and Leona McClung, promised to pay $1,000,000 with interest. The promise was secured by deed of trust on real property. A Promissory Note for $200,000 was executed by Quintero Golf and Country Club in favor of Dave & Cathleen Ostermeyer which was not timely repaid.

98. The Revenue Producing Certificates were issued to the Ostemeyers in the amounts of $100,000 (Number 37 dated 9/29/2003, Number 31 dated 1/21, 2003, and Number 90 dated1/20/2006).

99. Lots in the Quintero Golf Course with valid liens held by Nichols and Hilcher were sold by Quintero Golf and Country Club in August and September of 2004. The final settlement statements generated by First American Title Insurance Company indicates the following:

| Founders Estates #3 | | | | | |
|---|---|---|---|---|---|
| 8/12/2004 | Hilcher | $16,741.02 | File 207 | 4001574 | Lot 33 |
| | Nichols | $16,741.02 | File 207 | 4001574 | Lot 33 |
| | Hilcher | $16,901.32 | | 4089252 | Lot 36 |
| | Nichols | $16,901.32 | | 4089252 | Lot 36 |
| The Ridge | | | | | |
| 8/31/2004 | Hilcher | $6,828.22 | File 207 | 4001869 | Lot 13 |
| 8/31/2004 | Nichols | $6,828.22 | File 207 | 4001869 | Lot 13 |
| 9/8/2004 | Hilcher | $10,519.61 | File 207 | 4001574 | Lot 10 |
| | Nichols | $10,519.61 | File 207 | 4001574 | Lot 10 |
| 9/9/2004 | Hilcher | $16,254.24 | File 207 | 4297179 | Lot 8 |
| | Nichols | $16,254.24 | File 207 | 4297179 | Lot 8 |
| 9/9/2004 | Hilcher | $10,449.76 | File 207 | 4258869 | Lot 11 |
| | Nichols | $10,449.76 | File 207 | 4258869 | Lot 11 |

Case 4:11-cv-00893-DGK   Document 56   Filed 06/12/12   Page 18 of 72

| | | | | | |
|---|---|---|---|---|---|
| | Hilcher | $13,433.54 | File 207 | 4362350 | Lot 5 |
| | Nichols | $13,433.54 | File 207 | 4362350 | Lot 5 |

100. The above amounts were paid and received by FATCO. The amounts may have been wired to Hillcrest. Nichols and Hilcher have no records indicating that the above amounts were paid to them by Hillcrest or FATCO.

101. In Jackson County Missouri Case No. 0816-CV40818, Kenneth and Mary Nichols have judgments against Quintero Golf and Country Club, and Gary and Leona McClung for breaches of agreements with McClung and Quintero Golf and Country Club in the amount of $2,707,628.

102. In Jackson County Missouri Case No. 0816-CV38261, Larry and Marsha Hilcher have judgments against Quintero Golf and Country Club, Gary and Leona McClung for breaches of agreements in the amount of $603,285.

103. Judgment against Quintero Golf & Country Club and in favor of plaintiffs Lyle and Peggy Phillips was rendered in Case NO. 0916-cv08753 in Jackson County Missouri in the amount of $2,000,000.

104. McClung and, Quintero Golf and Country Club, each and severally, have failed to perform their respective duties under the agreements. Each breached their respective duties of the covenant of good faith and fair dealing. The plaintiffs have incurred costs and attorney fees. Each of the plaintiffs have been damaged as a result of the breaches and failures of McClung and Quintero Golf and Country Club.

## B. UNDERLYING WRONGDOING: PLAINTIFFS V MCCLUNG & QUINTERO GOLF AND COUNTRY CLUB BREACH OF FIDUCIARY DUTY, AFFIRMATIVE FRAUD, FRAUD BY SILENCE

105. McClung, using his Quintero entities, and with the full knowledge of each of the Hillcrest defendant board members and officers, ran a phony investment plan – a Ponzi scheme – in which monies paid by later investors were used to pay artificially high returns to the initial Quintero investors, with the goal of attracting more investors and giving the appearance that the Quintero loan with Hillcrest was performing when it was not.

106. Gary McClung used Quintero as his alter ego to propagate and advance the Ponzi scheme by new investor monies, borrowing revenues from other projects, and by moving monies around in a "check kiting" fashion in order to accomplish debt service and cash flow and working capital deficiencies. Investments were shuffled through various bank accounts or projects, paid out to other investors as interest or other payments or investments, and ultimately accumulated in the pockets of McClung and his wife Lea.

19

107. The money that investors put up wasn't invested in anything or the proper areas and that the purported profits were paid out of new money from subsequent investors or raised from the sale of home site lots and memberships which was improper. Because of the scheme, many of the Quintero lots do not have the infrastructure in place necessary to even build a home are now of no more value than desert land.

108. Quintero operated and continued to operate at a loss while McClung gave the plaintiffs the false appearance of being profitable by obtaining new investors and using those investors to pay for the high returns promised to earlier investors. The effect of this scheme was to put Quintero further into debt by incurring more and more liability while giving the false appearance of profitability in order to obtain new investors and giving the appearance that the Hillcrest loan was performing.

109. McClung had a fiduciary duty by virtue of his unique knowledge and position as the developer and officer of Quintero Golf and Country Club, and by virtue of his knowledge that each of the plaintiffs were relying upon him to protect their financial interests in the Golf Course development. That duty was breached by McClung's fraud, his self-dealing, and failure to protect each of the plaintiffs which resulted in the loss of their respective investments.

110. On November 28, 2001, McClung wrote a letter on Quintero Golf and Country Club stationary to Lyle Phillips that Phillips had security for his loan and that it would be a third position on the Jones property which McClung stated was appraised at thirty nine million dollars ($39,000,000) with nine million dollars ($9,000,000) in existing liens against it. McClung stated that his attorney Fred Davidson would draw up the necessary papers

111. Unknown to Phillips, the November 28, 2001, communication made by McClung and Quintero Golf and Country Club was material and was known to be false by McClung and Quintero Golf and Country Club. The representations were intentionally made for the purpose of inducing Phillips to act upon them which he did. Phillips reasonably relied and acted upon the above representations made. Phillips sustained damage by relying upon them.

112. On 12/21/2005, McClung wrote to the Benz family:

> Karen,
> I am back in KC and just got on the computer this morning after missing a day of checking messages--unusual for me. Our problem with the money is that I got blindsided by the cancellation of a transaction at the last minute that was bringing in $2.3 million cash flow.
> It was really a good deal for us and the investor, but his CPA talked him out of it at the last minute. I try to be a cash flow freak to avoid things like this---but this one got the best of me. I have a replacement deal hot on its heels, but it takes a

few days to get these things done, and particularly this time of the year. I feel really badly to let you down. You guys have been so awesome. The bare truth is that I hate to promise an exact date and let you down again. I would be eternally grateful if you can work with us through a couple of weeks.
It is not a threat to the project, but it is an embarrassment.
Gary

113. The email was false. The lack of financing was a threat to the Benz investments, McClung was not "blindsided" at the last minute, and did not have a "replacement deal hot on its heels."

114. On January 12, 2005, McClung wrote the following to each of the plaintiffs:

QUINTERO INVESTOR INFORMATION AND QUESTIONAIRE
January 12, 2005


As and [sic] investor I wanted to let you know about Quintero's financial events:

1. We have sold 4 memberships in the last 30 days.
2. We have closed $6.5 million in real estate since April 15.
3. We have $4.5 million more real estate in escrow.
4. We have good prospects for $4.0 million more real estate sales.
5. We owe $10.8 million to Western United Life Assurance Co., our only institutional debt.
6. We have a September, 2004 appraisal of only Phase 1 of Quintero in the amount of $47,890,000.
7. Phase 1 of Quintero is the Rees Jones course and surrounding real estate.
8. Phase 2 is the Norman course and its real estate.
9. Hillcrest Bank in Overland Park, KS (in the KC area) has approved a loan to expand our financing beyond only the cost of the real estate infrastructure currently provided by Western United Life. We expect to close on that loan by the end of January.
10. The next step in the financial process is to arrange for the financing of the Clubhouse and Clubhouse Suites,
plus another loan for the Norman course real estate.
11. Since we are now officially entitled to sell real estate we are enticing to the banks.
12. We have a history of offering investments to those who already are Quintero investors. I am doing that now with you. We need to know of your interest so we can prepare the best plan. If there is enough interest we will prepare an offering. If not, we will proceed with the banks.

21

> WOULD YOU PLEASE ANSWER THE FOLLOWING QUESTIONS. JUST STATE YOUR FEELINGS AS IT RELATES TO YOUR CURRENT SITUATION. THERE ARE NO WRONG ANSWERS. YOU CAN RESPOND BY EMAIL BY TYPING IN THE NUMBER (LETTER) OF THE QUESTION AND YOUR ANSWER, MANY OF WHICH ARE JUST YES OR NO.
>
> A. We will be calling in some the earlier investments in 2005. Do you have an interest in reviewing offerings which could be used to reinvest your current investment?
> B. Are you possibly interested in investing additional money?
> C. If the answer to B is yes, how much do you have in mind?
> D. If you had the option available would you like to extend your current investment one more year?
> E. We will be offering 5 more $100,000 Revenue Producing Memberships between now and January 31. The estimated return will be between 10 and 14% per year. Are you interested in any of those?
> F. Do you have any questions you would like answered about Quintero or this email? If you send me a phone number I will call you. Or you can get me or my voice mail at 816-413-3001 24 hours a day.
> I look forward to hearing from you. Things are great. Thanks for helping make them that way.
> Gary N. McClung

115. Unknown to each of the plaintiffs, the above January 2005 communication sent to each of the plaintiffs was materially false, incomplete, and misleading. The statements regarding debts and assets were false or misleading. McClung gave the false impression that the Quintero Golf Course Development was financially healthy when it was not. McClung failed to disclose he was using new investor monies to pay off old investors.

116. Each of the plaintiffs relied upon the above communication in conducting their financial affairs with McClung – either keeping their investments or investing additional monies with McClung. The plaintiffs were damaged as a result of McClung's misrepresentations.

117. On August 31, 2006, McClung wrote the following to the Benz family:

> George and Karen,
>
> Here is an update on the financing:
> Hillcrest Bank has approved a $52 million loan for the clubhouse, suites and the rest of Phase 1.
> That loan needs to be tied to a second loan of $54 million for phase 2.
> We have unofficial approval of that from First National of America.

22

> Now Hillcrest and First National have to do all the docs, inter-creditor agreements, etc. and then FINAL approvals and loan closing will happen. 60 days?
>
> I am happy but always impatient.
>
> I will let you know as it moves forward.
>
> Hope you are having a great time in AZ. Rudy told me he saw you.
>
> Lea is okay but not improving at the rate we wish. We think a change in meds is pending.
>
> Gary

118. The above representations were materially false in that McClung was omitting material information about the financing and was misrepresenting Hillcrest's approval or commitment. McClung was misrepresenting the approval of other banks and what was required to occur in order for the Quintero Golf development to continue.

119. The Benz plaintiffs relied upon this communication in keeping their investments and in investing additional monies with McClung which ultimately they lost and were thereby damaged by this fraud.

120. On 1/2/2007, the following was communicated"

> Karen and George,
>
> As I said in the earlier email, I am overdue in getting you this status report. I am finally getting back on track. Sorry about the delay. The bank and I were confident we would have the loan closed by the end of December--but that didn't happen. We have a $106 million loan approval. Hillcrest's legal loan limit is not that high, so they have gotten several participants to join them, but enough to get to the $106 million. They are embarrassed, as am I. I met with the Chairman, President and the two Sr. V.P.s from Hillcrest who are involved in our loan. It was a very positive meeting. They are all 100% behind Quintero. At the meeting we decided to reduce the initial loan amount and do the rest in another stage, which will allow them to close within 60-75 days. The delay is because now they have to redo all the pro
> formas, etc, and go back to the participating banks because there is a change in what they initially proposed, so those banks have to agree with the plan. It is tough to push bankers for quick responses, as I suspect you are well aware.
> My question to you is what does this do to you negatively? If it causes you any monetary expense I want to reimburse you. Your patience has been wonderful on my nerves---I am not happy about not performing on this. I know George and Derek are also involved and have other plans for the money. We will get it handled, it is simply the timing that is the problem. I hope I have explained it satisfactorily.
> I am available by phone if you need more info. Cell is 816-519-5200. We are

in KC until we fly to AZ on Jan 4.  We will be in AZ most of the time until June with 4 days a month in KC.  You two are special people, and we look forward to seeing you very soon.
Always,
Gary

121. The above representations were materially false in that McClung was omitting material information about loans, banks approving, Hillcrest Bank's state of mind, and was misrepresenting the viability of the Quintero Golf development to continue. The Benz plaintiffs relied upon this communication in keeping their investments and in investing additional monies with McClung which ultimately they lost and were thereby damaged by this fraud.

