IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

QUINTERO COMMUNITY
ASSOCIATION, INC., *et al.*,

Plaintiffs,

v.

HILLCREST BANK, *et al.*,

Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 4:11-cv-00893-JTM

FDIC AS RECEIVER FOR HILLCREST BANK, N.A.'S BRIEF REGARDING
ADMINISTRATIVE CLAIMS

In response to the Court's October 1, 2012 Order, FDIC as Receiver for Hillcrest Bank ("FDIC-R") states the following:

1.      Plaintiffs submitted the Second Amended Petition filed in the Circuit Court of Jackson County, Missouri, prior to removal to this Court, with their proofs of claim filed during FDIC-R's administrative claims process.  A copy of the Second Amended Petition is attached hereto as Exhibit "A".

2.      Plaintiffs since sought leave to amend their complaint which resulted in plaintiffs filing their "Omnibus Petition".  (Doc No. 56).

3.      Plaintiffs' Omnibus Petition alleges innumerable new factual allegations against FDIC-R which were not included in plaintiffs' Second Amended Petition.

4.      Plaintiffs' Omnibus Petition also alleges, what appear to be, four new causes of action against FDIC-R that were not included in plaintiffs' Second Amended Petition.

| COUNTS ASSERTED AGAINST FDIC-R AS ORIGINALLY PLED | COUNTS ASSERTED AGAINST FDIC-R IN OMNIBUS PETITION |
|---|---|
| Count 4 – Intentional Interference with Business Relationship | Count 10 – Intentional Interference with Business Relationship |
| Count 5 – Wrongful Cancellation & Dishonor | |

| | |
|---|---|
| Count 6 – Breach of Contract | Count 11 – Breach of Contract |
| Count 7 – Aiding & Abetting Quintero/McClung | Count 13 – Aiding & Abetting McClung |
| Count 8 – Aiding & Abetting Quintero/McClung's Fraud | Count 14 – Aiding & Abetting McClung's Fraud |
| Count 9 – Civil Conspiracy | |
| Count 10 – Negligence | Count 12 – Negligence |
| | **Count 1 – Consumer Protection, Breach of Fiduciary Duty, Invasion of Privacy** |
| | **Count 7 – Aiding & Abetting Conversion** |
| | **Count 15 – Joint Enterprise Conspiracy Concerted Action by Agreement** |
| | **Count 16 – Intentional Interference with Contracts Aiding McClung's Tortious Activity** |

5. The four new causes of action asserted against FDIC-R appear to be as follows: Count 1 (Consumer Protection, Breach of Fiduciary Duty, Invasion of Privacy); Count 7 (Conversion, Aiding & Abetting Conversion); Count 15 (Joint Enterprise Conspiracy Concerted Action by Agreement), and; Count 16 (Intentional Interference with Contracts Aiding McClung's Tortious Activity).

6. While five of the original counts asserted are also contained in the Omnibus Petition, the remaining four counts against FDIC-R, either in whole or in part, assert new lender liability claims against FDIC-R based upon an entirely new set of facts.

7. The bar date to submit a proof of claim for Hillcrest Bank was January 26, 2011 ("Claims Bar Date").

8. The Omnibus Petition was filed on June 12, 2012, long after expiration of the Claims Bar Date.

9. These claims and additional facts constitute new claims that were not submitted to FDIC-R through the claims administrative process and should be dismissed with prejudice.

7521.001

10.     Plaintiffs bear the burden to establish that jurisdiction exists and no presumptive truthfulness attaches to the plaintiffs' allegations.  Osborn v. United States, 918 F.3d 635, 730 (8th Cir. 2003).  If the court finds that jurisdiction is not present, it must dismiss the case. Fed. R. Civ. P. 12(h)(3);  Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583-84 (1999).

11.     The Court's jurisdiction over claims seeking payment from the assets of a closed bank institution is contingent upon exhausting the administrative claims process. 12 U.S.C. § 1821(d)(3)(D).  Under the administrative process, all claims against a federally-insured failed institution when the FDIC is receiver must be submitted to the FDIC by the claims bar date before they can be asserted in a court action.  Brech v. CU Mortgage Direct, LLC, 2011 WL 486155 at *3 (D. S. D. 2011); 12 U.S.C. §§ 1821(d)(3)-(13) (describing how the FDIC receives and handles administrative claims).

12.     The administrative claims process is mandatory and "[t]he language of FIRREA clearly indicates that unless administrative procedures are complied with, no court shall have jurisdiction to evaluate a claim brought against a failed banking institution for whom the FDIC has been appointed receiver."  Id.

13.     "No court has jurisdiction over the claim until the exhaustion of this administrative process."  Bueford v. Resolution Trust Corp., 991 F.2d 481, 485 (8th Cir.1993). "Indeed, the Supreme Court has consistently held that where Congress has imposed an administrative exhaustion requirement by statute, the exhaustion of those procedures is mandatory" and failure to comply warrants dismissal with prejudice under Rule 12(b)(1).  Id. at 484, 487.

14.     Similar to this situation, the plaintiff in Brown Leasing v. FDIC initially filed a lawsuit pre-receivership, and then filed an administrative claim after the appointment of the

7521.001

FDIC, attaching its previously filed complaint. 833 F.Supp. 672, (N.D. Ill.1993). The plaintiff later amended its complaint, asserting two new causes of action for breach of contract and conversion, but it did not amend its administrative claim to assert those causes of actions within the administrative review period. Id.

15. As in this case, the plaintiff argued that the claims asserted in the original complaint, the documents attached to that complaint, and the general request for adjudication of the parties' rights and liabilities under the participation agreements, sufficiently apprised the FDIC of its 'overall claims. Id. However, the court rejected the plaintiff's argument and held that the plaintiff could not pursue the new claims. Id. at 675; see also, Jahn v. FDIC, 828 F.Supp.2d 305, 316 (D.C. 2011) (holding that pursuant to FIRREA the district court is without subject matter jurisdiction to hear plaintiff's new causes of action if the plaintiff did not exhaust administrative remedies for those claims by submitting an appropriate administrative claim to the FDIC); 12 U.S.C.A. 1821(d).

16. As the Court correctly stated in Brown:

FDIC is entitled to fair notice of the facts and legal theories on which a claimant seeks relief from the failed institution. To require anything less would impose a burden on the FDIC to research the entire corpus of both federal and state law for any legal theory supported by each set of facts presented. Such an enterprise would impose indefensible costs on the FDIC and frustrate FIRREA's intended purpose of expeditiously and fairly resolving the majority of claims against failed institutions without protracted litigation.

833 F.Supp. at 675-76.

17. Plaintiffs are not representing themselves pro se, but rather, are represented by counsel. Plaintiffs had ample opportunity after the FDIC-R's appointment to fully present their factual basis and legal theories for recovery against Hillcrest Bank and FDIC-R. Plaintiffs have

4

not presented a legally permissible excuse for excluding these amended claims from the administrative claims and they should be dismissed with prejudice.

18. Furthermore, plaintiffs' counsel admittedly contacted FDIC-R directly, without FDIC-R's counsel's consent, and requested production of various documents from FDIC-R in order to respond to the Court's October 1, 2012 Order. A copy of counsel's email communications to FDIC-R, as submitted to the Court by counsel himself, is attached hereto as Exhibit "B".

19. The Court stayed all discovery in this matter pending further order. (Doc. No. 70).

20. Not only did plaintiffs' counsel violate the Court's order staying discovery, but his actions are also in direct contravention of the rules of professional conduct.

21. Rule 4-4.2 bars a lawyer's communication about the "subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Mo. Rules of Prof. Conduct 4-4.2.

WHEREFORE, Federal Deposition Insurance Corporation, in its capacity as Receiver for Hillcrest Bank request that the Court dismiss the "Omnibus Petition" with prejudice and award its costs incurred in responding thereto.

5

7521.001

Respectfully submitted,

MARTIN, LEIGH, LAWS & FRITZLEN, P.C.


By: /s/ Desarae G. Harrah
_____

| | |
|---|---|
| Steven M. Leigh | MO No. 29268 |
| Robert D. Kroeker | MO No. 33282 |
| Desarae G. Harrah | MO No. 57969 |

1044 Main St., Ste. 900
Kansas City, Missouri 64105
Telephone: (816)221-1430
Facsimile: (816)221-1044
sml@mllfpc.com; rdk@mllfpc.com
dgh@mllfpc.com
ATTORNEYS FOR FDIC-R


## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of October, 2012, a true and correct copy of the FDIC AS RECEIVER FOR HILLCREST BANK, N.A.'S BRIEF REGARDING ADMINISTRATIVE CLAIMS was served by electronically filing it with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system listed below:

| | |
|---|---|
| Linus L. Baker | Thomas Roy Larson |
| 6732 W. 185th Terr. | 1010 Walnut, Ste. 500 |
| Stillwell, Kansas 66085-8922 | Kansas City, Missouri 64106 |
| linusbaker@prodigy.net | trlarson@lrf-kc.com |
| ATTORNEY FOR PLAINTIFFS | ATTORNEY FOR DEFENDANTS WHEELER, ASNER, BLITT, CAMPBELL, P. FINGERSH, J. FINGERSH, WHITE, DEGEN, GERVY, RICHARDS, DAVIES, LIEBERMAN, SCHNEIDER, DAVIS, FORGEY, SCHWARTZKOPF, HOLDERMAN AND HILLCREST BANCSHARES |


/s/ Desarae G. Harrah
_____
ATTORNEY FOR FDIC-R

7521.001

In The Circuit Court of Jackson County Missouri
Kansas City Division

Quintero Community Association, Inc.
*and*
Lyle P. Phillips
*and*
Peggy Phillips
*and*
Philips W. Upham II
*and*
Sondra R. Upham
*and*
Nowell C. Upham
*and*
Britton B. Upham
*and*
Tory H. Upham
*and*
Kenneth Nichols
*and*
George Benz
*and*
Karen Benz
*and*
George Benz and Sons, LLC
*and*
Larry Hilcher
*and*
David Ostermeyer
*and*
Cathleen Ostermeyer

                    Plaintiffs,

v.

Hillcrest Bank
*and*
Quintero  Golf  and  Country  Club,  L.L.C.

                    Defendants.

Case No.  1016-CV13693

Div       18


              Jury Trial Demanded

Second Amended Petition

1

EXHIBIT
A

The plaintiffs Quintero Community Association, Inc., Lyle P. Phillips, Peggy Phillips, Philips W. Upham II, Sondra R. Upham, Nowell C. Upham, Britton B. Upham, Tory H. Upham, Kenneth Nichols, George Benz, Karen Benz, George Benz and Sons, LLC, Larry Hilcher, David Ostermeyer, and Cathleen Ostermeyer bring this second amended petition and alleges as follows:

## Parties

1. The plaintiffs Kenneth Nichols, Larry Hilcher, Britton and Nowell Upham are residents of Texas.

2. The plaintiffs Lyle and Peggy Phillips are residents of Kansas.

3. The plaintiff Tory Upham is a resident of Florida.

4. George Benz and Sons, LLC is a resident of Massachusetts.

5. The remaining plaintiffs are residents of Arizona.

6. The Quintero Community Association, Inc. (QCA) is an Arizona non-profit corporation.

7. The plaintiffs Quintero Community Association, Inc., Nichols, Hilcher, Benz, and Upham own property in the Quintero Golf and Country Club. The plaintiffs are members of the Quintero Community Association, Inc., or are affected adversely by the claims set forth in this complaint.