122. On 10/15/2007, the following was communicated by McClung to all of the plaintiffs:

QUINTERO STATUS REPORT 10-15-07

Members and Friends:

STATUS:

The planning and communications on the Joint Venture go on every day, and are definitely moving forward.  As you will recall, we agreed to not get too detailed in the reports as things have a way of changing along the course of developing a partnership.  We expect all of this to be concluded by the end of the year.

COMMENTARY:

We think it makes a great deal of sense to purchase the land to our east and to expand the real estate basis of Quintero.  It allows the cost of the infrastructure to be spread over larger numbers for the original cost of the project.   And it makes even more sense for the economic health of an ongoing operation, long after we are all gone.  Thirdly, it makes a larger market for memberships.  Even with all those benefits, we know that we do not want to take on that extra economic burden without a partner.  That is what started the Joint Venture program.

Our prospective partners have their own form of financing.   They also have their internal CFO's who review the numbers before submitting for final approval.  We cannot ignore that many markets throughout the country do have slow real estate markets.  The CFO's see it as their duty to be cautious.  So we are being asked why we are building the clubhouse at this time.   Their question is a fair one.  It raises monthly costs and they question the timing. They are removed from the action and do not know the dynamics. You and I know that it is critical for Quintero to start the clubhouse and suites as a way to jump start membership and suite sales.  You and I know that the suite sales will reimburse the cost of the clubhouse.  They know about the suite sales, but it is

24

still a big commitment for many months. I have told them all of this. They are just asking, not saying no. But wouldn't it be dramatic if we had a powerful response from you guys with YOUR opinion on the timing of the clubhouse? Believe me, I would bet a lot of money that I already know how you feel. But it would be wonderful to hear it from you and share it with them. I am not saying they won't agree without your input, but it certainly will help with our credibility in representing you that we think we know what you want and need. We are also going to tell them that we made a commitment to build the clubhouse, and we are going to fulfill that commitment.

As soon as the clubhouse construction starts we are going to start an aggressive membership and suite sales program. At that time we will be asking you to help us with referrals, and maybe even helping us host meetings in your home town. Just keep that in the back of your mind.

## INFO ON THE SUITES:

In case you didn't already know, we will have 40 suites. Phase I holds 16 suites and 14 of those are 2 bedrooms which will be sold in quarter ownerships for $300,000 plus a membership currently at $105,000. The other 2 are three bedroom suites and are already spoken for. Several of the 2 bedroom suites have also been reserved. There will be additional 3 bedroom opportunities in the remaining phases. The Clubhouse Suites are a different type of product which are unlikely to be affected by the overall real estate market. Because they are fully furnished, fully maintained, and have a shared ownership, much of the emotional attachment is released allowing a great opportunity for rental income if the owner desires. There should be appreciation on the value of the suites as well as the memberships. Many prospective members immediate needs will be met with this opportunity while planning for a more permanent future in housing.


## OTHER INFO:

The economic model of Quintero is different than most (maybe all) other golf clubs. We are a PRIVATE golf resort. Our usage is different. Our revenue is different. We have more room for guest play and therefore guest fees without interfering with member play. We will have rental management revenue. The clubhouse is absolutely essential since it will need to perform the duties of hotel amenities. The clubhouse suites are essential for places to stay. All the revenue is under one entity to help insure the long term economic health of the club.

## WHEN?

We had planned to have the clubhouse started by the time the course was reopened. Now it will be January. We did not have the land purchase or Joint Venture in our headlights when we planned for the October start date. Frankly, this is simply an opportunity that is worth the wait. Perhaps we have lost some credibility with some of you. All we can do is hope you will endorse the plan and see the long range advantages to you and your club. Now is the time to share your feelings with us about anything that is on your mind. You can just

25

punch "reply" and it will come right to Gary.

By the way-check out the Oct/Nov issue of Desert Golf Magazine.  Quintero is #3 of the top 10 courses voted by local golf professionals, Arizona.
Gary McClung

123. On June 3, 2009, McClung communicated the following to George Benz:

George,
SLS Funding: Mr. Vegors has put in writing that July 31 is the probable date of funding. Can he 100% guarantee that? Of course no one can do that, but the process is at a point that he is very confident of a successful conclusion. Payment to you would not be 100% from the first traunch. But it would be a nice
number and would take some of the pressure off for you. We also have the right to a second traunch of the same amount at an estimated timing of 90 days after the first traunch. We could settle up with you then.
Real Estate Transaction: We happened into this deal because the organizers of the 520 acres to our east want to sell us that property. They had a broker who arranged some private money for that land. Those investors wanted a guarantee from us that we would buy it. It was not in our best interest to obligate ourselves for that, so I said no. But, I said maybe it makes sense for Quintero to meet with the money man
and make a dual transaction. That is what we did. It was appealing to them, and Sam is arranging money for us and the 520 acres (the 520 acres will not be a liability to us until we are ready to buy it). He is confident of that happening by July 10. That money will have to be almost 100% used to retire all our existing debt to the property lien holders. It will make the project much more stabler financially. And it will free up money from the Vegors funding that will not have to be used for that purpose, therefore making it beneficial for you. And I believe you do have some funding with a lien on it that could apply for you.
Gary

124. The above representations made by McClung were material and were known to be false or untrue by McClung or were recklessly made without knowledge concerning them.  The representations were intentionally made for the purpose of inducing the plaintiffs to act upon them by delaying filing a lawsuit or by taking other collection efforts or otherwise utilizing other measures to protect their financial interests. George Benz and the other plaintiffs reasonably relied and acted upon the above representations made. George Benz and the other plaintiffs sustained damage by relying upon them.

125. On November 7, 2008, Gary McClung told Lyle Phillips by email that there was an agreement presently in place to fund Quintero Golf and Country Club and that the

funding date was the only open item.  In January 2009 Gary and Leona McClung stated in an email to Phillips that "Quintero is alive and well and will stay that way."

126. The above representations made by Gary McClung and Quintero Golf and Country Club were material and were known to be false or untrue by Gary McClung and Quintero Golf and Country Club or were recklessly made without knowledge concerning them.

127. The representations were intentionally made for the purpose of inducing Lyle Phillips to act upon them by delaying filing a lawsuit or by taking other collection efforts or otherwise utilizing other measures to protect his financial interests.

128.  Lyle Phillips reasonably relied and acted upon the above representations made. Lyle Phillips sustained damage by relying upon them.

129. On or about March 22, 2007, Gary McClung communicated to Lyle Phillips that "Plan B is going strong. I have not told anyone else about it (plan B) due to the wonders of rumors. We are likely to partner up (and very soon) with a company called The M3 companies. You can see them at www.m3comp.com. This partnership will include the 640 acres immediately adjacent to the east end of the property and phase 2. It will be an influx of cash, and allow us to not increase our loan amount at all. It takes risk way down, and will be excellent for Quintero and its members. Again, I trust your confidentiality on this, and I am not backing away from the completion of the Hillcrest deal."

130. Unknown to the plaintiffs, "Plan B" was not going strong on or about March 22, 2007. Unknown to the plaintiffs at the time, it was not likely that McClung or Quintero Golf & Country Club, L.L.C., would "partner up (and very soon) with a company called The M3 companies" on or about March 22, 2007.

131. On or about March 30, 2007, Gary McClung communicated the following to Lyle Phillips:

> Hillcrest is fine. Ironically, we have been approached by two companies to partner with them on the 640 acre piece of private land to our immediate east. That partnering would preclude the need to borrow any money, or at the very least decrease it significantly. They would reimburse us for a big slug of our current infrastructure and partner with us on the golf course and infrastructure for phase 2. You can go on the web to view M3comp.com. That is one of the two. We met with them Tuesday and they are doing a close inspection of all the land this weekend with our land planner Wendell Pickett. We will meet again next week. It is a good deal for both of us. The second people we have not met with and they are newer to the game. I will forward an email from Rudy with info on them. The process with this group just started last week. Neither party has purchased the land to our east yet because they recognize that they cannot likely

27

be successful there without us involved. We also have another partner who wants to develop the suites, which reduces our costs significantly, and reduces our loan again. Hillcrest knows what is going on and has us on hold at our request until at least next Friday. All of these partners came to us---which is a good way to do it. While all this is exciting and excellent for the project it is a little frustrating because it causes some indecision at a critical time. But this won't last long.

132. Each of the named defendant board members were fully aware of McClung's false communications regarding the purported financial viability of Quintero Golf course on or about March 30, 2007.

133. In a "status report" dated June 3, 2008, McClung communicated to Lyle Philips the following:

The future financing for the rest of the Quintero project will be provided by a partnership between a hedge fund and real estate financial group based in Dallas. Quintero will sell the various parcels of our land in individual transactions. These sales will be with the right of repurchase, and the right to continue the development process as well. The funds from the sale will be used to pay off all debt, cover operating expenses, build the clubhouse, and complete the real estate development of phase one and phase 2. We will also tie up the land purchase for phase 3. When the above items are accomplished we will complete the planning and development of phase 3, to include the golf course.

The site visit has been completed. Preliminary due diligence has been completed. A new pro forma reflecting the plan above will be completed this week. We will move to final approval soon thereafter. A closing date will be available after final approval. In the interim the Private Placement Memorandum (PPM) project is still an ongoing program.

The pro forma in its most conservative fashion shows outstanding results. The current slow market is less of an effect on Quintero because we do NOT have an inventory of real estate ready to sell but instead sitting. By the time the repurchase option is exercised the market should have returned and sales will be good. The investors recognize this situation and the logic of it all happens to fit them well. It is important to start the clubhouse and invigorate the membership and attract new members.

It will be exciting to make this announcement when it is official.

Gary

134. Unknown to the plaintiffs but known to be false by each of the named board member defendants, the statements made by McClung in the Status Report were not completely accurate and not completely true.

135. On or about October 23, 2008, McClung communicated to Lyle Phillips that "THE DEAL IS DEFINITELY STILL ON" and that "I think you can breathe easy."

Unknown to the plaintiffs but known to be false by each of the named board member defendants, the statements made by McClung were not completely accurate and not completely true.

136. On or about February 19, 2008, Lyle Phillips asked McClung this question: "I have been told you told some people at the club last week that you had signed a deal that would bring $20MM equity into Quintero. True?" to which McClung answered "It is true."

137. Unknown to the plaintiffs but known to be false by each of the named board member defendants, there was never a signed deal to bring twenty million dollars equity in Quintero on or about February 19, 2008.

138. On October 9, 2008, Lyle Phillips wrote McClung the following:

> Thanks for the update re the Quintero financing package. This email will confirm what we agreed to in our discussion today.
>
> Quintero is scheduled to receive the first funding payment by October 31, 2008. Quintero is scheduled to receive funding for the remainder of the total financing package by December 31, 2008 at the latest.
> Quintero will pay Lyle Phillips $500,000 no later than the first week of November, 2008.
> Quintero will pay Lyle Phillips the total remaining principle and interest due him no later than December 31, 2008.
> Gary McClung will contact Lyle Phillips prior to the final payment being made to Lyle Phillips to determine If there is any interest in reinvesting in Quintero.
>
> Gary, I believe this covers everything we discussed. If my understanding of our discussion is different from your's please let me know.

139. McClung intentionally failed to communicate to Lyle Phillips the true state of facts. Phillips relied upon McClung to communicate the true state of facts to him. Phillips sustained damages as a result of Gary McClung's failure to communicate this to Lyle Phillips.

140. On June 3, 2009, McClung wrote the following to Hillcrest Bank which was also sent to Phillips:

> Jon,
> I will give you my version of the phone conversation I had with Ken Vegors yesterday. KEN CAN MAKE HIS COMMENTS OF CONCURRENCE OR CORRECTION OF WHAT I SAID. You know that the essence of the funding is the selling of a bond collateralized by Senior Life Settlement Policies. Ken and his partner, Dr. Luther Bruce have been very adept at continuing to analyze

29

the market for their bond and reacting to any improvements in the process or product which will further insure the successful sale of the bond. To that end they have arranged a guarantee of the payment of the interest on the bond from a private equity firm. They used Senior Life Settlement Policies as the collateral for the private equity fund. They then desired a bank to guarantee the payment of the amount of the bond which was collateralized with Senior Life Settlement policies. They spoke with Comerica Bank and JPMorgan Chase. Through various conversations they switched to AAA rated US bonds as the collateral for the bond they are selling. JPMorgan Chase will sell these AAA rated bonds to SLS at a highly discounted rate. The return and resale value of the bonds will collateralize the bond which will be sold to a Pension Fund. JPMorgan Chase will act as the Placement Agency, and have already identified their customer(s). The purchase of the bonds can be done quickly, versus the vetting of the policies. The sale of the bond itself will likely be to a very small number of Pension Funds, perhaps to only one. So the process should go more quickly. There is one disadvantage to this method of collateralization----it is more expensive. That means that the available funds at the end are less. Crossover Capital (who will pay off the liens for Quintero Golf and Country Club) will receive an estimated $22 million on the first traunch. But on the other hand this will be a more sellable product and will result in the sale of several of these bonds at a fairly quick pace. It is planned for Quintero to receive a second traunch of $40 million (Ken will get a higher percentage of the funds on the second traunch).

Ken's confidence level is very high on the funding using this approach. He can better address the timing than can I.