8. The defendant Hillcrest Bank conducts continuous business in Missouri and has established bank offices in Missouri.

9. Defendant Quintero Golf and Country Club, L.L.C. was formerly an Arizona limited liability companies but is now under a court appointed Receiver Sperry Van Ness Advisors, by and through its agent, C. Sterling Scott. C. Sterling Scott. C. Sterling Scott conducts his business at Sperry Van Ness / Encompass Commercial Realtors, 4400 Shawnee Mission Parkway, Fairway, KS 66205, (913) 677-3400, Email: sterling.scott@svn.com.

10. Gary and Leona McClung are residents of Jackson County, Missouri.

## Venue and Jurisdiction

11. Hillcrest Bank does business in Jackson County in the State of Missouri; some of the fraudulent acts were committed in or from Jackson County and some or all of the contracts at issue may have been executed or last executed in Jackson County Missouri.

2

12. Gary McClung resides in Jackson County Missouri. The McClungs have filed for bankruptcy in Missouri which is pending. Quintero Golf and Country Club is the alter ego of McClung.

## Facts Common to All Counts

13. Plaintiffs re-allege the above paragraphs as if fully set forth herein.

14. Plaintiffs Lyle P. Phillips, Peggy Phillips, Philips W. Upham II, Sondra R. Upham, Nowell C. Upham, Britton B. Upham, Tory H. Upham, Kenneth Nichols, George Benz, Karen Benz, George Benz and Sons, LLC, Larry Hilcher, David Ostermeyer, and Cathleen Ostermeyer loaned Quintero Golf and Country Club, L.L.C. (Quintero) various amounts of money under Revenue Producing Membership Collateral Certificates and Agreements and other documents with repayment pledged by Gary McClung (McClung).

15. In Jackson County Missouri Case No. 0816-CV40818, Kenneth and Mary Nichols have judgments against Quintero Golf and Country Club, and Gary and Leona McClung for breaches of agreements in the amount of $2,707,628.

16. In Jackson County Missouri Case No. 0816-CV38261, Larry and Marsha Hilcher have judgments against Quintero Golf and Country Club, Gary and Leona McClung for breaches of agreements in the amount of $603,285.

17. Judgment against Quintero Golf & Country Club and in favor of plaintiffs Lyle and Peggy Phillips was rendered in Case NO. 0916-cv08753 in Jackson County Missouri in the amount of $2,000,000.

18. Phillips W. Upham II and Sondra Upham loaned Quintero monies pursuant to a Revenue Producing Membership Collateral Certificate and Agreement.

19. Nowell Upham loaned Quintero certain monies under a Revenue Producing Membership Collateral Certificates and Agreements as follows: Certificate F-71 | 50,000 with total due in interest in the amount of $78,010 as of March 3, 2010 and Certificate F-102 | $50,000 with total due in interest in the amount of $67,250 as of March 3, 2010.

20. Tory Upham loaned Quintero certain monies under a Revenue Producing Membership Collateral Certificate and Agreement as follows: Certificate F-73 | 50,000 with total due including interest in the amount of $70,773 as of February 28, 2010.

21. On or about November 3, 1999, Karen B. Benz entered into a membership agreement with Quintero Golf and Country Club, L.L.C.

3

22. On or about November 21, 2000, an agreement was entered into between Karen Benz, Quintero Golf and Country Club, L.L.C., Gary McClung, and Lee McClung, that in consideration of a loan for $1,000,000, Karen Benz would receive a $300,000 reduction in price of any selected real estate at Quintero.

23. On or about November 22, 2000, George Benz and Sons LLC loaned Quintero Capital LLC 1,000,000.00. Quintero Golf and Country Club, L.L.C., Gary McClung, and Leona McClung, promised to pay $1,000,000 with interest. The promise was secured by deed of trust on real property.

24. A Promissory Note for $200,000 was executed by Quintero Golf and Country Club in favor of Dave & Cathleen Ostermeyer which was not timely repaid.

25. The Revenue Producing Certificates were issued to the Ostemeyers in the amounts of $100,000 (Number 37 dated 9/29/2003, Number 31 dated 1/21, 2003, and Number 90 dated1/20/2006).

26. On May 24, 2004, the State of Arizona Department of Real Estate issued a Subdivision Public Report for Founders Estates Three, Quintero Golf & Country Club, Phase I, registration number DM04-048130. The subdivider identified in the Public Report is Quintero Golf and Country Club, LLC.

27. In June 2004, McClung personally, and as a representative of Quintero Golf & Country Club, began negotiating with Hillcrest Bank of Kansas City (Hillcrest) to procure a loan to complete the in-progress and contemplated improvements of the Quintero Community in Arizona.

28. Hillcrest indicated that it needed to add other banks or lenders to share the financing burden in order to achieve the development goals of the Quintero Community, including construction of a clubhouse.

29. Hillcrest assured McClung that it was able to obtain other participant banks. Based upon this assurance, McClung began the loan documentation process of Hillcrest. Hillcrest did not obtain any such participant banks to share in the financing burden.

30. Hillcrest requested a budget proposal from McClung for the purpose of establishing whether it would be prudent to fund the Quintero development.

31. McClung submitted a proposal on September 21, 2004 totaling Twenty-Nine Million Eight Hundred Seventy-One Thousand Sixty-Three Dollars ($29,871,063.00), which included Twenty-One Million One Hundred Sixty Thousand Sixty Dollars ($21,160,060.00) in hard costs and Four Million Eight Hundred Fourteen Thousand Seven Hundred Seventy-Eight Dollars ($4,814,778.00) in soft costs.

4

32. Hillcrest rejected the proposal and demanded that all the soft costs be eliminated from the proposal. The soft costs included engineering consultants, survey consultants, construction administration, construction management, planning and construction documents, Phase 2 planning and engineering and marketing for the entire project.

33. Hillcrest demanded and McClung agreed that all amounts which were not funded according to a final budget proposal in the form of a line of credit, would be privately funded by McClung.

34. McClung submitted a second proposal in January 2005, which itemized hard costs totaling Twenty Million Five Hundred Eighty Thousand Five Hundred One Dollars ($20,580,501.00) and, despite Hillcrest's directive to the contrary, soft costs of One Million Seven Hundred Ninety- Nine Thousand Seven Hundred Fifty-One Dollars ($1,799,751.00).

35. Hillcrest rejected the second proposal and again demanded the elimination of the soft costs from the budget.

36. McClung submitted a third budget proposal which itemized hard costs totaling Nineteen Million Sixty- One Thousand Three Hundred Thirty-One Dollars ($19,061,331.00) and no soft costs. At Hillcrest's request, McClung reduced the 15% contingency to 10%. The grand total of the third budget proposal was Twenty Million Nine Hundred Sixty-Seven Thousand Four Hundred Sixty-Four Dollars ($20,967,464.00).

37. Hillcrest again rejected the proposal and McClung submitted a fourth one in February 2005. This one itemized Seventeen Million Six Hundred Fifty- Two Thousand Six Dollars ($17,652,006.00) in hard costs with a 10% contingency of One Million Seven Hundred Sixty-Five Thousand Two Hundred One Dollars ($1,765,201.00) for a total of Nineteen Million Four Hundred Seventeen Thousand Two Hundred Six Dollars ($19,417,206.00). This did not end the process.

38. McClung originally approached Hillcrest for the Quintero funding because the institutions he had previously secured funding from were in financial distress. McClung first went to Kennedy Financial and refinanced the Kennedy loan with Old Standard Life Insurance Company (Old Standard).

39. When Old Standard publicly announced that it was unable to service its debt, McClung, even though he had a long standing relationship with Hillcrest, approached Washington United Life Assurance Company (WULA) and secured more than Fifteen Million Dollars ($15,000,000.00) for the continuation of the Quintero development.

40. McClung began soliciting investors and when he received funds from them, would pay off previous investors.

5

41. On March 2, 2004, courts in Arizona, Washington and Idaho issued rehabilitation orders for three banks: Old West Annuity and Life Insurance Company (domicile state –Arizona), Old Standard (domicile state – Idaho) and WULA (domicile state – Washington).

42. These three companies were affiliates of the so-called Metropolitan Mortgage Group of companies which were in bankruptcy proceeding in Washington.

43. Hillcrest knew about WULA's financial instability and the dealings McClung had with the predecessor companies. Hillcrest knew and was concerned about the Washington State Insurance Commission investigation of the various companies.

44. On December 2, 2004 a WULA representative met with McClung and his son Steve McClung at Quintero. The representative took pictures of the water treatment plant under construction and told Steve McClung that WULA was very interested in financing Phase 2 of Quintero, but was concerned that lots were not being sold.

45. Hillcrest did not determine if the proposed development and sale of lots could support the anticipated debt service.

46. Hillcrest did not request any documentation from McClung which accompanied his application to Old Standard or WULA.

47. Hillcrest did not request any information from McClung to explain WULA's continued lateness in meeting loan draw payment dates.

48. Hillcrest did not request information from McClung, for example, that would have shown that McClung had been soliciting and receiving investors' money, repaying previous investors, failing to make loan payments and as a result, experiencing delayed loan draw payments from WULA.

49. When Hillcrest became aware of WULA and its financial difficulties, rather than obtaining participant banks to share in the financing as it had represented to McClung, it decided to increase the previously slashed budget proposals submitted by McClung so that the line of credit was sufficient to cover the financial assurances necessary to satisfy the Arizona Department of Real Estate (ADRE) and pay off the WULA loan.

50. On March 8, 2005, Hillcrest finalized a line of credit to Quintero for Thirty-One Million One Hundred Thirty-Four Thousand Dollars ($31,134,000.00). This amount was calculated to pay off the WULA outstanding balance of Ten Million Six Hundred Eighty-Four Thousand Eight Hundred Twenty-Eight and 02/100 Dollars ($10,684,828.02), fees to First American Title Company (FATCO) of Sixty-One Thousand Five Hundred Twenty-Three and 59/100 Dollars ($61,523.59), fees to

6

Hillcrest for approximately Three Hundred Sixty Thousand Dollars ($360,000.00), legal fees of approximately Fifty Thousand Dollars ($50,000.00) and the pay off of other Quintero, McClung and Hillcrest loans.

51. The Line of Credit included paying off McClung's personal loan obligations, ADRE financial assurances of Sixteen Million One Hundred Eight Thousand Six Hundred Forty Dollars ($16,108,640.00) and an advance made on the loan to McClung for One Hundred Three Thousand One Hundred Sixty-Eight Dollars ($103,168.00).

52. Pursuant to the requirements of ADRE, the real estate development of the Quintero properties required guaranteed funding through an irrevocable Letter of Credit in favor of Quintero. Several Letters of Credit were issued and later amended or modified.

53. When the public reports were finalized, the lot and property closings with their sales proceeds were executed and finalized.

54. Pursuant to the transaction requirements, a portion of all Quintero lot sales would be paid to Hillcrest to service the loan. A smaller portion was to be used by Quintero pursuant to the guaranteed Line of Credit established by the loan with Hillcrest.

55. A budget was established that allocated Twenty One Million Six Hundred Fifty-One Thousand One Hundred Eighteen Dollars ($21,651,118.00) to infrastructure improvements.