Gary McClung

141. Unknown to Phillips, the above statements of McClung were misleading, incomplete, and false regarding the financing of the Quintero Golf Course.

142. On or about January 2009, Gary and Lea McClung communicated to Lyle Phillips that "Quintero is alive and well and will stay that way" and that "a number of members were willing to contribute money intending to help secure the future of Quintero in these tough times.  We are happy to announce that was not necessary. Lea and Gary have that handled."

143. Unknown to the plaintiffs but known to be false by each of the named board member defendants, those statements were patently false because the Quintero development was not "alive and well" as of January 2009, and "Lea and Gary" did not have the finances of Quintero "handled."

144. McClung, using his Quintero entities, schemed to defraud the plaintiffs and included plans or course of action intended to deceive or cheat the plaintiffs out of money, value, or property by means of false or fraudulent pretenses, representations, or promises.  McClung acted knowingly and with the specific intent

to deceive or cheat the plaintiffs while bringing about financial gain to himself and to Hillcrest and each of its defendant board members.

145. On March 31, 2010 the ADRE issued an order summarily suspending Quintero's Public Report. ADRE found that Quintero failed to complete roads by the date stated in the Public Reports as required by A.R.S.§32-2181(A)(18) and A.A.C. R4-28-B1203. ADRE found that the failure of the roads to be completed constituted an immediate threat to the public health, safety, and welfare warranting immediate suspension of the Public Reports.

146. Each of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White were aware that the roadways had not been completed and nevertheless decided to halt all funding for all construction. They each were aware that the roadways had not been completed and nevertheless loaned additional monies to McClung in order that its own debt service would continue.

147. In the Order of Summary Suspension, the ADRE found that the work identified in the Public Report had not been begun or completed even though McClung communicated to Sperry (and the other defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Wheeler and White were aware and complicit with this letter) that the work had been completed. The ADR Order found that McClung's statement was false and then suspended all land transactions on the subject properties. The investors, including the present plaintiffs, lost approximately 100 million dollars.

148. On October 22, 2010, the Bank Commissioner of the Office of the State Bank Commissioner of the State of Kansas appointed as Receiver of Hillcrest Bank the Federal Deposit Insurance Corporation. The FDIC accepted its appointment as receiver.

149. The Quintero Entities made judicial admissions in Missouri state case 1016 CV13578 in which the following was judicially admitted by the Quintero Entities:

> According to the defendants' admissions, Hillcrest Bank was aware of the Ponzi scheme of the Quintero Entities and Gary McClung. When they were made, Hillcrest Bank was aware of the false statements of fact being made by Gary McClung to the Quintero Entity investors including Phil Upham and the other named plaintiffs in this matter. The defendants admit that Hillcrest Bank allowed Gary McClung or did not inform the investors such as Phil Upham and the other named plaintiffs in this matter of the falsehoods made by the Quintero Entities and Gary McClung. The defendants admit that Hillcrest Bank did not inform the investors such as Phil Upham and the other named plaintiffs

31

in this matter of the falsehoods made by the Quintero Entities and Gary McClung because calling a default in the Quintero loans would have caused Hillcrest Bank to have an excessive amount of non-performing loans and Hillcrest Bank wanted to avoid FDIC scrutiny.

## C. Underlying Wrongdoing: McClung's Ongoing Fraud Known by the Board Members

150. In Missouri state court No. 0916-cv08753, ruled that "the evidence demonstrates that Gary McClung, as the main stockholder and managing member of Quintero, and Quintero, are alter egos of each other and are in privity with each other." That judge also ruled that:

> The uncontroverted averments and communications demonstrate that McClung had complete domination of Quintero, not only of finances, but of policy and business practices. The emails addressed to members were nearly always from McClung personally. The Phoenix Business Journal, which was attached and not controverted, states that the McClungs are listed as the only members of Quintero Golf & Country Club LLC and Quintero Entrada LLC, the two legal entities that were created in 2005 to handle development of the golf courses, the clubhouse, model homes and condominiums. The McClungs were the responsible parties for the loans signed with Hillcrest Bank and Compass Bank. The financial interests of Quintero and McClung were so intertwined that when Quintero went into foreclosure, McClung filed for bankruptcy.

79. McClung, as an officer and director of Quintero Golf and Country Club, violated his duties by:
   a) Breach of duty of loyalty to corporation and its members for acts or omissions not in good faith or which involved intentional misconduct or a knowing violation of law;
   b) Deriving improper personal benefit;
   c) Having conflicts of interest;
   d) Failing to disclose material facts about the financing of Quintero and the relationship he had with Hillcrest;
   e) Disseminating false and misleading information to the plaintiffs;
   f) Having excessive compensation;
   g) Failing to stop his own embezzlement from Quintero;
   h) Engaging in fraudulent conduct;
   i) Inducing Quintero to commit breach of contract;
   j) Inducing or abetting wrongdoing by Quintero and Hillcrest (as set forth in the above described averments);
   k) Approving of loans to or from Quintero to or from its directors and officers;
   l) Neglecting proper management with regard to corporate debts and property;
   m) Permitting Quintero to engage in activities prohibited by Arizona statute;
   n) Perverting corporate opportunity to his own personal benefit;
   o) Selling corporate assets for unreasonably low price;

32

p) Conducting transactions between corporations in which he was a common director.

151. Each of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White understood that these representations about financing had no factual basis and were without merit. These above named defendants understood that these were the kinds of representations being made to investors even though these board members knew or anticipated that the Quintero development was going to be improperly terminated. These above named defendants each understood that the effect of McClung's representations would have the effect of possibly delaying any of the investors filing a lawsuit or utilizing other measures to protect their financial interests.

## D. Underlying Wrongdoing: The Board Members Attempt to Cover Up and Thwart the Plaintiffs' Claims

152. Prior to the closing of Hillcrest Bank, Degen, Wheeler, and Schneider, with the knowledge of each of the other defendant board members, caused a large amount of copied bank files and records to be provided to the law firm of Bryan Cave and the copying and/or removal of those records from Hillcrest Bank was improper and unlawful according to a Federal lawsuit filed against Bryan Cave by the FDIC.

153. After this was discovered by the FDIC after the closure of Hillcrest, the FDIC took the position that "neither Mr. Degen, Mr. Wheeler nor Mr. Schneider were authorized to remove the Copied Bank Records from the bank premises as described above, or to provide the Copied Bank Records to Bryan Cave, or to convert those records to their own (or any other officer or director's) personal and individual possession, use and benefit." In a letter written by the attorneys for the Hillcrest receiver to Bryan Cave, it was stated by the FDIC that "the copying and removal of this information therefore constitutes misappropriation of trade secrets as well as a grave breach of your clients' fiduciary duties to the Bank…"

154. In a motion to consolidate filed by Hillcrest's Receiver in Federal Case 1:10-cv-03666-TCB Document 12 Filed 11/29/10 it is stated that "officers and directors of a failed bank-and their lawyers-may not possess bank records copied and removed by them on the eve of the bank's failure" and that "bank records being copied and removed from failing banks across the country at the expense of the failing bank and being stored-and moved-at the whim of the parties without the authority to have copied and removed them in the first place."

155. The Receiver also stated in that motion that certain bank documents had been shipped back "to unidentified members of its client group" which were the former members of the board of directors of Hillcrest Bank. It was then alleged that "the client group had hired the law firm of Rouse Hendricks German & May to defend

them" and that "Before the FDIC-Hillcrest was able to recover the copied bank records, those records had gone from the possession of Bryan Cave to the possession of one or more of its officer and director clients, and then to the new law firm, and then to BDK Forensics."

156.   According to the affidavit of Charlene Gordon, First Vice President of IT Risk Management of Hillcrest Bank, N.A., Case 1:10-cv-03666, she states that "during the week of October 4, 2010, I was instructed by Brian Schneider, who was then president of Hillcrest Bank, to provide Bryan Cave with the Portable Hard Drive containing the full set of file folders copied bank files that had been provided to the FDIC.  The total number of file folders copied onto this drive was 56,630, and the total number of files copied onto the drive was 88,551.  These files related to 9,420 separate accounts.  Among other confidential information, the Portable Hard Drive contained Hillcrest Bank's entire collection of electronically imaged Loan Files…" According to the affidavit, "G. Richard Degen, who was then Chief Financial Officer and Executive Vice President of Hillcrest Bank, instructed me to copy and to provide Bryan Cave copies of various types of files, including the entire email boxes of certain specified employees."

## E. Underlying Wrongdoing: The FDIC Allegations

157. On October 21, 2009 the FDIC and the Office of the Kansas State Bank Commissioner issued a Cease and Desist Order ordering Hillcrest Bank to cease and desist from the following unsafe or unsound banking practices:

> Operating with a board of directors that has failed to provide adequate supervision over and direction to the management of the Bank.
> Operating with management whose policies and practices are detrimental to the Bank.
> Operating with an inadequate level of capital protection for the kind and quality of assets held and/or appropriate to the risk inherent in the activities engaged in by the Bank.
> Engaging in imprudent lending and lax collection practices.
> Operating with an excessive level of adversely classifies loans or assets, and/or delinquent loans and/or non-accrual loans.
> Failing to properly identify risk and assess the level of risk in problem loans.
> Operating with an inadequate allowance for loans and lease losses for the volume, kind, and quality of loans and leases held, and/or failing to make provision for an adequate allowance for possible loan and lease losses.
> Operating with inadequate liquidity and an excessive reliance on wholesale funding in light of the bank's assets and liability mix.
> Operating with inadequate earnings.

158. On October 27, 2010, the FDIC sent a letter to the Board Members that stated the "FDIC's Claim currently involves the errors, misstatements, misleading statements,

34

actions, omissions, negligence and/or breach of duties of HBKS's directors and officers involving the following loans ("Target Loans")… Quintero Golf 63758."

159. The letter also stated that this "Claim includes, but is not limited to, the following:

> 1. Negligent and/or grossly negligent lending policies and practices that left [Hillcrest Bank Kansas] HBKS susceptible to catastrophic losses as the economy slowed, and as the real estate markets deteriorated both locally and in the out-of-area markets involved in HBKS's loans.
> These policies and practices include:
>> a. Failure to establish policies and procedures that required a diversified loan portfolio that would protect the safety and soundness of HBKS from economic and market downturns.
>> b. Implementation of a lending strategy that focused extensively on commercial real estate and high-risk construction and land development loans.
>> c. Failure to establish policies and procedures that limited HBKS's concentrations in commercial real estate, including construction and land development loans, and to assess and/or address the concentration risk of such loans in HBKS's loan portfolio;
>> d. Failure to properly review and approve loans.
> 2. Failure to implement, require and oversee adequate loan underwriting and credit risk management practices. These practices include:
>> a. Failure to assess and plan for possible risks associated with real estate development/ interest reserve loans and HBKS's loan portfolio concentration in such loans;
>> b. Negligent and/or grossly negligent loan administration and monitoring;
>> c. Failure to establish policies and procedures for loan underwriting that required assessment of the creditworthiness of borrowers/guarantors and of contingent liabilities, and confirmation of alternative sources of repayment in the event the collateral that secured HBKS's loans diminished in value;
>> d. Failure to establish policies and procedures for confirmation of collateral value, and/or the control and monitoring of the use of loan proceeds to insure loan proceeds are utilized in accordance with the terms and conditions of HBKS loans;
>> e. Failure to establish and employ sound internal controls; and
>> f. Failure to adequately oversee HBKS's management to insure operation of HBKS in a safe and sound manner, and in compliance with the directions and policies set by HBKS's Board of Directors.

## COUNT 1.

(QCA v. Hillcrest Bank and Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.),
Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider,
Schwartzkopf, Wheeler, and White

### Violation of Consumer Protection, Federal Law, Conversion, Breach of Fiduciary Duty, Invasion of Privacy, and Breach of Confidences

160. The Quintero Community Association (QCA) re-alleges the preceding paragraphs of this Omnibus Petition as if set forth at length.

161. Under the letters of credit, it was stated that "Issuer establishes this irrevocable Standby Letter of Credit in favor of Beneficiary in the amount indicated above. Beneficiary may draw on this Letter of Credit with a Draft.... Each Draft shall be signed on behalf of Beneficiary and marked "Drawn under Hillcrest Bank Letter of Credit No...."

162. Under the letters of credit, the letter of credit was made in favor of the QCA who was "Beneficiary for the account of Applicant." The Applicant was Quintero Golf and Country Club.

163. Hillcrest Bank was a fiduciary to QCA of the funds identified in the letters of credit. The QCA was a borrower and a bank customer of Hillcrest Bank. The QCA had signatory authority and Hillcrest Bank was aware of the QCA's beneficial interest in the funds of the account.

164. Hillcrest Bank, along with all of the defendant board members, were made very aware of the pending likelihood of the closing of the Bank by Kansas banking regulatory authorities and what would be a receivership by the FDIC. Despite this knowledge, Hillcrest Bank took insufficient actions to protect the confidential banking records of QCA. The individual board members provided substantial assistance to Hillcrest Bank in this failure to safeguard the records.