56. Only Sixteen Million Dollars ($16,000,000.00) was guaranteed by Hillcrest.

57. Later, the guaranteed amount was reduced to Fourteen Million Two Hundred Fifty-Five Thousand One Hundred Eighty-Four Dollars ($14,255,184.00).

58. A worksheet was maintained by Quintero that tracked the accounting of the balance of the loan. This worksheet was provided to Hillcrest indicating that Twenty-Nine Million Dollars ($29,000,000.00) was needed to complete the development of the Quintero properties. This amount did not include the costs associated with building the Quintero Clubhouse.

59. The Sixteen Million One Hundred Eight Thousand Six Hundred Forty Dollars ($16,108,640.00) designated for the ADRE assurances was in the form of a guaranteed irrevocable Letter of Credit in which the Quintero Community Association Inc. (QCA) was named as the beneficiary. The designation of QCA was a requirement of ADRE governing the sale and development of property. FATCO was to be the escrow agent and issuer of endorsement pursuant to an amended escrow agreement.

60. To secure Quintero's obligation under the Loan, Quintero and Hillcrest executed a

Construction Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated March 8, 2005 and recorded it on April 25, 2005 at Recording No. 20050533163, official records of Maricopa County (the "Construction Deed of Trust") which was recorded against the Quintero Property.

61. In the Spring of 2005 through the Summer of 2006, construction on capital improvements to Quintero properties began. Draws on the Letters of Credit were made and once draws on the line of credit depleted the amount available, any further draws were conditioned by Hillcrest to lot sales of Quintero properties.

62. All draws from the Letters of Credit were required to be submitted to a company in Las Vegas, Nevada named Project Disbursement Group (PDG) by Quintero.

63. PDG was a third-party retained by Hillcrest for the purpose of conducting independent construction inspections to verify to Hillcrest that each phase of construction be completed satisfactorily before funds would be disbursed by Hillcrest for payment to the appropriate contractors.

64. An inspector was then required to verify what percentage of the improvements had been completed, verify construction invoices and waivers from the draw. Once completed the inspector would report to Hillcrest as to whether there were any issues to resolve.

65. Hillcrest reviewed the documentation and subsequently released monies according to the Letters of Credit.

66. When those monies were released, a portion of the money was wired to FATCO as part of the process required by ADRE.

67. FATCO would subsequently wire these monies to PDG. The other monies released on the construction draw were wired directly to PDG. Upon receipt of all the monies being released pursuant to the Letters of Credit, PDG would prepare checks which were then sent to Quintero for payment to the vendors and contractors.

68. FATCO would then send a Title Endorsement to Hillcrest who then amended the Letters of Credit balance reflecting the draw down and remaining amount of guaranteed funds.

69. Because of the process involved or lack of funding, construction companies were not being paid timely.

70. Some of the plaintiffs purchased lots in the Founders Estates Three, Quintero Golf & Country Club, Phase I.

71. On page 12 of the Subdivision Public Report, under the category of Streets, Roads

8

and Drainage, it states that:

> **Access to the subdivision**: Subdivider will complete the asphalt paved public streets with concrete curbs to the minimum standards of the City of Peoria by December 26, 2005 which will then be accepted by Quintero Community Association, Inc., for maintenance. Costs to purchasers for maintenance are included in the community association assessments.
> **Access within the subdivision**: Subdivider will complete the asphalt paved private streets by February 15, 2006, which will then be accepted by Quintero Community Association, Inc., for maintenance. Costs to purchasers for maintenance are included in the community association assessments.
> **Flood and drainage**: Subdivider will complete the extensive grading improvements within the subdivision, including but not limited to, catch basins
> and pipes ("common facilities") by February 15, 2006 . . ."

72. No infrastructure work has been commenced at the entrance to Founders Estates Three.

73. The land approaching lots in this location do not allow for any reasonable access because it does not contain any curbing or paving.

74. To date, the area leading to lots in the area contains no utility infrastructure.

75. On March 8, 2005 Hillcrest Bank, through its agent Robert Sperry, issued various irrevocable standby letters of credit.

76. In the Irrevocable Standby Letter of Credit (Letter of Credit Number: 480) dated March 8, 2005, the following is stated:

SPECIAL INSTRUCTIONS. ****BENEFICIARY MUST CERTIFY, UNDER OATH, THAT QUINTERO GOLF & COUNTRY CLUB LLC HAS EITHER ABANDONED ITS CONTRUCTION AND/OR INSTALLATION OF THE REQUIRED IMPROVEMENTS FOR THE RIDGE, AS CONTEMPLATED BY THE ARIZONA DEPARTMENT OF REAL ESTATE PUBLIC SUBDIVISION REPORT, DATED MAY 24,2004, (THE "IMPROVEMENTS"), OR FAILED TO COMPLETE THE CONSTRUCTION AND/OR INSTALLATION OF THE IMPROVEMENTS ON OR BEFORE 15 FEBRUARY 2006 OR SUCH LATER DATE AS APPROVED BY THE ARIZONA DEPARTMENT OF REAL ESTATE,AND AS EVIDENCED BY AN AMENDED PUBLIC SUBDIVISION REPORT FOR THE RIDGE. BENEFICIARY MUST CERTIFY, UNDER OATH, THAT NO EXCEPTIONS OF TIME FOR COMPLETION OF THE IMPROVEMENTS HAVE BEEN GRANTED BY THE ARIZONA DEPARTMENT OF REAL ESTATE OTHER THAN THOSE SET FORTH IN ANY AMENDED PUBLIC SUBDIVISION REPORT.*****

77. In the Irrevocable Standby Letter of Credit (Letter of Credit Number: 481) dated March 8, 2005, the following is stated:

9

SPECIAL INSTRUCTIONS. ****BENEFICIARY MUST CERTIFY, UNDER OATH, THAT QUINTERO GOLF & COUNTRY CLUB LLC HAS EITHER ABANDONED ITS CONTRUCTION AND/OR INSTALLATION OF THE REQUIRED IMPROVEMENTS FOR THE ENCLAVE, AS CONTEMPLATED BY THE ARIZONA DEPARTMENT OF REAL ESTATE PUBLIC SUBDIVISION REPORT, DATED JUNE 17,2004, (THE "IMPROVEMENTS"), OR FAILED TO COMPLETE THE CONSTRUCTION AND/OR INSTALLATION OF THE IMPROVEMENTS ON OR BEFORE 15 APRIL 2006 OR SUCH LATER DATE AS APPROVED BY THE ARIZONA DEPARTMENT OF REAL ESTATE,AND AS EVIDENCED BY AN AMENDED PUBLIC SUBDIVISION REPORT FOR THE ENCLAVE. BENEFICIARY MUST CERTIFY, UNDER OATH, THAT NO EXCEPTIONS OF TIME FOR COMPLETION OF THE IMPROVEMENTS HAVE BEEN GRANTED BY THE ARIZONA DEPARTMENT OF REAL ESTATE OTHER THAN THOSE SET FORTH IN ANY AMENDED PUBLIC SUBDIVISION REPORT.*****

78. In the Irrevocable Standby Letter of Credit (Letter of Credit Number: 482) dated March 8, 2005, the following is stated:

SPECIAL INSTRUCTIONS. ****BENEFICIARY MUST CERTIFY, UNDER OATH, THAT QUINTERO GOLF & COUNTRY CLUB LLC HAS EITHER ABANDONED ITS CONTRUCTION AND/OR INSTALLATION OF THE REQUIRED IMPROVEMENTS FOR QUINTERO LANE, AS CONTEMPLATED BY THE ARIZONA DEPARTMENT OF REAL ESTATE PUBLIC SUBDIVISION REPORT, DATED _____, (THE "IMPROVEMENTS"), OR FAILED TO COMPLETE THE CONSTRUCTION AND/OR INSTALLATION OF THE IMPROVEMENTS ON OR BEFORE 15 APRIL 2006 OR SUCH LATER DATE AS APPROVED BY THE ARIZONA DEPARTMENT OF REAL ESTATE,AND AS EVIDENCED BY AN AMENDED PUBLIC SUBDIVISION REPORT FOR QUINTERO LANE. BENEFICIARY MUST CERTIFY, UNDER OATH, THAT NO EXCEPTIONS OF TIME FOR COMPLETION OF THE IMPROVEMENTS HAVE BEEN GRANTED BY THE ARIZONA DEPARTMENT OF REAL ESTATE OTHER THAN THOSE SET FORTH IN ANY AMENDED PUBLIC SUBDIVISION REPORT.*****

79. In the Irrevocable Standby Letter of Credit (Letter of Credit Number: 483) dated March 8, 2005, the following is stated:

SPECIAL INSTRUCTIONS. ****BENEFICIARY MUST CERTIFY, UNDER OATH, THAT QUINTERO GOLF & COUNTRY CLUB LLC HAS EITHER ABANDONED ITS CONTRUCTION AND/OR INSTALLATION OF THE REQUIRED IMPROVEMENTS FOR IRON AGE DRIVE (BLM #1), AS CONTEMPLATED BY THE ARIZONA DEPARTMENT OF REAL ESTATE PUBLIC SUBDIVISION REPORT, DATED _____, (THE "IMPROVEMENTS"), OR FAILED TO COMPLETE THE CONSTRUCTION AND/OR INSTALLATION OF THE IMPROVEMENTS ON OR BEFORE 15 APRIL 2006 OR SUCH LATER DATE AS APPROVED BY THE ARIZONA DEPARTMENT OF REAL ESTATE,AND AS EVIDENCED BY AN AMENDED PUBLIC SUBDIVISION REPORT FOR IRON AGE DRIVE (BLM #1). BENEFICIARY MUST CERTIFY, UNDER OATH, THAT NO

EXCEPTIONS OF TIME FOR COMPLETION OF THE IMPROVEMENTS HAVE BEEN GRANTED BY THE ARIZONA DEPARTMENT OF REAL ESTATE OTHER THAN THOSE SET FORTH IN ANY AMENDED PUBLIC SUBDIVISION REPORT.*****

80. In the Irrevocable Standby Letter of Credit (Letter of Credit Number: 485) dated March 8, 2005, the following is stated:

SPECIAL INSTRUCTIONS. ****BENEFICIARY MUST CERTIFY, UNDER OATH, THAT QUINTERO GOLF & COUNTRY CLUB LLC HAS EITHER ABANDONED ITS CONTRUCTION AND/OR INSTALLATION OF THE REQUIRED IMPROVEMENTS FOR TREATMENT PLANTS (WATER TREATMENT FACILITY, WASTEWATER TREATMENT FACILITY, WTP/WWTP SITE), AS CONTEMPLATED BY THE ARIZONA DEPARTMENT OF REAL ESTATE PUBLIC SUBDIVISION REPORT, DATED _____, (THE "IMPROVEMENTS"), OR FAILED TO COMPLETE THE CONSTRUCTION AND/OR INSTALLATION OF THE IMPROVEMENTS ON OR BEFORE 26 DECEMBER 2005 OR SUCH LATER DATE AS APPROVED BY THE ARIZONA DEPARTMENT OF REAL ESTATE,AND AS EVIDENCED BY AN AMENDED PUBLIC SUBDIVISION REPORT FOR TREATMENT PLANTS (WATER TREATMENT FACILITY, WASTEWATER TREATMENT FACILITY, WTP/WWTP SITE). BENEFICIARY MUST CERTIFY, UNDER OATH, THAT NO EXCEPTIONS OF TIME FOR COMPLETION OF THE IMPROVEMENTS HAVE BEEN GRANTED BY THE ARIZONA DEPARTMENT OF REAL ESTATE OTHER THAN THOSE SET FORTH IN ANY AMENDED PUBLIC SUBDIVISION REPORT.*****

81. In the Letters of Credit numbered 480, 481, 482, 483, 484, and 485, construction, installation, or improvement work ("the improvements" or "Quintero projects") was identified.