165. Partners Kathryn Knudson, W. Bard Brockman, and John Bielema, Jr. of the law firm of Bryan Cave were engaged a month before and three weeks after Hillcrest Bank's failure to represent and advise the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Wheeler, and White regarding their liability regarding FDIC claims and some or all of the claims being made in this petition. The engagement letter made it clear that Bryan Cave was retained to represent and advise these defendants regarding the protection of their own, individual interests with regard to the failure of Hillcrest Bank and the impending FDIC receivership, not the interests of the Bank itself, which was already represented by counsel.

166. Bryan Cave and the defendants Asner, Blitt, Campbell, Davies, Davis, Degen,

Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Wheeler, and White were aware that Hillcrest Bank was severely under-capitalized, that the Bank was on the verge of failing, and that the FDIC would be appointed as receiver. Federal regulators repeatedly advised Hillcrest Bank of its financial problems and that the Bank was subject to enforcement action.

167. Degen, Wheeler, and Schneider, with the knowledge and approval of the other board members, causes the Bank's records, including bank records regarding QCA to be given to Bryan Cave in Atlanta, Georgia. The defendant board members were not authorized to remove the bank records from the bank premises or to convert those records to their own personal and individual possession, use and benefit.

168. All of the individual board members knew of each other's antagonistic self – interests towards Hillcrest Bank, its customers, and the banking regulators. They all knew that they could be held personally liable for breaching their duties. None of the board members prevented Degen, Wheeler, and Schneider from not only taking the records but taking Bank money to pay to fight the claims of QCA and the other plaintiffs in hiring Bryan Cave.

169. Quintero Golf and Country Club, and QCA did not consent to Bryan Cave's acquisition of the bank records. The transfer of the bank records to Bryan Cave violated the bank policies adopted in accordance with federal law to protect nonpublic personal information of Hillcrest Bank customers – namely QCA.

170. The delivery by the board members to Bryan Cave violated 15 U.S.C. §§ 6801 and 6805(b) of the Gramm-Leach-Bliley Act, 12 U.S.C. § 1831p-1 of the Federal Deposit Insurance Act, and 12 C.F.R. Parts 332 and 364.

171. Wheeler, Degen, and Schneider owed a fiduciary duty and duty of loyalty to Hillcrest Bank and owed similar duties to QCA as a bank customer or as a borrower. Wheeler, Degen, and Schneider's conduct described above breached those duties because, *inter alia*, it elevated and served their individual interests above, and to the detriment of, the interests of QCA as a bank customer. The transaction of obtaining Bryan Cave as their personal attorneys and then the supplying of bank records involving Quintero Golf Course, McClung, and the QCA were antagonistic to QCA in that those records, including QCA's own records, were being used against QCA, to thwart QCA's claims against the board members and perhaps Hillcrest Bank, and to conceal, manipulate, or obfuscate the facts supporting QCA's claims against the individual board members.

172. The copying and transmission of the bank records by Bryan Cave's clients, and Bryan Cave's possession of the bank records constituted a violation of state and federal laws against the use of computers to gain unauthorized access to or obtain financial records or other electronically stored information, including the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a).

173. On October 27, 2010, the FDIC sent a letter to Bryan Cave demanding return of all copies of the bank records. Bryan Cave refused to return the records and claimed that it and the defendant board members each had a right to possess the records, including confidential information regarding QCA.

174. Bryan Cave and the defendant board members had no ownership interest in QCA's bank records. Bryan Cave's acquisition and possession of the records and its refusal to return those records constitutes conversion. The defendant board members committed conversion and substantially assisted Bryan Cave in the conversion.

175. Hillcrest Bank breached its contract or implied contract to keep bank records of QCA confidential to which each of the board members assisted in the breach.

176. QCA had been damaged as a result of the aforementioned conduct.

**WHEREFORE**, Quintero Community Association demands judgment in its favor and against the defendants Hillcrest Bank, Jon Forgey, Jeffrey F. Wheeler, Nicole Davis, Wanda Holdeman, Dan Schwartzkopf, Scott I. Asner, Irwin Blitt, Robert J. Campbell, Jack N Fingersh, Paul S. Fingersh, Sue Gallatin, Gerald M. White, G. Richard Degen, Tim Gervy, Joel Richards, Thomas J. Davies, George A. Lieberman, Brian K. Schneider to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

### COUNT 2.
Plaintiffs v. Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White

### Interference With Contract & Intentional Interference with Business Relationship and Aiding and Abetting Intentional Interference with Business Expectancy and Contract

177. The plaintiffs re-allege the preceding paragraphs of this Omnibus Petition as if set forth at length.

178. The plaintiffs, as described and set forth in the preceding paragraphs, had contracts with Quintero Golf and Country Club or Gary McClung. The plaintiffs each had a valid business relationship with McClung regarding the golf course development in which the plaintiffs had invested in.

179. Hillcrest Bank interfered with the plaintiffs contracts with Quintero Golf and Country Club and McClung and interfered with their respective business expectations regarding their investments and the golf course development. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.),

Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White interfered with the plaintiffs contracts with Quintero Golf and Country Club and McClung and interfered with their respective business expectations regarding their investments and the golf course development.

180. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White aided and abetted Hillcrest Bank in interfering with the plaintiffs contracts with Quintero Golf and Country Club and McClung and interfered with their respective business expectations regarding their investments and the golf course development.

181. Hillcrest Bank and the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White were each aware of the loans, contracts or business relationships when the plaintiffs purchased land in Quintero or when monies were loaned to Quintero by each of the plaintiffs.

182. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White were each aware of the contractual relationship between McClung and the plaintiffs or Quintero Golf and Country Club LLC and the plaintiffs when each of these defendants voted to cancel the guaranteed line of credit even though they knew that the conditions in the letter of guarantee had not been met, the cancellation was part of their collective scheme to give a false appearance of financial well-being to the plaintiffs and to the banking regulators, that this action would assist McClung in breaching his fiduciary duties to the plaintiffs, and that McClung was engaging in false and misleading representations to the plaintiffs about Hillcrest Bank's commitment to the development and the financial well-being of Hillcrest Bank and the golf course development.

183. Each of the plaintiffs were reasonably certain to have continued the relationship with the golf course development and realized (or come closer to realizing) their respective expectancy on the repayment of their loans and investments but for the conduct of each of the board member defendants.

184. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White knew that there was no legal right to take the action of stopping payments: the requirements of Arizona law and the terms of the letters of credit for cancelling the irrevocable letters of credit had not been met because (a) the work identified in those letters of credit including the infrastructure had not been completed; and (b) the QCA had not certified to the bank that the work had been completed.

185. With the knowledge that the development had not been completed or the necessary certification of completion done, each of the named board member defendants nevertheless voted to stop the funding and directed PDG to halt payments to Quintero to complete the development. Each of the defendants were aware of Sperry and McClung's plan to circumvent the terms of the letters of credit and to improperly use the dedicated funds in a sham manner to show that the Quintero loan was performing when it was not. By the above actions stated in the preceding paragraphs of this Omnibus petition, the actions of defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White interfered with the developer Quintero Golf and Country Club's performance and McClung's performance of their respective contractual obligations as developer and guarantor of that development.

186. As a result, Quintero Golf and Country Club and McClung breached their respective obligations under the contracts and guarantees made with each of the plaintiffs. defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White caused or induced Quintero to breach its duties as developer under Arizona law and caused or induced McClung to breach his personal guarantees of those contracts.

187. By voting to stop the payments knowing that the terms of the letters of credit had not been met, and by in fact stopping those payments and diverting those dedicated funds that were being held in trust for QCA and the other plaintiffs, the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White induced or caused those breaches of the contract and a complete severance of the business expectations regarding the golf course and the relationship between Quintero as developer and these plaintiffs.

188. The breaches of the plaintiff's contracts and guarantees with Quintero and McClung respectively were procured by the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White. There was no legal right or justification for the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White in inducing or causing the breaches and in severance of the relationship. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White knew that the requirements of Arizona law and the terms of the letters of credit for cancelling the irrevocable letters of credit had not been met because (a) the work identified in those letters of credit including the infrastructure had not been completed; and (b) the QCA had not certified to the bank

that the work had been completed and could not rely in good faith upon a sham letter written by McClung to the contrary and employed improper means as in interfering with the contracts and business expectations.

189. Plaintiffs have each been damaged as a result of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White actions as described herein.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 3.
Plaintiffs v. Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White

**Aiding and Assisting Hillcrest Bank, Quintero Golf and Country Club, and McClung in Breaching Their Respective Fiduciary Duties and Guaranteed Funding in the Letters of Credit**

190. The plaintiffs re-allege the preceding paragraphs of this Omnibus Petition as if set forth at length.

191. The Arizona statutes governing development of commercial property in Arizona oblige the subdivider Quintero and Hillcrest Bank created fiduciary duties on the part of Quintero and Hillcrest Bank regarding the designated funds identified as the irrevocable letters of credit signed by Sperry of Hillcrest Bank.

192. Hillcrest Bank promised to set aside the amounts in the letter of credit to be devoted solely for the use by Quintero for the benefit of the QCA. Hillcrest Bank was not free to take unilateral action to cancel the credit or to modify its terms. The letter was non-cancelable.

193. The letter of credit was a negotiable instrument. The letter of credit included an unconditional promise to pay, on demand or at a definite time. Hillcrest Bank, with the assistance of McClung, Sperry, and the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Wheeler, and White who voted for the action, exercised control over those funds to which it had no right.

41

194. The funds identified in the irrevocable letters of credit defined the amount of money dedicated and the terms of the duties upon Hillcrest Bank and Quintero i.e. construction payments for the improvement of real property at the Quintero Golf course. Hillcrest Bank was a trustee over those funds. Quintero and Hillcrest Bank were prohibited by Arizona statute and the terms of the letters of credit from diversion or use of those trust funds for any other purposes that to be used for development of the Quintero golf course for the benefit of QCA and the other plaintiffs.

195. Sperry, with each of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Wheeler, and White approval and vote, permitted Hillcrest Bank to withdraw the trust funds designated in the irrevocable letter of credit, funds that each of those defendants knew were held in a fiduciary capacity for the benefit of Quintero golf course, QCA, and the plaintiff investors and had notice that the fiduciaries Hillcrest Bank, McClung, Quintero Golf and Country Club, was committing a breach of trust by misusing those funds and each of the above named board member defendants participated in that breach as detailed herein.

196. Each of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Wheeler, and White knew of the bank's bad financial condition, knew and agreed to a plan to put that dedicated Quintero money for a different use, and each voted or indicated their approval to improperly accept the trust funds with notice of a breach of trust and improperly allowed the misrepresentations to the ADRE and to have the funds misappropriated with notice of that breach of trust. Each of the board members actively participated and assisted or caused Hillcrest Bank in the misappropriation of the irrevocable letter of credit monies and further assisted Hillcrest Bank and Quintero in the defalcation of those funds when these defendants and McClung agreed to misrepresent to the ADRE that the golf course development had been completed when it had not and misrepresented that the terms of the letters of credit and been fulfilled when they had not.

197. All of the board member defendants had knowledge of the circumstances of the Arizona real estate requirements for commercial development, the terms of the letter of credit that the development was not completed, and that McClung was going to send a sham letter to them claiming the development was completed. Sperry and McClung could not accomplished the above actions all by themselves or misappropriate the letter of credit funds alone. Many accounting functions had to be falsified by the board members and officers. The board members had to vote to approve this action. Each board member defendant had to respond to regulatory and accounting inquiries telling the same misrepresentation. Each of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Wheeler, and White, by assisting Sperry and McClung, either by the manner which they

Case 4:11-cv-00893-DGK   Document 56   Filed 06/12/12   Page 42 of 72

directed or supervised bank management, committees, compliance officer, internal auditor, Chief Operating and Financial Officers to be complicit with the actions of McClung or actions to misrepresent or obfuscate the Quintero loan,   voting for the actions, requiring personnel to not adhere to sound banking practices in the recordation of documents and reports,   or not opposing that action, causes the corporate trustee Hillcrest Bank to commit a breach of trust causing loss to the trust administered by Hillcrest Bank and can be personally liable to the beneficiaries for the loss.

198. Plaintiffs have each been damaged as a result of the defendants' Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White actions as described herein.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

### COUNT 4.
Plaintiffs v. Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White
### Aiding and Abetting and Participating in Hillcrest Bank, Quintero Golf and Country Club, and McClung's Torts and Wrongdoing

199.   The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

200. The board members were responsible for the strategic plan of Hillcrest Bank but also became increasingly involved in the day-to-day management.  Sperry, Fingersh, Wheeler, Forgey, and the other board members helped McClung engage in a pyramid scheme where as long as the bank would make payments on the letters of credit, McClung could continue to sell his Revenue Producing Membership Collateral Certificate and Agreements regardless of the sufficiency of McClung's own financial condition or the golf course's financial condition used to collateralize those Certificates.  As long as Hillcrest Bank continued to prop up McClung with a purported good track record to point to in order to induce others to invest in the golf course, Hillcrest Bank benefitted in pointing the banking regulators to what appeared to be a sufficiently performing loan when it was not.