82. As construction proceeded within the Quintero Property, contractors submitted draw requests which were processed through Quintero's construction manager, FATCO, Hillcrest and PDG.

83. The Quintero Community Association, Inc. did not certify under oath to Hillcrest Bank that Quintero Golf & Country Club L.L.C. had abandoned its construction as referred to in the Irrevocable Standby Letter of Credit ("Letters of Credit) numbered 480, 481, 482, 483, 484, or 485.

84. Gradually, Hillcrest Bank reduced the funding when applications and certifications for payment were submitted, knowing that the balance necessary to finish the project was Four Million Five Hundred Thirteen Thousand Five Hundred Thirteen Dollars and Fifty Two Cents ($4,513,513.52).

85. Despite knowing that there were millions of Dollars of work to be completed to conclude the project and that some of the work to be completed was infrastructure, Hillcrest loaned additional funds to McClung under the guise that it would be used for the construction of the Quintero Clubhouse. In fact, the millions of Dollars

11

Hillcrest loaned to McClung, he used to service the Quintero debt to Hillcrest.

86. Hillcrest Bank was aware on December 1, 2006, that all of the work identified in Public Report DM04-049029 had not been completed.

87. Hillcrest Bank was aware on January 1, 2007, that all of the work identified in Public Report DM04-049029 had not been completed.

88. Hillcrest Bank was aware on February 1, 2007, that all of the work identified in Public Report DM04-049029 had not been completed.

89. Hillcrest Bank was aware on March 1, 2007, that all of the work identified in Public Report DM04-049029 had not been completed.

90. Hillcrest Bank was aware on April 1, 2007, that all of the work identified in Public Report DM04-049029 had not been completed.

91. Quintero Golf and Country Club, LLC, as the developer of Founder's Estates 4, Quintero Golf and Country Club Phase 1, failed to complete legal access to one or more properties by the specified completion date in the Public Report (DM04-049029) of the Arizona Department of Real Estate.

92. Hillcrest Bank was aware on March 1, 2007, that Quintero Golf and Country Club, LLC, as the developer of Founder's Estates 4, Quintero Golf and Country Club Phase 1, failed to complete legal access to one or more properties by the specified completion date in the Public Report (DM04-049029) of the Arizona Department of Real Estate.

93. Hillcrest Bank was aware on April 1, 2007, that Quintero Golf and Country Club, LLC, as the developer of Founder's Estates 4, Quintero Golf and Country Club Phase 1, failed to complete legal access to one or more properties by the specified completion date in the Public Report (DM04-049029) of the Arizona Department of Real Estate.

94. Hillcrest did some or all the described actions set forth in this petition in order to avoid the Quintero loan appearing in Hillcrest's books (and scrutinized by the FDIC) as a non-performing loan.

95. Even though the improvements had not been completed, the developer Quintero sold property in the development.

96. Sometime in the middle of August 2006, Quintero communicated to Hillcrest that it wanted Wespac Construction to perform an analysis of the amounts remaining in the Letters of Credit. Hillcrest agreed.

12

97. The analysis performed indicated the balance was One Million Seven Hundred Sixty- Three Thousand Dollars ($1,763,000.00) for the Rees Jones Blvd. improvement, the improvements related to a water facility, and several other projects.

98. Quintero had a contractual right to and therefore requested that Hillcrest agree to a completion date. The Founder's Estates Three (FE3) project did have its completion date extended by Hillcrest to September 2007. Because of this extension, the Public Reports submitted to ADRE were required to be submitted again to ADRE.

99. The attorney for Quintero, Fred Davidson, communicated to McClung his concerns regarding falsehoods being represented to ADRE as to actual completion of improvements.

100. Davidson stated that the completion dates being communicated to ADRE were being shown as being completed sooner rather than later.

101. Gary McClung, using Quintero ran a phony investment plan or Ponzi scheme in which monies paid by later investors were used to pay artificially high returns to the initial investors, with the goal of attracting more investors.

102. Investments were shuffled through various bank accounts or projects, paid out to other investors as interest or other payments or investments, and ultimately accumulated in the pockets of Gary McClung and his wife Peggy.

103. The money that investors put up wasn't invested in anything or the proper areas and that the purported profits were paid out of new money from subsequent investors or raised from the sale of home site lots and memberships which was improper. Because of the scheme, many of the Quintero lots do not have the infrastructure in place necessary to even build a home are now of no more value than desert land.

104. Quintero operated and continued to operate at a loss while Gary McClung gave the plaintiffs the false appearance of being profitable by obtaining new investors and using those investors to pay for the high returns promised to earlier investors.

105. The effect of this scheme was to put Quintero further into debt by incurring more and more liability while giving the false appearance of profitability in order to obtain new investors.

106. Gary McClung, was operating a Ponzi scheme through Quintero which induced investment by promising financial returns in varying degrees, by funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment.

13

107. Gary McClung used Quintero as his alter ego to propagate and advance the Ponzi scheme by new investor monies, borrowing revenues from other projects, and by moving monies around in a "check kiting" fashion in order to accomplish debt service and cash flow and working capital deficiencies.

108. Quintero, including Gary McClung, schemed to defraud the plaintiffs which included plans or course of action intended to deceive or cheat the plaintiffs out of money, value, or property by means of false or fraudulent pretenses, representations, or promises.

109. Gary McClung operated a Ponzi scheme which defrauded the plaintiffs.

110. Quintero, including Gary and Leona McClung, when advancing the Ponzi scheme, had a criminal intent to defraud beyond a reasonable doubt which is defined means to act knowingly and with the specific intent to deceive or cheat someone, ordinarily for the purpose of causing some financial loss to another or bringing about financial gain to one's self and that Quintero and Gary McClung knowingly and willfully devised, intended to devise, or participated in a scheme to defraud.

111. Quintero, along with Gary McClung, committed the requisite acts and mental state of mind to constitute a Ponzi scheme pursuant to Internal Revenue Bulletin 2009-14.

112. In September 2006, the project related to the Water/Wastewater Treatment Facility was completed. Pursuant to an agreement with the City of Peoria, Arizona, the Facility was deeded to the City. This event allowed the Quintero Community Association (QCA) to begin establishing its dues and property assessments. There were numerous members of the QCA, including some of the plaintiffs, who owned properties. QCA employed a management agent and the assessments began in October of 2006.

113. On October 27, 2006, a draw from the Letter of Credit designated "Draw #HCHD-14" was submitted to Hillcrest for work that was performed by construction companies through the period of July, August, and September of 2006.

114. By this date, the majority of contractors had discontinued work on the Quintero projects due to being paid untimely or not being paid at all.

115. At this time there was a One Million One Hundred Seventy-Seven Thousand Four Hundred Forty-Four dollar ($1,177,444) balance remaining in the Letter of Credit.

116. On August 31, 2006, McClung wrote the following:

> George and Karen,

14

Here is an update on the financing:
Hillcrest Bank has approved a $52 million loan for the clubhouse, suites and the rest of Phase 1.
That loan needs to be tied to a second loan of $54 million for phase 2.
We have unofficial approval of that from First National of America.
Now Hillcrest and First National have to do all the docs, inter-creditor agreements, etc and then FINAL approvals and loan closing will happen. 60 days?
I am happy but always impatient.
I will let you know as it moves forward.
Hope you are having a great time in AZ. Rudy told me he saw you.
Lea is okay but not improving at the rate we wish. We think a change in meds is pending.
Gary

117. On 1/2/2007, the following was communicated"

Karen and George,

As I said in the earlier email, I am overdue in getting you this status report. I am finally getting back on track. Sorry about the delay. The bank and I were confident we would have the loan closed by the end of December--but that didn't happen. We have a $106 million loan approval. Hillcrest's legal loan limit is not that high, so they have gotten several participants to join them, but enough to get to the $106 million. They are embarrassed, as am I. I met with the Chairman, President and the two Sr. V.P.s from Hillcrest who are involved in our loan. It was a very positive meeting. They are all 100% behind Quintero. At the meeting we decided to reduce the initial loan amount and do the rest in another stage, which will allow them to close within 60-75 days. The delay is because now they have to redo all the pro
formas, etc, and go back to the participating banks because there is a change in what they initially proposed, so those banks have to agree with the plan. It is tough to push bankers for quick responses, as I suspect you are well aware.
My question to you is what does this do to you negatively? If it causes you any monetary expense I want to reimburse you. Your patience has been wonderful on my nerves---I am not happy about not performing on this. I know George and Derek are also involved and have other plans for the money. We will get it handled, it is simply the timing that is the problem. I hope I have explained it satisfactorily.
I am available by phone if you need more info. Cell is 816-519-5200. We are in KC until we fly to AZ on Jan 4. We will be in AZ most of the time until June with 4 days a month in KC. You two are special people, and we look forward to seeing you very soon.
Always,

15

| Gary

118. Quintero represented to Hillcrest that it would perform its obligation of improvements amounting to Three Million Three Hundred Thirty-Six Thousand and Sixty-Nine Dollars ($3,336,069.00).

119. The Application for Certification and Payment was signed by McClung on November 9, 2006 and submitted to Hillcrest.

120. Hillcrest only paid five Hundred Thirty-Four Thousand Seven Hundred Twenty-Two and 04/100 Dollars ($534,722.04) to FATCO in November 2006.

121. Hillcrest refused to release any more funds on this draw. This draw remained outstanding in PDG's books and in Quintero's books.

122. Presently, there are unpaid construction vendors totaling approximately Five Million Five Hundred Thousand Dollars ($5,500,000.00) and multiple judgments or liens against the Quintero owned properties.

123. On December 13, 2006, amendments to the Letters of Credit reflecting the payments were issued by Hillcrest to QCA as beneficiary. Amendments to extend the LOCs were received on January 30, 2007. Hillcrest was fully aware of an unpaid draw as well as the nature of the improvements necessary to complete the project.

124. In March 2007, McClung, acting on behalf of and as Beneficiary, asked for the original Letters of Credit to be sent back to Hillcrest for the projects already completed.

125. Bob Sperry at Hillcrest said that Hillcrest would "free up" some funds in order to service the loan interest payment.

126. This transaction did not include the Founder's Estates 2 (FE2), FE3, Founder's Estates 4 (FE4) or the Rees Jones Blvd projects because they were not completed improvements.

127. Communications between Hillcrest and McClung addressed the issue of a final draw and inspection for FATCO/ADRE but nothing was requested.

128. No endorsements from FATCO were received.

129. No amendments or other correspondence was received from Hillcrest.

130. There was no final inspection requested or completion as was required.

16

131. The Quintero Community Association, Inc. did not certify under oath to Hillcrest Bank that Quintero Golf & Country Club L.L.C. had abandoned its installation of the required improvements as identified in the Letters of Credit numbered 480, 481, 482, 483, 484, and 485.

132. The Quintero Community Association, Inc. did not certify under oath to Hillcrest Bank that no exceptions of time for completion of the improvements, as identified in the Letters of Credit numbered 480, 481, 482, 483, 484, or 485, were granted by the Arizona Department of Real Estate other than those set forth in any amended public subdivision report.