43

201. The survival of Hillcrest Bank, the board member's investments, dividend payments, and income from salaries in that bank and Hillcrest Bancshares was inextricably married to the viability of the Quintero golf course loan, the largest commercial loan in Hillcrest Bank's loan portfolio. McClung had as much a vested interest in the viability of Hillcrest Bank as any of the board members given the fact he had committed all of his personal finances to guaranteeing to investors and Hillcrest Bank the golf course development.

202. In that regard each of the board member defendants and McClung had this common goal but then resorted to improper means to effectuate their goal of common survival. The defendant board members and officers encouraged – and certainly did nothing to prevent McClung – his ongoing misleading representations to the plaintiff investors about the viability of the golf course and that either Hillcrest Bank was "on board" or other financing sources were soon coming. The board members were aware McClung was pitching the viability of the golf course using dummied figures – using new investor money to kite returns to earlier investors all the while not servicing the Quintero loan.

203. Sometime in late 2006 to early 2007, Quintero Golf & Country Club was substantially in arrears in servicing its debt from loan transactions entered into with Hillcrest Bank. During this time, none of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White called the note or otherwise declared a default – even though this was contrary to sound banking practices and even though McClung's bad financial condition was well known to the Bank. All the while McClung was still taking in investor monies based upon a Ponzi scheme through fraudulent representations about the viability and financing of the Golf Course.

204. One or more of the Hillcrest Board, likely Sperry, Forgey, Wheeler, and Fingersh (but not to the exclusion of other board members) planted the seeds of action with McClung in concocting a plan to make the Quintero golf course appear viable, that the loan was viable, and that the bank had more cash reserves than it really had.

205. The board members all had insider information. They knew of the bank regulator's reports and the increasingly precarious condition of the bank. The board assisted McClung to that end in many ways. The board members all voted to take measures that perpetuated McClung's investment scheme. The board executed transactions that gave the false appearance of financial viability which initially prolonged the financial life of McClung to the detriment of the plaintiffs. The board had great economic motivation to aid McClung in his fraudulent misrepresentations. The board members would have conducted votes on whether to shut down the Quintero golf development – which it was not defaulted until the very end. The board used their influence as board members with Hillcrest Bank employees and officers, filling out documentation that the Quintero loan was performing well

44

enough. They concocted a scheme with McClung to make false representations to the ADRE – that the golf course had been completed and terms of the irrevocable letter of credit had been fulfilled – when it had not.

206. The board assisted McClung by failing to take any affirmative actions to tell the complete truth to investors or bank regulators about the financial condition of the bank or the Quintero loan. Rather, the bank's reports, ledgers, and other documentation were jimmied to make it appear that McClung's representations about the viability of funding for the Quintero golf course were true or more plausible and that the Quintero loan was within the banking standard guidelines.

207. Each of the individual board members assisted Hillcrest Bank and McClung in those common goals by deliberately failing to comply with banking regulation requirements so as to make it appear McClung's false representations about the viability of funding for the Quintero golf course seemed true or more plausible and to make it appear the Quintero loan was being sufficiently serviced and viable. They provided substantial assistance to McClung and to the bank when they willfully disregarded the Arizona real estate development statutes in failing to fulfill the terms of the irrevocable letter of credit leaving the investors holding worthless property and commitments from McClung and the developer Quintero Golf and Country Club.

208. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White had a duty to disclose to the regulatory officials about the misrepresentations being made regarding the purported completion of the Quintero golf course development but failed to do so.

209. Under Arizona law, the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White are liable to the plaintiffs because they participated and had knowledge amounting to acquiescence to the wrongdoing of Hillcrest Bank, other individual board members, and McClung as described in the counts and the underlying wrongdoing portions of this petition. *See Jabczenski v. Southern Pacific Memorial Hospitals, Inc.,* 119 Ariz. 15, 579 P.2d 53, 58 (App.1978).

210. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White had a general awareness of their respective roles in their own conduct, McClung's conduct, and Hillcrest Bank's conduct and authorized Hillcrest Bank's wrongdoing, intentional torts, and negligence by virtue of their voting and authority as board members. These defendants participated in Hillcrest Bank's actions that damaged the plaintiffs.

211. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White bank had a general awareness of McClung's and their fraudulent scheme and knew of Hillcrest Bank's and McClung's wrong doing and further participated in its evolution as described previously in this petition. These former corporate directors and officers also provided help to Hillcrest Bank and McClung in the commission of wrongdoing and torts as previously described and as follows:

212. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White were each aware of or willfully blind to the misrepresentations of McClung to the plaintiffs and other Quintero Entity investors as previously described in this petition.

213. Each of the defendant board members, along with the defendant Hillcrest officers, had been aware of McClung's communications to the investors regarding the viability of Quintero and its financing. Despite being aware of these false communications, the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White voted or agreed to reduce the funding when applications and certifications for payment were submitted knowing the balance necessary to finish the project was approximately 4.5 million dollars. Despite each of the Hillcrest Board members and officers knowing that there were millions of dollars to be completed to conclude the project and that some of the work to be completed was infrastructure, Hillcrest's board members and officers authorized the bank to loan additional funds to McClung under the guise that it would be used for construction of the Quintero Clubhouse when in fact the money was to be used to service the Quintero debt to Hillcrest.

214. All of the defendant board members and officers took this action in agreement and concert with McClung to give the appearance that the Quintero loan was performing when in fact it was not.

215. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White were aware of the preceding facts made in this petition or were willfully blind to them and each intended to cloak the Quintero Golf Course development with a false appearance of financial well-being as an ongoing and vital business investment when it was not.

216. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White were major players and facilitators of McClung's fraud upon investors as described in the preceding facts made in this

46

petition.

217. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White were aware of McClung's Ponzi scheme and were aware of the false statements of fact being made by McClung to the Quintero Entity investors including George Benz and the other named plaintiffs. 80. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White took no actions to correct the misrepresentation or to otherwise prevent McClung from communicating to the plaintiff investors of the falsehoods made by McClung.

218. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White knew or were willfully blind to and/or acted with reckless disregard as to whether McClung and the Quintero Entities were breaching their foregoing fiduciary duties. Each of these above named defendants in this paragraph either knew or deliberately made himself or herself ignorant of facts clearly disclosed in the Bank's and McClung's transactions and then each purposely closed his or her eyes to clear implications of such facts.

219. If each of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White did not have specific knowledge, they each knew from the facts and circumstances of which they each had actual knowledge, should have known of the existence of the fiduciary duty that McClung owed the plaintiffs. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White actively participated or substantially assisted in or encouraged the breach to the degree that none of them, individually or collectively, could reasonably be held to have acted in good faith.

220. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White voted or collectively decided to only declared default on the loans in June of 2009 – about the same time Hillcrest Bank was being subjected to greater scrutiny by the Kansas and Federal banking authorities. As to why the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White allowed a 50 plus million dollar investment to go under was directly related to their own individual mismanagement and purposeful manipulation of Hillcrest accounts so as to attempt to avoid FDIC scrutiny or bank closure.

221. Eventually the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White could not continue to skew or otherwise conceal the very bad financial condition of Hillcrest Bank. On October 12, 2007, assistant vice president Jon P. Forgey of Hillcrest Bank, with the knowledge, consent, and approval of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White, instructed PDG to terminate the Quintero Property projects, each knowing that the infrastructure had not been completed and that multiple properties would be incapable of being developed or resold and this action would cause interference with the plaintiffs' contracts with McClung and the Quintero Entities. The Quintero Entities operated and continued to operate at a loss while McClung, with the assistance of each of the board members, gave the plaintiff Quintero Entity investors the false appearance of being profitable. McClung, with the knowledge of each of the above defendants, obtained new investors and using those investors to pay for the high returns promised to earlier investors. The effect of this scheme was to put the Quintero Entities further and further into debt by incurring more and more liability while giving the false appearance of profitability in order to obtain new investors.

222. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White each understood that Hillcrest Bank was undercapitalized and that numerous loans, including the Quintero Golf Course loan, were not performing. There were numerous and significant banking decisions made by the board of the Hillcrest Bank that were unsound and in violation of federal banking regulations and perhaps contrary to Hillcrest's own internal procedures. The decision of the Hillcrest Bank's board to forbear enforcement of the Quintero loan was contrary to prudent banking practices. Hillcrest was placed under a cease and desist order by the Federal Deposit Insurance Company in which the FDIC stated that Hillcrest Bank had violated several banking rules including "imprudent lending and collection practices" and that the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White "failed to provide adequate supervision over and direction to the management of the bank."

223. The assistance provided by each of the former board members made it easier for the fraud and other wrongdoing to occur. Related to each of the defendants who were directors or officers of Hillcrest Bank's intent and motivation to give the false impression of financial viability, the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White, individually and severally, aided and abetted and conspired with McClung to represent to the ADRE that the development had been completed but this was a lie. In 2008, Hillcrest Bank sent an independent consultant, Charlie Martin, to assess the completion status of

48

the Quintero projects. On March 27, 2007, McClung sent a letter to Robert Sperry at Hillcrest Bank requesting that he cancel certain letters of credit.

224. McClung, with the full knowledge and assistance of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White, lied about whether the work had been completed in order for the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White to use the dedicated development funds in the letter of credit as an accounting device to show the loan as performing – when it was not.

225. Each of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White were very aware that the work identified in the Public Report had not been completed – even though McClung created a sham letter to the contrary. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White each knew the work had not been completed from many sources. Not only did the consultants, who told each of them that the work had not been completed, each of them was well aware that no monies had been released to pay for the work. McClung and the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White cooked up a plan to divert the monies that were to be paid for capital improvements back to Hillcrest Bank to show that the loan was still being serviced by Quintero – thus avoiding FDIC scrutiny: accounting *hocus pocus* in order to deceive the FDIC and the plaintiff investors.

226. The FDIC found that the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White (Hillcrest Group) deferral on calling a default on the loan was contrary to sound banking practices under the Cease and Desist Order issued by the FDIC. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White did not inform the plaintiffs who were Quintero investors or land owners of the falsehoods and false impressions of fact given by McClung and the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White because calling a default in the Quintero loans would have caused Hillcrest Bank to have an excessive amount of non-performing loans and the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler and White wanted to avoid revealing to the FDIC its bad financial condition

49

and thus each defendant perfectly content in aiding and providing help to McClung in giving a false impression of financial viability of the Golf Course development to the plaintiffs and to the FDIC and Kansas banking authorities.

227. The Hillcrest Group knew, was willfully blind to and/or acted with reckless disregard as to whether McClung and Quintero were breaching their foregoing fiduciary duties or there were Hillcrest Bank directors, officers or employee(s) that deliberately made himself or herself ignorant of facts clearly disclosed in McClung's transactions with Hillcrest Bank or his communications and purposely closed his or her eyes to clear implications of such facts.

228. The individual defendant board members acted in such a way as to assist substantially, and to aid and abet, McClung's and Quintero' violation of their foregoing fiduciary duties. As a result of McClung's and Quintero' violation of their foregoing fiduciary duties, and of the Hillcrest Group's aiding and abetting such violation, the plaintiffs sustained severe injury, loss and damage.

229. The board members substantially assisted and encouraged McClung in the achievement of the breach of his obligations because Hillcrest was aware of the financial instability of Old Standard and WULA, failed to conduct appropriate due diligence, insisted on worthless personal guarantees by McClung and his wife without requesting any financial verification of McClung's net worth and knew that McClung was in financial dire straits.

230. The board members who are defendants substantially assisted or encouraged McClung in the achievement of the breach of Quintero and McClung's obligations by failing to act or by insisting on a significant reduction in the funding of the lines of credit and requiring McClung to be responsible for privately funding substantial portions of the development when it knew he was financially incapable of doing so.

231. The board members substantially assisted or encouraged McClung in the achievement of the breach of his obligations by failing to act or in halting the funding of the Quintero development, knowing that the infrastructure was incomplete in violation of the Public Report and then loaning McClung Millions more for the sole purpose of servicing the debt on an otherwise non-performing loan. The plaintiffs sustained damage by relying upon them.

232. Hillcrest Group substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation because Hillcrest was aware of the financial instability of Old Standard and WULA, failed to conduct appropriate due diligence, insisted on worthless personal guarantees by McClung and his wife without requesting any financial verification of McClung's net worth and knew that McClung was in financial dire straits.

233. These former board member defendants substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation by insisting on a significant reduction in the funding of the lines of credit and requiring McClung to be responsible for privately funding substantial portions of the development when it knew he was financially incapable of doing so. They were aware of McClung's conduct that amounted to breaches of his obligations to the plaintiffs yet they substantially assisted or encouraged McClung in the achievement of the breach of his obligations by only agreeing to fund the development at a level substantially below the threshold necessary to complete the project.

234. The Hillcrest Group substantially assisted or encouraged McClung in the achievement of the breach of his obligations by halting the funding of the Quintero development, knowing that the infrastructure was incomplete in violation of the Public Report and then loaning McClung millions more for the sole purpose of servicing the debt on an otherwise non-performing loan.

235. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White breaches were an actual and proximate cause of each of the plaintiffs' damages.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendants Robert Sperry, Jon Forgey, Jeffrey F. Wheeler, Nicole Davis, Wanda Holdeman, Dan Schwartzkopf,  Scott I. Asner,  Irwin Blitt, Robert J. Campbell,  Jack N Fingersh, Paul S. Fingersh, Sue Gallatin, Gerald M. White, G. Richard Degen, Tim Gervy, Joel Richards, Thomas J. Davies, George A. Lieberman, Brian K. Schneider to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

### COUNT 5.
Plaintiffs v. Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White
### Joint Enterprise, Conspiracy, and Concerted Action By Agreement

236.   The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

237. Hillcrest Bank and its respective board members were gatekeepers with unique knowledge and information to detect what McClung was doing and saying regarding the Quintero Golf course.  Whether the bank detected his wrongdoing or was negligent in doing so, one thing for sure happened – the bank and its board members became complicit in McClung's Quintero investment scheme.  They attempted to act

51

as guiltless and mindless conduits for disseminating McClung's fraudulent representations about Quintero Golf course's viability.

238. Hillcrest Bank, McClung, and Quintero Golf and Country Club, as the developer, eventually came together in a limited joint enterprise made in crisis mode. There was an agreement between McClung and the board members regarding representing that the Quintero golf course had been completed and then purportedly cancelling the letter of credit allowing the board members to manipulate the books to show cash liquidity. There was a common purpose and a common pecuniary interest in which both sides wanted the other to appear financially solvent.

239. In this crisis-created enterprise that was formed, there was dual control – there had to be. This was a deal made on the foundation of hurried expediency. Each side had an authoritative voice or had some voice to be heard regarding the direction their shady enterprise would go. They needed each other. They each had great power to alter the destiny of the other. Each had to cooperate with the other to pull off the charade. These were desperate times and in poker terminology, the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, White, and McClung were "all in" regarding the Quintero golf course: McClung had committed through personal guarantees his entire life earnings and savings while the Quintero loan was the largest commercial loan on the books for Hillcrest Bank. The financial well-being of both were interdependent on each other – if one failed the other failed – and the individual board members lose their bank investments and dividends and in some cases their bank salaries.

240. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, White, and McClung were not bystanders and pursued one or more of the same goals in this enterprise:

   a) Encouraging in their correspondence or verbal conversations with McClung his: (1) misleading representations about funding for the golf course and its viability; (2) using new investors to pay for high returns promised to earlier investors (Ponzi scheme) while not taking any affirmative steps to warn existing or prospective investors about the true state of facts.
   b) Voting, using their influence as board members with Hillcrest Bank employees and officers, filling out documentation, or failing to take any affirmative actions to tell the truth, in order to avoid revealing to bank regulators sufficient existing facts about the financial condition of the Quintero loan to shut down the bank;
   c) Manipulating the Quintero loan and the bank's books to make it appear that McClung's false representations about the viability of funding for the Quintero golf course seemed true or more plausible and to make it appear the Quintero loan was being sufficiently serviced and viable;

52

d) Manage the Quintero Golf loan in such a way as to ignore or fail to comply with banking regulation requirements so as to make it appear McClung's false representations about the viability of funding for the Quintero golf course seemed true or more plausible and to make it appear the Quintero loan was being sufficiently serviced and viable;

e) Manipulating Hillcrest Bank's policies and procedures regarding the irrevocable letter of credit of the Quintero loan and disregarding the terms and conditions set forth in the letter of credit in order to give the false appearance that Hillcrest Bank had more cash reserves and liquidity than it really did and that the Quintero loan was being sufficiently serviced and viable;

f) Not pay the contractors and laborers working on the Quintero development in order to re-route that money to show as cash reserves when it was not;

g) Disregard or otherwise violate Arizona real estate development statutes such as A.R.S. §32-2183.E and F, A.R.S.§32-2181(A)(18) and A.A.C. R4-28-B1203;

h) Engage in one or more of the improper banking practices cited in the October 21, 2009 Cease and Desist Order of the FDIC and the Office of the Kansas State Bank Commissioner;

i) Encouraging or assisting McClung and Quintero Golf and Country Club, as the developer, to breach their duties to each of the plaintiffs in order to show Hillcrest Bank cash reserves as being higher than they really were.

241. Although some of them performed different functions they were all in contact with one another and agreed amongst themselves and with McClung for those purposes which were not lawful purposes and were pursued by improper and unlawful means.

242. The funding for Quintero was stopped by the board – they all voted to do so. They all understood that concerted action was needed to present to the banking regulators that the bank was solvent enough. There was a plan. There had to be a plan between McClung and the board. It was not by accident that McClung would write a letter out of the blue claiming that the Quintero golf course development had been completed – when every board member knew it was not.

243. The conspiratorial agreement, if it was not express, was implicit by the tortious conduct and is also established by circumstantial evidence through the nature of the acts, the relationship of the parties, the interests of the conspirators, or other circumstances.

244. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, White, and McClung each committed at least one act in furtherance of the agreed goals and of which those acts are described above.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the

defendants Robert Sperry, Jon Forgey, Jeffrey F. Wheeler, Nicole Davis, Wanda Holdeman, Dan Schwartzkopf, Scott I. Asner, Irwin Blitt, Robert J. Campbell, Jack N Fingersh, Paul S. Fingersh, Sue Gallatin, Gerald M. White, G. Richard Degen, Tim Gervy, Joel Richards, Thomas J. Davies, George A. Lieberman, Brian K. Schneider to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 6.

Plaintiffs v. Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White

### Breach of Fiduciary Duty | Aiding and Abetting Securities Fraud

245. The plaintiffs re-allege the preceding paragraphs of this Omnibus Petition as if set forth at length.

246. QCA is a nonprofit corporation which has all the powers set forth in Section 10-3302 and 10-3303 of the Arizona Revised Statutes. Quintero Golf and Country Club had an account with Hillcrest Bank, No. 40011991.

247. McClung created a financing scheme for the golf course which involved ownership interests in the Quintero Golf Course enterprise. McClung required a "deposit" of certain monies which were, in fact, loans. Each loan, and as secured by the Revenue Membership Certificate, would be paid back within 30 years and produce 14% and 18% annual returns on the loan.

248. These Certificates evidenced an obligation of the issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer which was represented by a security certificate in bearer or registered form. Thus, the plaintiffs loaned money with the golf course for a membership interest secured by a Certificate. The security in the membership was certificated after each plaintiff entered into a "Quintero Golf and Country Club Founding Membership Agreement." McClung then provided security to each plaintiff lender with what he called Revenue Producing Membership Collateral Certificate and Agreement. The Certificates were "issued" to a named plaintiff, with an "investment date" and "investment amount." Many of the Certificates were called "Certificate Type 'D.'" These Certificates were signed.

249. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White had a fiduciary duty to the QCA by virtue of the irrevocable letter of credit which created a trust for the benefit of QCA who was the named beneficiary in the irrevocable letter of credit. By terms in the letter of

credit a definite amount of money was held in trust for the benefit of QCA and that QCA would be intimately involved in the development and specifically that it would be required for the QCA, as beneficiary, to certify under oath that:

> Quintero Golf & Country Club LLC Has Either Abandoned Its Construction and/or Installation Of The Required Improvements For The Ridge, As Contemplated By The Arizona Department Of Real Estate Public Subdivision Report, Dated [Date] (The "Improvements"), Or Failed To Complete The Construction and/or Installation Of The Improvements On Or Before [Date] Or Such Later Date As Approved By The Arizona Department Of Real Estate, and As Evidenced By An Amended Public Subdivision Report For The Ridge. Beneficiary Must Certify, Under Oath, That No Exceptions Of Time For Completion Of The Improvements Have Been Granted By The Arizona Department Of Real Estate Other Than Those Set Forth In Any Amended Public Subdivision Report.

250. QCA was entirely dependent upon Hillcrest Bank and its individual board members to protect its interests and to require proper presentment and cancellation.

251. The letter of credit was not cancelled by the terms of the letter of credit but Hillcrest Bank repudiated its obligations. The rights of the QCA should not have been affected but were by the actions of the board members in voting to cancel the letter of credit and in ratifying the actions of Sperry and McClung.

252. McClung developed Private Placement Memorandum through Crossover Capital for Quintero Premier memberships. Each of these Premier memberships cost $500,000. McClung used this scheme to give the appearance of Quintero Golf course's viability having "Term Sheets" dummied up for funding from life insurance investments. McClung would provide these "Term Sheets" to Hillcrest Bank and other investors such as the plaintiffs to give a false appearance (to the investors) as though viable deals and funding was available. The board members were aware of the scheme but did nothing to stop it and instead encouraged McClung in that endeavor.

253. McClung either participated in or induced securities transactions in violation of A.R.S. § 44-1991(A) and § 44-2003(A). The misrepresentations and non-disclosures of McClung have previously been specifically pled in the various emails and communications made by McClung. The motivations and state of mind of each of the board members has previously been described. McClung was misrepresenting Hillcrest Bank and other financing resources commitments, Hillcrest Bank's financial well-being, and concealing from the plaintiff investors McClung's knowledge of Hillcrest Bank's bad financial condition. McClung made, participated in and induced the unlawful sale or purchases of the Memberships evidenced by the Certificates. McClung persuaded each of the plaintiffs to buy securities through misrepresentations to them.

254. The Hillcrest board was generally aware of McClung's fraudulent scheme but

encouraged him because this made the bank and the golf course appear prosperous and financially solid when, in fact, neither one was. Through McClung's acts and omissions, with the assistance of the each board member, induced the plaintiffs to purchase and retain their Memberships and Certificates. Each of the board members knew that the Arizona statute governing the real estate development of Quintero golf course was being violated by the sham letter sent from McClung to Sperry and the subsequent cancellation of the funding even though QCA had not certified under oath that the development had been completed.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendants Robert Sperry, Jon Forgey, Jeffrey F. Wheeler, Nicole Davis, Wanda Holdeman, Dan Schwartzkopf, Scott I. Asner, Irwin Blitt, Robert J. Campbell, Jack N Fingersh, Paul S. Fingersh, Sue Gallatin, Gerald M. White, G. Richard Degen, Tim Gervy, Joel Richards, Thomas J. Davies, George A. Lieberman, Brian K. Schneider to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

### COUNT 7.
Hilcher and Nichols v. Hillcrest Bank, Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White
#### Conversion and Aiding and Abetting Conversion

255. The Quintero Community Association (QCA), Larry Hilcher (Hilcher) and Ken Nichols (Nichols) re-allege the preceding paragraphs of this Omnibus Petition as if set forth at length.

256. Hillcrest Bank received Nichol's and Hilcher's monies paid to Hillcrest Bank by FATCO and did not pay or otherwise deliver the money to Hilcher and Nichols.

257. The individual board member defendants knew that this occurred because they had accounting reports and settlement statements from the sale of the property yet voted or otherwise took decisions to keep the money rather than give it to Nichols and Hilcher. The money was converted.

**WHEREFORE**, the Ken Nichols and Larry Hilcher demand judgment in their favor and against the defendants Hillcrest Bank, Robert Sperry, Jon Forgey, Jeffrey F. Wheeler, Nicole Davis, Wanda Holdeman, Dan Schwartzkopf, Scott I. Asner, Irwin Blitt, Robert J. Campbell, Jack N Fingersh, Paul S. Fingersh, Sue Gallatin, Gerald M. White, G. Richard Degen, Tim Gervy, Joel Richards, Thomas J. Davies, George A. Lieberman, Brian K. Schneider to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are

56

fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 8.
Plaintiffs v. Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White
### Negligence | Assisting and Participating in the Negligence of Hillcrest Bank

258.  The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

259. Hillcrest Bank was obliged to hold and administer the funds held in the irrevocable letters of credit and the defendant Board Members are liable for Hillcrest Bank's misconduct in cancelling the letters of credit and participating in the falsehoods to the Arizona Real Estate Commission which was a breach of that trust.

260. The Hillcrest Group was obligated to exercise due care to ensure that McClung and Quintero were not engaging in transactions that would have the effect of shielding those activities from the scrutiny of the Arizona Department of Real Estate or that would otherwise frustrate such scrutiny or make such scrutiny more difficult.

261. Under Arizona law, the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White are liable to non-customers through negligent management and supervision and in their respective failures in exercising their core corporate duties which are supervision and management. *See Jabczenski v. Southern Pacific Memorial Hospitals, Inc.,* 119 Ariz. 15, 579 P.2d 53, 58 (App.1978).

262. Quintero Golf and Country Club, McClung, and QCA were Hillcrest Bank's customers.  As a promoter and the Manager of Quintero, McClung, in his individual capacity, owed a fiduciary duty to Plaintiffs as property owners and investors in Quintero and the QCA. As an officer, director and shareholder of Quintero, McClung owed a fiduciary duty to Quintero and both McClung and Quintero owed a fiduciary duty to the Quintero Entity investors such as the plaintiffs.