133. The Quintero Community Association, Inc. did not certify under oath to Hillcrest Bank that Quintero Golf & Country Club L.L.C. had completed the required improvements for the treatment plants (water treatment facility, wastewater treatment facility, wtp/wwtp site), the Ridge, IRON AGE DRIVE (BLM #1), The Enclave as contemplated by the Arizona Department of Real Estate Public Subdivision Reports.

134. The developer Quintero Golf and Country Club, LLC, failed to complete the internal paved roads by the specified completion date in the Public Report DM04-049029.

135. Arizona Revised Statutes ("ARS.") § 32-2181(A)(18) requires a subdivider to provide "A true statement of the nature of any improvements to be installed by the subdivider, the estimated schedule for completion and the estimated costs related to the improvements that will be borne by purchasers of lots in the subdivision."

136. Arizona Administrative Code R4-28-B1203 provides that a Developer shall notify the Department of a material change to a Subdivision Disclosure Report and shall amend that Subdivision Disclosure Report.

137. Quintero Golf & Country Club failed to complete roads by the date stated in the Subdivision Disclosure Reports (Public Reports) as required by AR.S. § 32-2181(A)(18) and AAC. R4-9 28-B1203.

138. Quintero Golf & Country Club is not in compliance with the requirements for a Subdivision Disclosure Report (Public Report), as set forth in AR.S. § 32-2181(A)(18) and AAC. R4-28-B1203.

139. On March 27, 2007, McClung, on behalf Gary McClung (McClung) of QCA the Quintero Community Association, Inc. and as managing member of Quintero sent a letter to Robert Sperry at Hillcrest Bank requesting that he cancel certain letters of credit. He stated that the improvements had been completed and the letters of credit were no longer required for the Arizona Department of Real Estate. When McClung made this statement, the infrastructures and other work contemplated in the LOCs

17

had not been completed.

140. On October 12, 2007, assistant vice president Jon P. Forgey of Hillcrest Bank instructed PDG to terminate the Quintero Property projects, knowing that the infrastructure had not been completed and that multiple properties, including that of the Plaintiffs, would be incapable of being developed or resold.

141. McClung claimed that there were investors interested and that Hillcrest Bank was working with Quintero to keep operating until additional investment funds could be obtained.

142. In September and October of 2008, Hillcrest sent an independent consultant, Charlie Martin, to Quintero to assess the completion and conditions. Martin determined a "ballpark" figure for completion and then submitted an analysis to Hillcrest. Hillcrest informed Quintero that the updated appraisal being evaluated by the Bank was reduced by the outstanding improvements to be completed. Hillcrest was aware that the projects had not been completed.

143. On March 31, 2010 the Arizona Department of Real Estate (ADRE) issued an order summarily suspending Quintero's Public Report. ADRE found that Quintero failed to complete roads by the date stated in the Public Reports as required by A.R.S.§32-2181(A)(18) and A.A.C. R4-28-B1203.

112. ADRE found that the failure of the roads to be completed constituted an immediate threat to the public health, safety, and welfare warranting immediate suspension of the Public Reports.

113. Hillcrest was aware that the roadways had not been completed and nevertheless decided to halt all funding for all construction.

114. Hillcrest was aware that the roadways had not been completed and nevertheless loaned additional monies to McClung in order that its own debt service would continue.

144. On June 3, 2009, McClung wrote the following to Hillcrest Bank:

> Jon,
> I will give you my version of the phone conversation I had with Ken Vegors yesterday. KEN CAN MAKE HIS COMMENTS OF CONCURRENCE OR CORRECTION OF WHAT I SAID. You know that the essence of the funding is the selling of a bond collateralized by Senior Life Settlement Policies. Ken and his partner, Dr Luther Bruce have been very adept at continuing to analyze the market for their bond and reacting to any improvements in the process or product which will further insure the successful sale of the bond. To that end they have arranged a guarantee of the payment of the interest on the bond

18

from a private equity firm. They used Senior Life Settlement Policies as the collateral for the private equity fund. They then desired a bank to guarantee the payment of the amount of the bond which was collateralized with Senior Life Settlement policies. They spoke with Comerica Bank and JPMorgan Chase. Through various conversations they switched to AAA rated US bonds as the collateral for the bond they are selling. JPMorgan Chase will sell these AAA rated bonds to SLS at a highly discounted rate. The return and resale value of the bonds will collateralize the bond which will be sold to a Pension Fund. JPMorgan Chase will act as the Placement Agency, and have already identified their customer(s). The purchase of the bonds can be done quickly, versus the vetting of the policies. The sale of the bond itself will likely be to a very small number of Pension Funds, perhaps to only one. So the process should go more quickly. There is one disadvantage to this method of collateralization----it is more expensive. That means that the available funds at the end are less. Crossover Capital (who will pay off the liens for Quintero Golf and Country Club) will receive an estimated $22 million on the first traunch. But on the other hand this will be a more sellable product and will result in the sale of several of these bonds at a fairly quick pace. It is planned for Quintero to receive a second traunch of $40 million (Ken will get a higher percentage of the funds on the second traunch).

Ken's confidence level is very high on the funding using this approach. He can better address the timing than can I.

Gary McClung

145. The above representations made by McClung and the defendants were material and were known to be false or untrue by Gary McClung and the defendants or were recklessly made without knowledge concerning them.

146. The representations were intentionally made for the purpose of inducing the plaintiffs to act upon them by delaying filing a lawsuit or by taking other collection efforts or otherwise utilizing other measures to protect their financial interests.

147. The plaintiffs reasonably relied and acted upon the above representations made.

148. In June 2009, Hillcrest sent a Notice of Default to Quintero on the loan. Quintero's management and control was subsequently taken from McClung by Ken Nichols & Larry Hilcher.

149. On October 21, 2009 the Federal Deposit Insurance Corporation and the Office of the Kansas State Bank Commissioner issued a Cease and Desist Order ordering Hillcrest Bank to cease and desist from the following unsafe or unsound banking practices:

Operating with a board of directors that has failed to provide adequate supervision over and direction to the management of the Bank.

Operating with management whose policies and practices are detrimental to the Bank.

Operating with an inadequate level of capital protection for the kind and quality of assets held and/or appropriate to the risk inherent in the activities engaged in by the Bank.

Engaging in imprudent lending and lax collection practices.

Operating with an excessive level of adversely classifies loans or assets, and/or delinquent loans and/or non-accrual loans.

Failing to properly identify risk and assess the level of risk in problem loans.

Operating with an inadequate allowance for loans and lease losses for the volume, kind, and quality of loans and leases held, and/or failing to make provision for an adequate allowance for possible loan and lease losses.

Operating with inadequate liquidity and an excessive reliance on wholesale funding in light of the bank's assets and liability mix.

Operating with inadequate earnings.

150. Judgment against Quintero Golf & Country Club and in favor of plaintiffs Lyle and Peggy Phillips was rendered in Case NO. 0916-cv08753 in Jackson County Missouri.

151. In the final judgment in 0916-cv08753, Judge Joel May made findings of fact which are incorporated herein and set forth in paragraphs a)-v) as follows:

a) Gary McClung was the managing member of Quintero Clubhouse Villas, L.L.C., Quintero Golf and Country Club, L.L.C., and Quintero Capital, L.L.C. (Quintero Entities).

b) On October 27, 2006, a draw from the Letter of Credit designated "Draw #HCHD-14" was submitted to Hillcrest Bank for work that was performed by construction companies through the period of July, August, and September of 2006. By this date, the majority of contractors had discontinued work on the Quintero projects due to being paid untimely or not being paid at all.

c) At this time there was a $1,177,444 balance remaining in the Letter of Credit. Quintero had communicated to Hillcrest Bank it would perform its obligation of improvements amounting to $3,336,069. The draw was signed by Gary McClung

on 11/9/06 and submitted to Hillcrest Bank. Hillcrest paid out $534,722.04 to FATCO in November 2006. No other payment was made on this draw. This draw remained outstanding in PDG's books and in Quintero's books. There are unpaid construction vendors totaling approximately $5.5 million, many with judgments or liens against the property.

d) On December 13, 2006, amendments to the Letters of Credit reflecting the payments were issued by Hillcrest Bank to Quintero Community Association, Inc as beneficiary. Amendments to extend the LOCs were received on January 30, 2007. Hillcrest Bank was fully aware of an unpaid draw as well as the amount of improvements to complete the project.

e) In March 2007, Gary McClung, acting on behalf of and as Beneficiary, asked for the original Letters of Credit to be sent back to Hillcrest Bank for the projects already completed. Bob Sperry communicated that it would "free up" some funds in order to service the Hillcrest Bank loan interest payment. But this transaction did not include the improvement projects known as "Founders Estates" known as "FE2, FE3, and FE4" or Rees Jones Blvd projects because they were not completed improvements. Communications between Hillcrest Bank and Gary McClung addressed the issue of a final draw and inspection for FATCO/ADRE but nothing was requested. No endorsements from FATCO were received, no amendments or other correspondence was received from Hillcrest Bank according to Quintero personnel. There was no final inspection requested or completed as was required.

f) In October 2009, Hillcrest Bank sought appointment of a receiver and the Receiver took control of Quintero's bank funds and operations. The notice of foreclosure has been revised numerous times.

g) The statements made by Gary McClung in the emails attached as Exhibit A are not completely true and contain material misrepresentations.

h) Exhibit B attached to the plaintiffs' summary judgment motion, page numbers 1-73, are true and correct email communications between Quintero, Gary McClung, and Lyle Phillips.

i) The statements made by Gary McClung in Exhibit B were generally statements about financing, the payment of debts, and his ability to obtain new financing.

j) On or about March 22, 2007, Gary McClung communicated to Lyle Phillips that "Plan B is going strong. I have not told anyone else about it (plan B) due to the wonders of rumors. We are likely to partner up (and very soon) with a company called The M3 companies. You can see them at www.m3comp.com. This partnership will include the 640 acres immediately adjacent to the east end of the property and phase 2. It will be an influx of cash, and allow us to not increase our loan amount at all. It takes risk way down, and will be excellent for Quintero and

its members. Again, I trust your confidentiality on this, and I am not backing away from the completion of the Hillcrest deal."

k) Plan B was not going strong on or about March 22, 2007. It was not likely that Gary McClung or Quintero Golf & Country Club, L.L.C., would "partner up (and very soon) with a company called The M3 companies" on or about March 22, 2007.

l) On or about March 30, 2007, Gary McClung communicated the following to Lyle Phillips:

Hillcrest is fine. Ironically, we have been approached by two companies to partner with them on the 640 acre piece of private land to our immediate east. That partnering would preclude the need to borrow any money, or at the very least decrease it significantly. They would reimburse us for a big slug of our current infrastructure and partner with us on the golf course and infrastructure for phase 2. You can go on the web to view M3comp.com. That is one of the two. We met with them Tuesday and they are doing a close inspection of all the land this weekend with our land planner Wendell Pickett. We will meet again next week. It is a good deal for both of us. The second people we have not met with and they are newer to the game. I will forward an email from Rudy with info on them. The process with this group just started last week. Neither party has purchased the land to our east yet because they recognize that they cannot likely be successful there without us involved. We also have another partner who wants to develop the suites, which reduces our costs significantly, and reduces our loan again. Hillcrest knows what is going on and has us on hold at our request until at least next Friday. All of these partners came to us--- which is a good way to do it. While all this is exciting and excellent for the project it is a little frustrating because it causes some indecision at a critical time. But this won't last long.

m) The statements made by Gary McClung in the email indicate that Hillcrest Bank was fully knowledgeable of Gary McClung's false communications to Lyle Phillips and the rest of the Quintero membership on or about March 30, 2007.

n) In a "status report" dated June 3, 2008, Gary McClung communicated to Lyle Philips the following:

The future financing for the rest of the Quintero project will be provided by a partnership between a hedge fund and real estate financial group based in Dallas. Quintero will sell the various parcels of our land in individual transactions. These sales will be with the right of repurchase, and the right to continue the development process as well. The funds from the sale will be used to pay off all debt, cover operating expenses, build the clubhouse, and complete the real estate development of phase one and phase 2. We will also tie up the land purchase for phase 3. When the above items are accomplished we will complete the planning and development

of phase 3, to include the golf course.