263. Hillcrest Bank had a duty to take reasonable steps to understand and follow the instructions of its customers – and specifically the letter of credit that specifically made QCA a beneficiary of that.  In the alternative that the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White were not engaged in willful or malicious behavior, they each failed to exercise reasonable care to prevent fraud upon the ADRE, to prevent unauthorized transfers

57

of the monies dedicated in the letter of credit, and to determine whether McClung was authorized to state that certain work on the Quintero Golf Course had taken place and whether that statement was true.

264. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White failed to take reasonable steps to determine that McClung or some of the board members were acting for their own personal purposes or for improper purposes in misrepresenting the financial condition of the bank or the Quintero golf course development.

265. Each of the defendant Board Members committed negligent management and supervision. These negligent management actions consist both of an action, such as an improper management decision, as well as an omission, such as a failure to properly manage a business or a specific aspect thereof. To the extent the knowledge or participation factual allegations are inconsistent with the factual allegations related to the negligence allegations, the factual allegations are alleged in the alternative.

266. It is reasonably foreseeable that the class of persons who would be harmed by defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White and Hillcrest Bank's failure to exercise due care in the oversight and handling of the letter of credit loan account would be the QCA who is the beneficiary under the letter of credit and the plaintiff investors who have property subject to the benefit of the development funds being dispersed.

267. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White saw red flags that should have put each board member on notice that improprieties in the way the Quintero loan was being handled was taking place, as well as evidence of certain banking practices in connection with the Quintero loan that were not commercially reasonable and that enabled Hillcrest Bank and McClung to perpetrate fraud as previously described.

268. The red flags also included the decisions of some of the bank board members who acted outside the bank's protocols and the warnings of the bank regulators and auditors. Red flags were the manner in which McClung was able to have personal finances refinanced in conjunction with the Quintero golf course financing. There were red flags that should have informed each of the board members that the acts weren't isolated but were occurring persistently and continuously for substantial periods of time and where other board members may have been willfully blind or had the opportunity to discover the wrongful acts but did not, or did discover and failed to adequately act.

269. The above referred to circumstances and facts should have aroused the suspicions of an ordinary prudent board member but each of the former board member defendants failed to make reasonable inquiry and act with due care regarding those suspicions. They each were negligent in failing to learn of and prevent the aforementioned wrongdoing stated above in this petition.

270. The defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White failed in their core corporate duties, committed misfeasance or nonfeasance including the following:

> Negligent and/or grossly negligent lending policy and practices regarding a Target Loan denominated by the FDIC as "Quintero Golf 63758" including:
> a. Failure to implement, require and oversee adequate loan underwriting and credit risk management practices regarding Quintero Golf 63758;
> b. Negligent and/or grossly negligent loan administration and monitoring regarding Quintero Golf 63758;
> c. Failure to ensure that the infrastructure was completed at Quintero Golf Course prior to participating in the false representation of McClung that the infrastructure had been completed;
> d. Failure to establish policies and procedures for confirmation of collateral value, and/or the control and monitoring of the use of loan proceeds to insure loan proceeds are utilized in accordance with the terms and conditions of the irrevocable letters of credit regarding Quintero;
> e. Failure to establish and employ sound internal controls; and
> f. Failure to adequately oversee Hillcrest Bank's management are related to Quintero Golf and in compliance with the directions and policies set by Hillcrest Bank's Board of Directors.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendants Robert Sperry, Jon Forgey, Jeffrey F. Wheeler, Nicole Davis, Wanda Holdeman, Dan Schwartzkopf, Scott I. Asner, Irwin Blitt, Robert J. Campbell, Jack N Fingersh, Paul S. Fingersh, Sue Gallatin, Gerald M. White, G. Richard Degen, Tim Gervy, Joel Richards, Thomas J. Davies, George A. Lieberman, Brian K. Schneider to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

59

## COUNT 9.

Plaintiffs v. Hillcrest Bank, Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White

### Violations of Consumer Protection Law | Assisting and Participating in the Violations of Consumer Protection Law

271.   The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

272. At all relevant times, Hillcrest Bank engaged in trade and or commerce within the meaning of the Arizona Consumer Protection statutes.

273. The plaintiffs were consumers purchasing property and golf course memberships from Quintero Golf and Country Club through McClung.  The QCA was a consumer with Hillcrest Bank being a customer. The bank knew that McClung was a fiduciary depositing the money of investors into the Quintero Golf Course bank account at Hillcrest Bank.

274. Hillcrest Bank and McClung have engaged in unfair and or deceptive acts and practices within the meaning of Arizona Consumer Protection statutes, as a direct result of which acts and or practices the plaintiffs have sustained injury, loss, and damage.

275. McClung and Hillcrest Bank used deception, false statement, false pretense, false promise or misrepresentation and concealed suppressed or failed to disclose a material fact in the sale of merchandise with the intent that the plaintiffs rely on such concealment, suppression or nondisclosure.

276. McClung was acting as an investment advisor and persuaded the plaintiffs to purchase securities (Revenue Certificates) and to loan Quintero Golf and Country Club money.  McClung was not registered as a securities salesman, commingled investor funds with his personal funds, convert for his own use investor funds, and used funds from some investors to make payments to other investors.

277. The board members encouraged and took actions to facilitate the success of McClung's fraud and attempts to make the project appear profitable and viable to the plaintiffs.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant Hillcrest Bank and Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, and White to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for

such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 10.

Plaintiffs v. Hillcrest Bank
### Intentional Interference with Business Relationship

278. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

279. There was a loan, contract, or a valid business relationship or expectancy short of a contract between Quintero and the plaintiffs or between Gary McClung and each of the plaintiffs. Hillcrest was aware of the loans, contracts or business relationships when the plaintiffs purchased land in Quintero or when monies were loaned to Quintero by each of the plaintiffs.

280. Hillcrest was aware of the contractual relationship between Quintero and the plaintiffs when the purchase proceeds from the sales of the property owned by the plaintiffs were applied to the Hillcrest loan balance. Hillcrest knew that McClung and Quintero did not meet the requirements of Arizona law or the letters of credit for cancelling the irrevocable letters of credit.

281. Hillcrest knew that when McClung requested that the letters of credit be cancelled that the work identified in those letters of credit including the infrastructure had not been completed. With this knowledge Hillcrest directed PDG to halt payments and declared default in June 2009 and the projects which interfered with the plaintiffs' ability to develop or resell their land.

282. With this knowledge Hillcrest interfered with the developer Quintero's performance of its contractual obligations as developer to the benefit of the plaintiff QCA and property owners. Quintero and McClung breached their respective obligations under the contracts, loans and guarantees in favor of the plaintiffs.

283. Hillcrest caused or induced Quintero to breach its duties as developer under Arizona law. Hillcrest induced or caused those breaches of the contract or severance of the relationship as described in the facts common to all counts in this petition.

284. There was no legal right or justification for Hillcrest's actions in inducing or causing the breaches or severance of the relationship. Hillcrest Bank employed improper means as described in this petition in exercising any right to interfere if it did exist.

285. Plaintiffs have each been damaged as a result of Hillcrest's actions as described herein and in the facts set forth in this petition.
**WHEREFORE**, the plaintiffs demand judgment in their favor and against the

Case 4:11-cv-00893-DGK   Document 56   Filed 06/12/12   Page 61 of 72

defendant Hillcrest Bank to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 11.
QCA v. Hillcrest Bank
### Breach of Contract

286. The plaintiff re-alleges the preceding paragraphs of this Petition as if set forth at length.

287. There was a contractual relationship between Hillcrest and QCA who was the beneficiary of the irrevocable letters of credit issued by Hillcrest Bank. Despite being irrevocable, Hillcrest Bank revoked the letters of credit, reneged on the loan agreement, did not abide by its good faith and fair dealing obligation when board member Sperry came up with a scheme with McClung to claim that the Quintero development was completed when it was not as a sham basis to cancel the letters of credit.

288. Hillcrest Bank breached this loan agreement first by committing the acts described in this petition. The QCA and the plaintiffs were an intended beneficiary of this loan.

289. Hillcrest breached and failed to perform its duties under the irrevocable letters of credit. In the letters of credit, Hillcrest promised to pay a draft drawn on it upon presentation of specified documents and procedures. Hillcrest wrongfully dishonored its irrevocable standby letter of credit and failed to specify the discrepancies which caused Hillcrest to reject the draft and documents submitted to it.

290. Hillcrest failed to notify Quintero of any purported discrepancies in a timely fashion. Hillcrest wrongfully set off amounts owed to it against other funds. Hillcrest's conduct in this matter amounted to a waiver of its opportunity to claim that the alleged discrepancies were not in accordance with the letter of credit.

291. Hillcrest's conduct estops it from asserting the alleged discrepancies as a defense in this action. The terms of cancellation of the letters of credit were not met or otherwise fulfilled.

292. Hillcrest Bank breached its duty of the covenant of good faith and fair dealing. Hillcrest exercised judgment conferred by the terms of the irrevocable letters of credit in such a manner as to evade the spirit of the transaction or so as to deny QCA the expected benefit of the letters of credit.

293. The plaintiff has been damaged as a result of the breaches and failures of the

defendant.

**WHEREFORE**, the plaintiff Quintero Community Association demands judgment in its favor and against the defendant Hillcrest Bank to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 12.
### QCA v. Hillcrest Bank
### Negligence

294. The plaintiff re-alleges the preceding paragraphs of this Petition as if set forth at length.

295. QCA was Hillcrest Bank's customer and guarantor of certain monies as represented to the Arizona Corporation Commission and Hillcrest Bank accordingly owed QCA a duty of due care.

296. The foregoing duty of care included a duty to exercise reasonable care with regard to the issue of whether McClung was authorized to state that certain work on the Quintero Golf Course had taken place when it had not.

297. The duty to exercise reasonable care regarding the foregoing issue in turn required Hillcrest Bank to take reasonable steps to investigate facts suggesting that McClung might be acting for his own personal purposes rather than for the benefit of the plaintiffs.

298. As alleged above, there were many such facts. But Hillcrest Bank failed to take reasonable steps to investigate such facts.

299. As a direct result of Hillcrest Bank's foregoing failure to investigate, and of Hillcrest Bank's overall violation of its duty of care regarding the issue of whether McClung was acting in breach of the authority McClung exercised, QCA sustained severe injury, loss and damage.

**WHEREFORE**, the plaintiff Quintero Community Association demands judgment in their favor and against the defendant Hillcrest Bank to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

**COUNT 13.**

Plaintiffs v. Hillcrest

**Aiding & Abetting Quintero Golf and Country Club and McClung's Primary Torts, Wrongdoing, and Violations**

300. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

301. Hillcrest Bank materially assisted Quintero Golf and Country Club and McClung in the acts constituting his underlying wrongdoing, torts, and statutory violations as set forth in this Omnibus Petition. Hillcrest Bank was aware of McClung's conduct and that it would constitute a breach of his obligations to the plaintiffs.

302. Hillcrest Bank materially assisted McClung in the violation of Arizona law and McClung's officer and director duties to QCA and Quintero. As a promoter and the Manager of Quintero, McClung, in his individual capacity, owed a fiduciary duty to Plaintiffs as property owners and investors in Quintero and the QCA.

303. As described in the facts set forth in the petition, McClung and Quintero made multiple misrepresentations to Plaintiffs regarding his and Quintero's ability to repay the Plaintiffs.

304. Hillcrest Bank was obligated to exercise due care to ensure that McClung and Quintero were not engaging in transactions that would have the effect of shielding those activities from the scrutiny of the Arizona Department of Real Estate or that would otherwise frustrate such scrutiny or make such scrutiny more difficult.

305. Hillcrest Bank was aware of or willfully blind to the misrepresentations of McClung to the plaintiffs and other Quintero Entity investors. Hillcrest Bank allowed or otherwise remained silent regarding these misrepresentations or duty to speak on the part of McClung and the McClung Entities in order to conceal or otherwise avoid the findings or facts set forth in the FDIC on October 21, 2009. That is, Hillcrest Bank had a nonperforming loan with Quintero but did not inform the plaintiffs or other investors of any of the misrepresentations of McClung in order to delay having the Quintero loan be classified as a non-performing or problem loan with an associated write-off.

306. As an officer, director and shareholder of Quintero, McClung owed a fiduciary duty to Quintero and both McClung and Quintero owed a fiduciary duty to the Quintero Entity investors such as the plaintiffs. McClung breached his fiduciary duty to Quintero and to Quintero' investor-clients such as the plaintiffs, and also caused Quintero to breach their fiduciary duty to Quintero' investor-clients including the plaintiffs by using money entrusted to Quintero by the investor-clients contrary to the terms under which such money was entrusted.

307. As a Manager of Quintero, McClung has a duty to manage the corporate affairs of Quintero with the ordinary care a reasonably prudent person would.

308. McClung, in his management and supervision of Quintero, fell below the standard of care of a reasonably prudent person and, as a result, breached his duty to Plaintiffs. Hillcrest Bank was well aware of the fiduciary duty owed by McClung to Quintero, by Quintero to its investor-clients and by McClung to Quintero' investor-clients.