The site visit has been completed. Preliminary due diligence has been completed. A new pro forma reflecting the plan above will be completed this week. We will move to final approval soon thereafter. A closing date will be available after final approval. In the interim the Private Placement Memorandum (PPM) project is still an ongoing program.

The pro forma in its most conservative fashion shows outstanding results. The current slow market is less of an effect on Quintero because we do NOT have an inventory of real estate ready to sell but instead sitting. By the time the repurchase option is exercised the market should have returned and sales will be good. The investors recognize this situation and the logic of it all happens to fit them well. It is important to start the clubhouse and invigorate the membership and attract new members.

It will be exciting to make this announcement when it is official.

Gary

  o) The statements made by Gary McClung in the Status Report were not completely accurate and not completely true. On or about October 23, 2008, Gary McClung communicated to Lyle Phillips that "THE DEAL IS DEFINITELY STILL ON" and that "I think you can breathe easy." The statements made by Gary McClung as were not completely accurate and not completely true.

  p) On or about February 19, 2008, Lyle Phillips asked Gary McClung this question: "I have been told you told some people at the club last week that you had signed a deal that would bring $20MM equity into Quintero. True?" to which Gary McClung answered "It is true." There was never a signed deal to bring twenty million dollars equity in Quintero on or about February 19, 2008.

  q) On or about January 2009, Gary and Lea McClung communicated to Lyle Phillips that "Quintero is alive and well and will stay that way" and that "a number of members were willing to contribute money intending to help secure the future of Quintero in these tough times. We are happy to announce that was not necessary. Lea and Gary have that handled." Those statements were patently false because none of Quintero were "alive and well" as of January 2009, and "Lea and Gary" did not have the finances of Quintero "handled."

  r) On August 15, 2002, Quintero Golf & Country Club, L.L.C., Gary N. McClung, and Leona B. McClung signed a document titled "Guaranty." In the Guaranty it was stated that

To induce you to enter into that certain Operating Agreement for Quintero Clubhouse Villas, L.L.C., dated 12 May 2002, as amended by that certain Amendment to Operating Agreement, by and between you and Gary N. McClung and Leona B. McClung of even date herewith and to induce you to enter into that certain Repurchase Option Agreement, of even date herewith (collectively referred to as the "Agreements"), and

23

in consideration thereof, the undersigned hereby jointly and severally guarantee the performance by Quintero Clubhouse Villas, L.L.C. ("Quintero Villas") of all the terms and conditions of the Agreement to be performed by Quintero Villas thereunder, and the undersigned hereby jointly and severally agree to indemnify and hold you and your successors and assigns harmless from and against all liability and expense, including reasonable attorney's fees, sustained by you by reason of the failure of the said Quintero Villas fully to perform and comply with tile terms and obligations of the Agreements. Further, the undersigned hereby jointly and severally guarantee that Quintero Villas shall exercise the Repurchase Option described in the Agreements, during the Option Term, during that term is defined in the Agreement, and to that end, make payment to you in the amount required under the Agreements, in order to repurchase your membership interest in Quintero Villas. Should either Quintero Villas or the undersigned fail to exercise the Repurchase Option as hereby required, you shall be entitled to pursue any claims arising out of the breach of this Guaranty by the undersigned.

On November 7, 2008, Gary McClung told Lyle Phillips that there was an agreement presently in place to fund Quintero Golf and Country Club and that the funding date was the only open item. In January 2009 Gary and Leona McClung stated that "Quintero is alive and well and will stay that way."

s) The above representations made by Gary McClung and Quintero Golf and Country Club were material and were known to be false or untrue by Gary McClung and Quintero Golf and Country Club or were recklessly made without knowledge concerning them. The representations were intentionally made for the purpose of inducing Lyle Phillips to act upon them by delaying filing a lawsuit or by taking other collection efforts or otherwise utilizing other measures to protect his financial interests. Lyle Phillips reasonably relied and acted upon those representations.

t) On October 9, 2008, Lyle Phillips wrote Gary McClung the following:

Thanks for the update re the Quintero financing package. This email will confirm what we agreed to in our discussion today.

Quintero is scheduled to receive the first funding payment by October 31, 2008. Quintero is scheduled to receive funding for the remainder of the total financing package by December 31, 2008 at the latest.
Quintero will pay Lyle Phillips $500,000 no later than the first week of November, 2008.
Quintero will pay Lyle Phillips the total remaining principle and interest due him no later than December 31, 2008.
Gary McClung will contact Lyle Phillips prior to the final payment being made to Lyle Phillips to determine If there is any interest in reinvesting in Quintero.

24

Gary, I believe this covers everything we discussed. If my understanding of our discussion is different from your's please let me know.

u) Gary McClung had knowledge of the facts set forth in the plaintiffs' petition which Lyle Phillips did not have and which Lyle Phillips could not have discovered by the exercise of reasonable diligence. Gary McClung was under an obligation to communicate the true state of facts to Lyle Phillips. Gary McClung intentionally failed to communicate to Lyle Phillips the true state of facts. Lyle Phillips relied upon Gary McClung to communicate the true state of facts to him.

v) Lyle Phillips sustained damages as a result of Gary McClung's failure to communicate this to Lyle Phillips.

152. In the court ruled in Case NO. 0916-cv08753, as a matter of law, that "the evidence demonstrates that Gary McClung, as the main stockholder and managing member of Quintero, and Quintero, are alter egos of each other and are in privity with each other."

153. Judge Joel May ruled that:

The uncontroverted averments and communications demonstrate that McClung had complete domination of Quintero, not only of finances, but of policy and business practices. The emails addressed to members were nearly always from McClung personally. The Phoenix Business Journal, which was attached and not controverted, states that the McClungs are listed as the only members of Quintero Golf & Country Club LLC and Quintero Entrado LLC, the two legal entities that were created in 2005 to handle development of the golf courses, the clubhouse, model homes and condominiums. The McClungs were the responsible parties for the loans signed with Hillcrest Bank and Compass Bank. The financial interests of Quintero and McClung were so intertwined that when Quintero went into foreclosure, McClung filed for bankruptcy.

154. McClung has made improper multiple payments from Quintero to himself amounting to at least four Hundred six Thousand five Hundred ninety one Dollars ($406,591.00) in contravention of his duties of loyalty and self-dealing.

155. The notations regarding these payments in Quintero's transaction report state "repay interest on loan taken from personal account," "pay back short term loan" and "reimbursement for short term loan."

78. These payments appear to have been made to Quintero from Quintero's Owners Equity account at Hillcrest Bank and to McClung from the Quintero checking account at Hillcrest Bank.

25

79. McClung, as an officer and director of Quintero Golf and Country Club, violated his duties as officer and director of Quintero and QCA by:

a) Breach of duty of loyalty to corporation and its members for acts or omissions not in good faith or which involved intentional misconduct or a knowing violation of law;
b) Deriving improper personal benefit;
c) Having conflicts of interest;
d) Failing to disclose material facts about the financing of Quintero and the relationship he had with Hillcrest;
e) Disseminating false and misleading information to the plaintiffs;
f) Having excessive compensation;
g) Failing to stop his own embezzlement from Quintero;
h) Engaging in fraudulent conduct;
i) Inducing Quintero to commit breach of contract;
j) Inducing or abetting wrongdoing by Quintero and Hillcrest (as set forth in the above described averments);
k) Approving of loans to or from Quintero to or from its directors and officers;
l) Neglecting proper management with regard to corporate debts and property;
m) Permitting Quintero to engage in activities prohibited by Arizona statute;
n) Perverting corporate opportunity to his own personal benefit;
o) Selling corporate assets for unreasonably low price;
p) Conducting transactions between corporations in which he was a common director.

## COUNT 1.
### (Plaintiffs v. Quintero Golf and Country Club | Breach of Contract)

156. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

157. Quintero had contractual obligations to each of the plaintiffs under the contracts described above.

158. Quintero breached its obligations under the contracts with each of the plaintiffs.

159. This breach caused harm to each of the plaintiffs.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant Quintero Golf and Country Club, L.L.C. to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

26

## COUNT 2.

(Plaintiffs v. Quintero Golf and Country Club | Breach of Fiduciary Duty)

160. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

161. There was a fiduciary relationship between Quintero and each of the plaintiffs. Quintero and McClung were required to exercise due care to avoid foreseeable injury to each of the plaintiffs. Quintero and McClung assumed a fiduciary duty by the above described contracts and agreements.

162. Quintero and McClung were required to act for the benefit of each of the plaintiffs on the above described matters.

163. Quintero and McClung breached that fiduciary duty in the manner and conduct described above in the statement of facts.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant Quintero Golf and Country Club, L.L.C. to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 3.

(Plaintiffs v. Quintero Golf and Country Club | Civil Conspiracy)

164. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

165. Quintero, Gary McClung and Robert Sperry, Jeffrey Wheeler, and John Forgey had a meeting of the minds with an unlawful objective. Those unlawful objectives or torts were:

1) Conspiring to wrongfully dishonor the drafts under the irrevocable letters of credit.

1) Conspiring to breach the agreements of the contractors and laborers as described herein;

2) Conspiring with Gary McClung as McClung acted in part out of self interest that went beyond the agency relationship;

27

3) Violating A.R.S. §32-2183.E and F, A.R.S.§32-2181(A)(18) and A.A.C. R4-28-B1203;

4) Engaging in one or more of the improper banking practices cited in the October 21, 2009 Cease and Desist Order of the Federal Deposit Insurance Corporation and the Office of the Kansas State Bank Commissioner;

5) Colluding with Hillcrest for Hillcrest to breach its fiduciary duties to each of the plaintiffs.

6) Colluding with Hillcrest to conceal Gary McClung's violation of his corporate duties as an officer and director

7) Colluding with Hillcrest to conceal or facilitate McClung's Ponzi scheme and fraud.

166. Quintero committed at least one act in furtherance of the conspiracy.

167. Each of the plaintiffs was thereby injured.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant Quintero Golf and Country Club, L.L.C. to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 4.
(Plaintiffs v. Hillcrest Bank | Intentional Interference with Business Relationship)

168. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

169. There was a loan, contract, or a valid business relationship or expectancy short of a contract between Quintero and the plaintiffs or between Gary McClung and each of the plaintiffs.

170. Hillcrest was aware of the loans, contracts or business relationships when the plaintiffs purchased land in Quintero or when monies were loaned to Quintero by each of the plaintiffs.