309. Hillcrest Bank knew, was willfully blind to and/or acted with reckless disregard as to whether McClung and Quintero were breaching their foregoing fiduciary duties. There were Hillcrest Bank employee(s) that deliberately made himself or herself ignorant of facts clearly disclosed in McClung's transactions with Hillcrest Bank or his communications and purposely closed his or her eyes to clear implications of such facts.

310. If Hillcrest Bank did not have specific knowledge, Hillcrest Bank, from the facts and circumstances of which Hillcrest Bank had actual knowledge, should have known of the existence of the fiduciary duty that McClung owed the plaintiffs.

311. Hillcrest Bank actively participated or substantially assisted in or encouraged the breach to the degree that Hillcrest Bank could not reasonably be held to have acted in good faith. Hillcrest Bank acted in such a way as to assist substantially, and to aid and abet, McClung's and Quintero' violation of their foregoing fiduciary duties.

312. As a result of McClung's and Quintero' violation of their foregoing fiduciary duties, and of Hillcrest Bank's aiding and abetting such violation, the plaintiffs sustained severe injury, loss and damage.

313. The board members and officers of Hillcrest Bank all had an agreement or understanding to substantially assist McClung and Hillcrest Bank in their respective tortious activity and to direct and vote to have Hillcrest Bank directly breach contracts and to commit its own tortious acts as already described in this petition.

314. By making misrepresentations and failing to disclose pertinent information to Plaintiffs regarding his relationship with Hillcrest, the correct financial condition of Quintero, and the investments of the plaintiffs, McClung and Quintero breached their respective fiduciary duties to the plaintiffs.

315. Hillcrest was aware of McClung's tortuous conduct and that it would constitute a breach of his obligations to Plaintiffs. Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations by only agreeing to fund the development at a level substantially below the threshold necessary to complete the project. Hillcrest substantially assisted or encouraged McClung in the

achievement of the breach of his obligations because Hillcrest was aware of the financial instability of Old Standard and WULA, failed to conduct appropriate due diligence, insisted on worthless personal guarantees by McClung and his wife without requesting any financial verification of McClung's net worth and knew that McClung was in financial dire straits.

316. Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of Quintero and McClung's obligations by failing to act or by insisting on a significant reduction in the funding of the lines of credit and requiring McClung to be responsible for privately funding substantial portions of the development when it knew he was financially incapable of doing so.

317. Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations by failing to act or in halting the funding of the Quintero development, knowing that the infrastructure was incomplete in violation of the Public Report and then loaning McClung Millions more for the sole purpose of servicing the debt on an otherwise non-performing loan.

318. The plaintiffs sustained damage as a result of the foregoing actions by Hillcrest Bank.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant Hillcrest Bank to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

### COUNT 14.
Plaintiffs v. Hillcrest Bank
### Aiding & Abetting Quintero's and McClung's Fraud

319. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

320. Quintero Golf and Country Club and McClung had knowledge of the facts regarding Hillcrest Bank's bad financial condition, the lack of financial commitments from financial sources, and the board member's desire and plan to have McClung manipulate the loan arrangement for the development by claiming it was completed when it was not which the other plaintiffs did not have and which the other plaintiffs could not have discovered by the exercise of reasonable diligence.

321. McClung and Quintero made material false representations as described in this Petition to the plaintiffs regarding the repayment of monetary obligations. McClung and Quintero knew these representations were false or was willfully blind or

66

otherwise ignorant of their truth.

322. McClung and Quintero intended for the plaintiffs to act upon these representations in the manner reasonably contemplated by lending or investing money with him and Quintero and allowing McClung additional time for repayment.

323. Hillcrest Bank, Quintero Golf and Country Club, and McClung were under an obligation to communicate the true state of facts to the plaintiffs. They individually and collectively intentionally misrepresented or failed to communicate to the plaintiffs the true state of facts. Plaintiffs were unaware of the falsity of McClung's representations and relied on their truth.

324. Plaintiffs had a right to rely on Quintero and McClung's representations as McClung was intimately aware of and controlled both his and Quintero's finances. McClung's misrepresentations consequently and proximately caused Plaintiffs damages in an amount to be determined at trial.

325. McClung has employed Quintero for fraudulent purposes by making promises regarding repayment with the present intention not to perform the same. McClung made the material false representations alleged herein, did so for his personal gain and would be responsible for the damages suffered by Plaintiffs and, because he has used Quintero as his alter ego, McClung would be individually liable for his actions.

326. As described in this Petition, Hillcrest knew of McClung's tortious and fraudulent conduct and knew that it constituted a breach of his obligations to Plaintiffs. Hillcrest substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation by only agreeing to fund the development at a level substantially below the threshold necessary to complete the project.

327. Hillcrest substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation because Hillcrest was aware of the financial instability of Old Standard and WULA, failed to conduct appropriate due diligence, insisted on worthless personal guarantees by McClung and his wife without requesting any financial verification of McClung's net worth and knew that McClung was in financial dire straits.

328. Hillcrest substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation by insisting on a significant reduction in the funding of the lines of credit and requiring McClung to be responsible for privately funding substantial portions of the development when it knew he was financially incapable of doing so.

329. Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations by halting the funding of the Quintero development, knowing that the infrastructure was incomplete in violation of the Public Report and

67

then loaning McClung millions more for the sole purpose of servicing the debt on an otherwise non-performing loan.

330. The plaintiffs relied upon Quintero and McClung to communicate the true state of facts to them.

331. The plaintiffs sustained damages as a result of the defendant's failure to communicate this to the plaintiffs.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant Hillcrest Bank to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

### COUNT 15.
Plaintiffs v. Hillcrest Bank
### Joint Enterprise, Conspiracy or Concerted Action By Agreement

332. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length. The plaintiffs specifically incorporate the facts set forth in Count 5 as though fully set forth in this Count.

333. Hillcrest Bank, with the substantial assistance of the defendants Asner, Blitt, Campbell, Davies, Davis, Degen, Fingersh (J.), Fingersh (P.), Forgey, Gallatin, Gervy, Holdeman, Lieberman, Richards, Schneider, Schwartzkopf, Sperry, Wheeler, White, and McClung, had a common agreement and understanding to pursue one or more of the same goals in this enterprise which were primary torts and violations of affirmative fraud, fraud by silence, negligent misrepresentations, negligence, securities fraud, breach of fiduciary duty, and intentionally interference with the business relationship or expectancy that QCA and the other plaintiffs had with Hillcrest Bank and Quintero Golf and Country Club. Those common goals and agreement was as follows:

a) Encouraging in their correspondence or verbal conversations with McClung his: (1) misleading representations about funding for the golf course and its viability; (2) using new investors to pay for high returns promised to earlier investors (Ponzi scheme) while not taking any affirmative steps to warn existing or prospective investors about the true state of facts;

b) Voting, using their influence as board members with Hillcrest Bank employees and officers, filling out documentation, or failing to take any affirmative actions to tell the truth, in order to avoid revealing to bank regulators sufficient existing facts about the financial condition of the Quintero loan to shut down the bank;

68

c) Manipulating the Quintero loan and the bank's books to make it appear that McClung's false representations about the viability of funding for the Quintero golf course seemed true or more plausible and to make it appear the Quintero loan was being sufficiently serviced and viable;

d) Manage the Quintero Golf loan in such a way as to ignore or fail to comply with banking regulation requirements so as to make it appear McClung's false representations about the viability of funding for the Quintero golf course seemed true or more plausible and to make it appear the Quintero loan was being sufficiently serviced and viable;

e) Manipulating Hillcrest Bank's policies and procedures regarding the irrevocable letter of credit of the Quintero loan and disregarding the terms and conditions set forth in the letter of credit in order to give the false appearance that Hillcrest Bank had more cash reserves and liquidity than it really did and that the Quintero loan was being sufficiently serviced and viable;

f) Not pay the contractors and laborers working on the Quintero development in order to re-route that money to show as cash reserves when it was not;

g) Disregard or otherwise violate Arizona real estate development statutes such as A.R.S. §32-2183.E and F, A.R.S.§32-2181(A)(18) and A.A.C. R4-28-B1203;

h) Engage in one or more of the improper banking practices cited in the October 21, 2009 Cease and Desist Order of the FDIC and the Office of the Kansas State Bank Commissioner;

i) Encouraging or assisting McClung and Quintero Golf and Country Club, as the developer, to breach their duties to each of the plaintiffs in order to show Hillcrest Bank cash reserves as being higher than they really were.

334. The plaintiffs each were damaged by the conduct of Hillcrest Bank.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant Hillcrest Bank to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

**COUNT 16.**

Plaintiffs v. Hillcrest Bancshares

**Tortious Interference With Contracts | Aiding and Abetting Hillcrest Bank's and McClung's Tortious Conduct**

335. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

336. Hillcrest Bancshares is a bank holding company, as provided by the Bank Holding Company Act of 1956, 12 U.S.C. § 1841(a)(2)(A) et seq. Hillcrest Bancshares is company that had control over Hillcrest Bank. All shares of Hillcrest Bank were owned by Hillcrest Bancshares. Hillcrest Bank and Hillcrest Bancshares have common directors or officers. Jack N. Fingersh was or continues as the chairman of Hillcrest Bancshares.

337. The directors and officers of Hillcrest Bank and Hillcrest Bancshares were identical or substantially the same. Hillcrest Bancshares, Hillcrest Bank, and McClung had common goals and agreements that Hillcrest Bancshares would provide assistance in the underlying torts of McClung (tortious interference with contract and business expectations, fraud, breach of fiduciary duty) and Hillcrest Bank and that these would be common goals to be pursued:

a) Encouraging in their correspondence or verbal conversations with McClung the sale of McClung's securities (Revenue Certificates) and his: (1) misleading representations about funding for the golf course and its viability; (2) using new investors to pay for high returns promised to earlier investors (Ponzi scheme) while not taking any affirmative steps to warn existing or prospective investors about the true state of facts.

b) Voting, using their influence as board members with Hillcrest Bank employees and officers, filling out documentation, or failing to take any affirmative actions to tell the truth, in order to avoid revealing to bank regulators sufficient existing facts about the financial condition of the Quintero loan to shut down the bank;

c) Manipulating the Quintero loan and the bank's books to make it appear that McClung's false representations about the viability of funding for the Quintero golf course seemed true or more plausible and to make it appear the Quintero loan was being sufficiently serviced and viable;

d) Manage the Quintero Golf loan in such a way as to ignore or fail to comply with banking regulation requirements so as to make it appear McClung's false representations about the viability of funding for the Quintero golf course seemed true or more plausible and to make it appear the Quintero loan was being sufficiently serviced and viable;

e) Manipulating Hillcrest Bank's policies and procedures regarding the irrevocable letter of credit of the Quintero loan and disregarding the terms and conditions set forth in the letter of credit in order to give the false

70

appearance that Hillcrest Bank had more cash reserves and liquidity than it really did and that the Quintero loan was being sufficiently serviced and viable;

f) Not pay the contractors and laborers working on the Quintero development in order to re-route that money to show as cash reserves when it was not;

g) Disregard or otherwise violate Arizona real estate development statutes such as A.R.S. §32-2183.E and F, A.R.S.§32-2181(A)(18) and A.A.C. R4-28-B1203;

h) Engage in one or more of the improper banking practices cited in the October 21, 2009 Cease and Desist Order of the FDIC and the Office of the Kansas State Bank Commissioner;

i) Encouraging or assisting McClung and Quintero Golf and Country Club, as the developer, to breach their duties to each of the plaintiffs in order to show Hillcrest Bank cash reserves as being higher than they really were.

338. Fingersh, with the knowledge and approval of the other board member defendants, used the means and instrumentalities of interstate commerce and of the mails in connection with the purchase or sale of securities, knowingly, willingly, or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

339. Fingersh and the other board member defendants each had a general awareness that he or she was a part of an overall activity that was improper or illegal and knowingly, or with severe recklessness, provided substantial assistance to violations by McClung of Section 13(a) of the Exchange Act in signing materially false and misleading periodic reports about non-performing assets and net income and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rules 10-b-5 thereunder, 17 C.F.R. § 240.10b-5.

340. By reason of the foregoing, Fingersh and the other board members of Hillcrest Bancshares tortuously interfered with the plaintiffs' contracts with Quintero Golf and Country Club, McClung, and Hillcrest Bank, and aided and abetted McClung's security violations and McClung's fraudulent investment scheme which harmed each of the plaintiffs. Plaintiffs have each been damaged as a result of Hillcrest Bancshare's actions as described herein and in the facts set forth in this petition.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant Hillcrest Bancshares to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## Demand For Jury

A jury Trial is Demanded on All Counts

Respectfully Submitted,

By  /s/ Linus L. Baker
Linus L. Baker  #44980
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:   913.486.3913
Fax:            913.232.8734
E-Mail:
linusbaker@prodigy.net
Attorney for the plaintiffs

Certificate of Service

The undersigned hereby certifies that this document was filed electronically on June 12, 2012, with the United States District Court for the Western District of Missouri, Western Division, with notice of case activity to be generated and sent electronically by the Clerk of the Court to all designated persons.

/s/ Linus L. Baker