171. Hillcrest was aware of the contractual relationship between Quintero and the plaintiffs when the purchase proceeds from the sales of the property owned by the

28

plaintiffs were applied to the Hillcrest loan balance.

172. Hillcrest knew that McClung and Quintero did not meet the requirements of Arizona law or the letters of credit for cancelling the irrevocable letters of credit.

173. Hillcrest knew that when McClung requested that the letters of credit be cancelled that the work identified in those letters of credit including the infrastructure had not been completed.

174. With this knowledge Hillcrest directed PDG to halt payments and declared default in June 2009 and the projects which interfered with the plaintiffs' ability to develop or resell their land.

175. With this knowledge Hillcrest interfered with the developer Quintero's performance of its contractual obligations as developer to the benefit of the plaintiff QCA and property owners.

176. Quintero and McClung breached their respective obligations under the contracts, loans and guarantees in favor of the plaintiffs.

177. Hillcrest caused or induced Quintero to breach its duties as developer under Arizona law.

178. Hillcrest induced or caused those breaches of the contract or severance of the relationship as described in the facts common to all counts in this petition.

179. There was no legal right or justification for Hillcrest's actions in inducing or causing the breaches or severance of the relationship. Hillcrest Bank employed improper means as described in this petition in exercising any right to interfere if it did exist.

180. Plaintiffs have each been damaged as a result of Hillcrest's actions as described herein and in the facts set forth in this petition.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant Hillcrest Bank to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 5.

(QCA v. Hillcrest Bank | Wrongful Cancellation & Dishonor)

29

181. The plaintiff re-alleges the preceding paragraphs of this Petition as if set forth at length.

182. Hillcrest bound itself to one or more irrevocable letters of credit which were used as security for the developer's obligations under the Arizona Public Report.

183. QCA was the named beneficiary of the letters of credit.

184. Hillcrest cancelled the letters of credit by declaring a default under the loan in June of 2009.

185. Hillcrest breached and failed to perform its duties under the irrevocable letters of credit. In the letters of credit, Hillcrest promised to pay a draft drawn on it upon presentation of specified documents and procedures.

186. All requirements of the letters of credit were met in order for Hillcrest to honor drafts submitted to it.

187. QCA never certified under oath that the construction had been abandoned or that the construction had been completed as contemplated by the Arizona Department of Real Estate Public Subdivision Report.

188. Hillcrest wrongfully cancelled and dishonored its irrevocable standby letter of credit pursuant to the Uniform Customs and Practices for Documentary Credits Publication No. 500 and failed to specify the discrepancies which caused Hillcrest to reject the draft and documents submitted to it.

189. Hillcrest failed to notify Quintero of any purported discrepancies in a timely fashion.

190. Hillcrest took the funds from the letters of credit and improperly applied them to service a loan between Quintero and Hillcrest.

191. Hillcrest's conduct in this matter amounted to a waiver of its opportunity to claim that the alleged discrepancies were not in accordance with the letter of credit.

192. Hillcrest's conduct estops it from asserting the alleged discrepancies as a defense in this action.

193. The terms of cancellation of the letters of credit were not met or otherwise fulfilled.

194. Hillcrest Bank breached its duty of the covenant of good faith and fair dealing. Hillcrest exercised judgment conferred by the terms of the irrevocable letters of credit in such a manner as to evade the spirit of the transaction or so as to deny QCA

30

the expected benefit of the letters of credit.

195. The plaintiff has been damaged as a result of the wrongful dishonor.

**WHEREFORE**, the plaintiff demands judgment in their favor and against the defendant to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 6.
### (QCA v. Hillcrest Bank  | Breach of Contract)

196. The plaintiff re-alleges the preceding paragraphs of this Petition as if set forth at length.

197. There were three contractual relationships concerning Hillcrest and QCA. The first was the agreement between Quintero and QCA. The second contract is the contractual arrangement between Hillcrest and Quintero whereby Hillcrest agreed to issue the letter of credit and Quintero and McClung agreed to repay Hillcrest for the amounts paid under the letter of credit. The third contract is the contractual relationship between Hillcrest and the beneficiary of the letter of credit created by the letter of credit which was the QCA. Hillcrest agreed to honor QCA's drafts or demands for payment which conform to the terms of the letter of credit.

198. In June 2009, Hillcrest sent a Notice of Default to Quintero on the loan agreement with Quintero.

199. Hillcrest Bank breached this loan agreement first by committing the acts described in this petition.

200. The QCA and the plaintiffs were an intended beneficiary of this loan.

201. Hillcrest breached and failed to perform its duties under the irrevocable letters of credit. In the letters of credit, Hillcrest promised to pay a draft drawn on it upon presentation of specified documents and procedures.

202. Hillcrest wrongfully dishonored its irrevocable standby letter of credit and failed to specify the discrepancies which caused Hillcrest to reject the draft and documents submitted to it.

203. Hillcrest failed to notify Quintero of any purported discrepancies in a timely fashion.

31

204. Hillcrest wrongfully set off amounts owed to it against other funds.

205. Hillcrest's conduct in this matter amounted to a waiver of its opportunity to claim that the alleged discrepancies were not in accordance with the letter of credit.

206. Hillcrest's conduct estops it from asserting the alleged discrepancies as a defense in this action.

207. The terms of cancellation of the letters of credit were not met or otherwise fulfilled.

208. Hillcrest Bank breached its duty of the covenant of good faith and fair dealing. Hillcrest exercised judgment conferred by the terms of the irrevocable letters of credit in such a manner as to evade the spirit of the transaction or so as to deny QCA the expected benefit of the letters of credit.

209. The plaintiff has been damaged as a result of the breaches and failures of the defendant.

**WHEREFORE**, the plaintiff demands judgment in its favor and against the defendant to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

### COUNT 7.
(Plaintiffs v. Hillcrest | Aiding & Abetting Quintero | McClung)

210. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

211. Hillcrest Bank materially assisted Quintero and McClung in the acts complained of in Counts 1 & 2 of this Petition. Hillcrest was aware of McClung's conduct and that it would constitute a breach of his obligations to the plaintiffs.

212. Hillcrest Bank materially assisted McClung in the violation of Arizona law and McClung's officer and director duties to QCA and Quintero.

213. As a promoter and the Manager of Quintero, McClung, in his individual capacity, owed a fiduciary duty to Plaintiffs as property owners and investors in Quintero and the QCA.

214. As described in the facts set forth in the petition, McClung and Quintero made multiple misrepresentations to Plaintiffs regarding his and Quintero's ability to repay the Plaintiffs.

32

215. Hillcrest Bank was obligated to exercise due care to ensure that McClung and Quintero were not engaging in transactions that would have the effect of shielding those activities from the scrutiny of the Arizona Department of Real Estate or that would otherwise frustrate such scrutiny or make such scrutiny more difficult.

216. Hillcrest Bank was aware of or willfully blind to the misrepresentations of McClung to the plaintiffs and other Quintero Entity investors.

217. Hillcrest Bank allowed or otherwise remained silent regarding these misrepresentations or duty to speak on the part of McClung and the McClung Entities in order to conceal or otherwise avoid the findings or facts set forth in the FDIC on October 21, 2009. That is, Hillcrest Bank had a nonperforming loan with Quintero but did not inform the plaintiffs or other investors of any of the misrepresentations of McClung in order to delay having the Quintero loan be classified as a non-performing or problem loan with an associated write-off.

218. As an officer, director and shareholder of Quintero, McClung owed a fiduciary duty to Quintero and both McClung and Quintero owed a fiduciary duty to the Quintero Entity investors such as the plaintiffs.

219. McClung breached his fiduciary duty to Quintero and to Quintero' investor-clients such as the plaintiffs, and also caused Quintero to breach their fiduciary duty to Quintero' investor-clients including the plaintiffs by using money entrusted to Quintero by the investor-clients contrary to the terms under which such money was entrusted.

220. Hillcrest Bank was well aware of the fiduciary duty owed by McClung to Quintero, by Quintero to its investor-clients and by McClung to Quintero' investor-clients.

221. Hillcrest Bank knew, was willfully blind to and/or acted with reckless disregard as to whether McClung and Quintero were breaching their foregoing fiduciary duties. There were Hillcrest Bank employee(s) that deliberately made himself or herself ignorant of facts clearly disclosed in McClung's transactions with Hillcrest Bank or his communications and purposely closed his or her eyes to clear implications of such facts.

222. If Hillcrest Bank did not have specific knowledge, Hillcrest Bank, from the facts and circumstances of which Hillcrest Bank had actual knowledge, should have known of the existence of the fiduciary duty that McClung owed the plaintiffs.

223. Hillcrest Bank actively participated or substantially assisted in or encouraged the breach to the degree that Hillcrest Bank could not reasonably be held to

33

have acted in good faith.

224. Hillcrest Bank acted in such a way as to assist substantially, and to aid and abet, McClung's and Quintero' violation of their foregoing fiduciary duties.

225. As a result of McClung's and Quintero' violation of their foregoing fiduciary duties, and of Hillcrest Bank's aiding and abetting such violation, the plaintiffs sustained severe injury, loss and damage.

226. Some or all the defendants had an agreement or understanding with Hillcrest Bank to breach the contracts and to commit acts of fraud, fraud by silence, and breach of fiduciary duty which have been performed and of which caused damage to the plaintiffs.

227. By making misrepresentations and failing to disclose pertinent information to Plaintiffs regarding his relationship with Hillcrest, the correct financial condition of Quintero, and the investments of the plaintiffs, McClung and Quintero breached their respective fiduciary duties to the plaintiffs.

228. As a Manager of Quintero, McClung has a duty to manage the corporate affairs of Quintero with the ordinary care a reasonably prudent person would.

229. McClung, in his management and supervision of Quintero, fell below the standard of care of a reasonably prudent person and, as a result, breached his duty to Plaintiffs.

230. McClung's breaches resulted in Plaintiffs losing all of their investments in an amount to be determined at trial.

231. McClung's breaches were an actual and proximate cause of Plaintiffs' damages.

232. McClung actually made the misrepresentations alleged herein, failed to disclose pertinent information to Plaintiffs and failed to manage Quintero with the ordinary care a reasonable person would, he acted or failed to act for his personal gain and is responsible for the damages suffered by Plaintiffs and, because he has used Quintero as his alter ego, McClung is individually liable for his actions.

233. Hillcrest was aware of McClung's tortuous conduct and that it would constitute a breach of his obligations to Plaintiffs.

234. Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations by only agreeing to fund the development at a level substantially below the threshold necessary to complete the project.

34

235. Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations because Hillcrest was aware of the financial instability of Old Standard and WULA, failed to conduct appropriate due diligence, insisted on worthless personal guarantees by McClung and his wife without requesting any financial verification of McClung's net worth and knew that McClung was in financial dire straits.

236. Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of Quintero and McClung's obligations by failing to act or by insisting on a significant reduction in the funding of the lines of credit and requiring McClung to be responsible for privately funding substantial portions of the development when it knew he was financially incapable of doing so.

237. Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations by failing to act or in halting the funding of the Quintero development, knowing that the infrastructure was incomplete in violation of the Public Report and then loaning McClung Millions more for the sole purpose of servicing the debt on an otherwise non-performing loan.

238. The plaintiffs sustained damage by relying upon them.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

### COUNT 8.
(Plaintiffs v. Hillcrest Bank | Aiding & Abetting Quintero and McClung's Fraud)

239. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

240. Quintero and McClung had knowledge of the above facts which the other plaintiffs did not have and which the other plaintiffs could not have discovered by the exercise of reasonable diligence.

241. McClung and Quintero made material false representations as described in this Petition to the plaintiffs regarding the repayment of monetary obligations.

242. McClung and Quintero knew these representations were false or was willfully blind or otherwise ignorant of their truth.

243. McClung and Quintero intended for the plaintiffs to act upon these

35

representations in the manner reasonably contemplated by lending or investing money with him and Quintero and allowing McClung additional time for repayment.

244. Quintero and McClung were under an obligation to communicate the true state of facts to the plaintiffs.

245. The defendants intentionally misrepresented or failed to communicate to the plaintiffs the true state of facts.

246. Plaintiffs were unaware of the falsity of McClung's representations and relied on their truth.

247. Plaintiffs had a right to rely on Quintero and McClung's representations as McClung was intimately aware of and controlled both his and Quintero's finances.

248. McClung's misrepresentations consequently and proximately caused Plaintiffs damages in an amount to be determined at trial.

249. McClung has employed Quintero for fraudulent purposes by making promises regarding repayment with the present intention not to perform the same.

250. McClung made the material false representations alleged herein, did so for his personal gain and would be responsible for the damages suffered by Plaintiffs and, because he has used Quintero as his alter ego, McClung would be individually liable for his actions.

251. As described in this Petition, Hillcrest knew of McClung's tortious and fraudulent conduct and knew that it constituted a breach of his obligations to Plaintiffs.

252. Hillcrest substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation by only agreeing to fund the development at a level substantially below the threshold necessary to complete the project.

253. Hillcrest substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation because Hillcrest was aware of the financial instability of Old Standard and WULA, failed to conduct appropriate due diligence, insisted on worthless personal guarantees by McClung and his wife without requesting any financial verification of McClung's net worth and knew that McClung was in financial dire straits.

254. Hillcrest substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation by insisting on a significant reduction in the funding of the lines of credit and requiring McClung to be responsible for privately funding substantial portions of the development when it knew he was financially incapable of doing so.

36

255. Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations by halting the funding of the Quintero development, knowing that the infrastructure was incomplete in violation of the Public Report and then loaning McClung millions more for the sole purpose of servicing the debt on an otherwise non-performing loan.

256. The plaintiffs relied upon Quintero and McClung to communicate the true state of facts to them.

257. The plaintiffs sustained damages as a result of the defendant's failure to communicate this to the plaintiffs.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 9.
### (Plaintiffs v. Hillcrest Bank | Civil Conspiracy)

258. The plaintiffs re-allege the preceding paragraphs of this Petition as if set forth at length.

259. Robert Sperry, Jeffrey Wheeler and Jon Forgey were all corporate officers of Hillcrest. Each and all of these individuals agreed with McClung and Quintero to accomplish an unlawful purpose, as described above or to accomplish a lawful object by unlawful means, as described above.

260. Those unlawful objectives or torts were:

2) Conspiring to wrongfully dishonor the drafts under the irrevocable letters of credit.

3) Conspiring to breach the agreements of the contractors and laborers as described herein;

4) Violating A.R.S. §32-2183.E and F, A.R.S.§32-2181(A)(18) and A.A.C. R4-28-B1203;

5) Engaging in one or more of the improper banking practices cited in the October 21, 2009 Cease and Desist Order of the Federal Deposit Insurance Corporation and the Office of the Kansas State Bank Commissioner;

37

6) Colluding with Quintero and McClung for them to breach their fiduciary duties to each of the plaintiffs.

7) Colluding with Quintero and McClung to conceal Gary McClung's violation of his corporate duties as an officer and director

8) Colluding with Quintero and McClung to recklessly ignore, willfully conceal, or negligently facilitate McClung's Ponzi scheme and fraud.

261. Hillcrest committed at least one act in furtherance of the conspiracy and of which those acts are described herein in this Petition.

262. There was the existence of a fiduciary relationship by the defendant, a breach of that fiduciary duty which caused harm to the plaintiffs.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## COUNT 10.
(QCA v. Hillcrest Bank | Negligence)

263. The plaintiff re-alleges the preceding paragraphs of this Petition as if set forth at length.

264. QCA was Hillcrest Bank's customer and guarantor of certain monies as represented to the Arizona Corporation Commission and Hillcrest Bank accordingly owed QCA a duty of due care.

265. The foregoing duty of care included a duty to exercise reasonable care with regard to the issue of whether McClung was authorized to state that certain work on the Quintero Golf Course had taken place when it had not.

266. The duty to exercise reasonable care regarding the foregoing issue in turn required Hillcrest Bank to take reasonable steps to investigate facts suggesting that McClung might be acting for his own personal purposes rather than for the benefit of the plaintiffs.

267. As alleged above, there were many such facts. But Hillcrest Bank failed to take

38

reasonable steps to investigate such facts.

268. As a direct result of Hillcrest Bank's foregoing failure to investigate, and of Hillcrest Bank's overall violation of its duty of care regarding the issue of whether McClung was acting in breach of the authority McClung exercised, QCA sustained severe injury, loss and damage.

**WHEREFORE**, the plaintiff Quintero Community Association demands judgment in their favor and against the defendant to include special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

## DEMAND FOR JURY

The plaintiffs demand a jury on all issues to the maximum extent allowed under the law.

**WHEREFORE**, the plaintiffs demand judgment in their favor and against the defendant to include punitive and special damages, compensatory damages to include compensatory damages of the costs of collection, court costs, reasonable attorney fees, and late fees, and accrued interest on all amounts and for such damages as are fair and reasonable and any other equitable relief as be the Court may deem appropriate.

By: _____

Linus L. Baker MO 44980
6732 West 185th Terrace
Stilwell, KS 66085-8922
Telephone:  913.486.3913
Fax:           913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiffs

A copy of the above was mailed or emailed on July   , 2010, to:

Kelly A. Campbell
1000 Walnut Street
Suite 1400
Kansas City, MO 64106
816.474.8100
816.474.3216 (fax)
kcampbell@spencerfane.com
bclark@spencerfane.com
Attorneys for Hillcrest Bank

_____
Attorney

40

**Linus Baker**

| | |
|---|---|
| **From:** | Linus Baker <linusbaker@prodigy.net> |
| **Sent:** | Thursday, October 04, 2012 9:18 AM |
| **To:** | 'NonDepositor Claims Dallas' |
| **Subject:** | RE: 10302 Hillcrest Bank Overland Park |

OK. I guess we are done. Your response does indicates to me that the information can be obtained – else you wouldn't direct me to make the request a different way. I did try though.

From: NonDepositor Claims Dallas [mailto:NonDepClaimsDal@FDIC.gov]
Sent: Thursday, October 04, 2012 9:09 AM
To: Linus Baker
Subject: RE: 10302 Hillcrest Bank Overland Park

We review what you submit.

At this point I suggest you consider submitting a Freedom of Information Act request through the FDIC Corporate offices in DC. You can access out public web site for further information on that procedure.

From: Linus Baker [mailto:linusbaker@prodigy.net]
Sent: Thursday, October 04, 2012 8:50 AM
To: NonDepositor Claims Dallas
Subject: RE: 10302 Hillcrest Bank Overland Park

OK. And one last question since you brought it up. The review online – is there a link you could send me where that I could view it? If not then basically you are telling me there is no way for me to ever ascertain what was filled out in any claim.

From: NonDepositor Claims Dallas [mailto:NonDepClaimsDal@FDIC.gov]
Sent: Thursday, October 04, 2012 8:44 AM
To: Linus Baker; NonDepositor Claims Dallas
Subject: RE: 10302 Hillcrest Bank Overland Park

We are NOT able to give you the information. No form is produced, no records are printed. All review is done on line.

From: Linus Baker [mailto:linusbaker@prodigy.net]
Sent: Thursday, October 04, 2012 8:38 AM
To: NonDepositor Claims Dallas
Subject: RE: 10302 Hillcrest Bank Overland Park

OK but that doesn't mean the information isn't available to me in some way – I think. I assume though that you could reproduce the data sent in some way so as to indicate what was input. I assume you could either print out the data that was input for each claim or otherwise convert it to a pdf or some form that would indicate what was input. So even if you don't store it as a "form" it would still be available to reproduce wouldn't it? If I am not able to get the information input into the claims from you in any type or form please let me know.

<table>
<tr><td>EXHIBIT<br><br>B</td></tr>
</table>

From: NonDepositor Claims Dallas [mailto:NonDepClaimsDal@FDIC.gov]
Sent: Thursday, October 04, 2012 6:36 AM
To: Linus Baker
Subject: RE: 10302 Hillcrest Bank Overland Park

The data is simply stored electronically.  There is NO form created.

From: Linus Baker [mailto:linusbaker@prodigy.net]
Sent: Wednesday, October 03, 2012 4:03 PM
To: NonDepositor Claims Dallas
Subject: RE: 10302 Hillcrest Bank Overland Park

Yes.  I am saying that when a claimant files an online proof of claim, we don't get a copy of the proof of claim.  It is all online.  So I don't have a copy of the online form I filled out on behalf of the claimants.  If you can get me the electronic copy (I assume pdf) of the proof of claim, then I can send you the NS claim numbers.  Let me know one way or the other.  Thanks.

From: NonDepositor Claims Dallas [mailto:NonDepClaimsDal@FDIC.gov]
Sent: Wednesday, October 03, 2012 3:55 PM
To: Linus Baker
Subject: RE: 10302 Hillcrest Bank Overland Park

I am having a hard time following what it is that you need.  Are you saying you do not have copies of what you sent us?  Also, you have not given me any identifying information on the claims you represent.

From: Linus Baker [mailto:linusbaker@prodigy.net]
Sent: Wednesday, October 03, 2012 2:27 PM
To: NonDepositor Claims Dallas
Subject: RE: 10302 Hillcrest Bank Overland Park

So when you say as an electronic file – a pdf file?  As long as I can view it that would be great.  Can I get the claims in the electronic form then?

From: NonDepositor Claims Dallas [mailto:NonDepClaimsDal@FDIC.gov]
Sent: Wednesday, October 03, 2012 2:22 PM
To: Linus Baker
Subject: RE: 10302 Hillcrest Bank Overland Park

When you file on line, the system does not create a claim form.  It is simply an electronic file.  After 60 days, any hard copy documents submitted are shredded and also only exist as an electronic file.

From: Linus Baker [mailto:linusbaker@prodigy.net]
Sent: Wednesday, October 03, 2012 1:35 PM
To: NonDepositor Claims Dallas
Subject: 10302 Hillcrest Bank Overland Park

To Paul's Department Heads

I spoke with Paul in the Dallas office yesterday and today and he directed me to contact you all. I filed several proof of claims on behalf of numerous clients back in January 2011 and they were denied April 2011.  I filed the proof of claims

online so I didn't get a copy.  I need to view or obtain a copy of those claims as the link that Paul provided only gives the document number but no way of viewing.  If that is doable I can provide the NS claimant IDs for you.  Let me know.  Thanks

Linus L. Baker
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:          913.232.8734
linusbaker@prodigy.net

*email communication is not a secure method of communication any email that is sent may be copied and held by various computers it passes through and may be improperly or illegally intercepted*