# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| QUINTERO COMMUNITY ASSOCIATION, INC., et al., ) ) ) Plaintiffs, ) ) v. ) ) HILLCREST BANK, et al., ) ) Defendants. ) | No. 04-11-CV-00893-DGK |

## ORDER DISMISSING FDIC-R FROM THE CASE

This case arises from Plaintiffs' losses sustained from their investment in, and purchase of, property at a failed golf course development owned and operated by Gary McClung and his related companies and entities. Plaintiffs, who include individual investors and the Quintero Community Association ("QCA"), sued various entities, including Hillcrest Bank, Hillcrest Bancshares, and the officers and directors of both under a variety of legal theories. The only remaining claims are those by QCA against (1) the Federal Deposit Insurance Corporation, in its capacity as Receiver for Hillcrest Bank ("FDIC-R"), for breach of contract (Count 11), and (2) the former board of directors and officers of Hillcrest Bank and Hillcrest Bancshares (the "Former Directors and Officers") for conversion (Count 1).

Pending before the Court is FDIC-R's Motion to Dismiss (Doc. 145) in which it argues that the Court lacks subject-matter jurisdiction under the doctrine of prudential mootness. Because the Court finds that QCA would not receive the monetary relief it seeks even if it prevailed on its claim against FDIC-R, the Court GRANTS the motion and dismisses FDIC-R from this lawsuit. The Court also exercises its discretion to retain the supplemental state law claim for conversion against the Former Directors and Officers.

**Background**

The parties do not dispute the relevant facts for purposes of this motion. Plaintiffs were purchasers of, and investors in, property belonging to an Arizona golf course community development, Quintero Golf and Country Club, LLC ("QGCC"), initiated by Gary McClung and his related companies (the "McClung Entities"). Some, but not all, individual Plaintiffs were also members of Plaintiff QCA, an Arizona non-profit which itself owns property in the QGCC. Defendants Hillcrest Bank and Hillcrest Bancshares, the corporation which held all the stock in Hillcrest Bank, were also investors in QGCC, having lent over $50,000,000 to the McClung Entities. The McClung Entities' golf course project eventually failed, causing Plaintiffs to sustain significant financial losses.

This case originated out of two actions filed in state court. On May 3, 2010, Plaintiffs filed their first petition against Hillcrest Bank in the Circuit Court of Jackson County, Missouri under various lender liability theories. In October of that year, the Office of the State Banking Commissioner of Kansas closed Hillcrest Bank and appointed the FDIC-R to serve as its receiver. On March 1, 2011, upon motion by Hillcrest Bank, the state court substituted FDIC-R for Hillcrest Bank.

On January 4, 2011, Plaintiffs filed a second petition against the McClung Entities and Former Directors and Officers of Hillcrest Bank and its parent company, Hillcrest Bancshares, also in the Circuit Court of Jackson County, Missouri. The court consolidated these cases into one action on April 21, 2011. Defendants removed the case to this Court on September 6, 2011, and the Court denied Plaintiffs' motion to remand on December 6, 2011 (Doc. 13).

On June 12, 2012, Plaintiffs filed an amended complaint (the "Complaint") (Doc. 56) which set forth the following allegations. Plaintiffs allege that Hillcrest Bank and its Board of

Directors financed the McClung Entities' QGCC development knowing of the McClung Entities' dire financial condition and inability to service the debt. Furthermore, Plaintiffs allege that Hillcrest Bank and its directors "concocted a scheme with McClung" to conceal QGCC's financial condition from Plaintiffs rather than declaring a default on the loan. As a result of what Plaintiffs allege to be Defendants' concealment and misrepresentation about the financial condition of QCGG,[1] Plaintiffs maintain they were improperly induced to invest in an illegitimate business venture which was never completed. Accordingly, in the Complaint, Plaintiffs brought claims against FDIC-R as receiver for Hillcrest bank, Hillcrest Bancshares, and the Former Directors and Officers under a variety of theories of liability.

Shortly after Plaintiffs filed the Complaint, FDIC-R and the Former Directors and Officers moved to dismiss (Docs. 58 & 63), arguing that the Complaint failed to state a claim against them. On January 3, 2013, the Court dismissed fourteen of the sixteen counts, leaving only two claims asserted by QCA: one against FDIC-R for breach of contract (Count 11), and another against the Former Directors and Officers for conversion (Count 1). In the breach of contract claim, QCA alleges that prior to receivership Hillcrest Bank breached its contractual relationship to QCA when it "revoked the letters of credit, reneged on the loan agreement, [and] did not abide by its good faith and fair dealing obligation." (Doc. 56 at 62).

During the discovery period and as a part of its receivership duties, the FDIC-R completed a review of Hillcrest Bank's financials and determined the former bank maintained insufficient assets to distribute any funds to general unsecured creditors (the "No Value Determination"). On September 12, 2013, the FDIC-R posted a notice in the Federal Register to

---

[1] After an FDIC inspection of Hillcrest Bank, the FDIC found that Hillcrest Bank had violated several banking rules including "imprudent lending and collection practices" (Doc. 37, at 8). It also found that Hillcrest's management "failed to provide adequate supervision over and direction to the management of the bank." *Id*.

this effect (Doc. 146-1). The notice alerted potential claimants that the Hillcrest Bank receivership possessed $126,154,744 in assets, while the total administrative expenses and deposit liabilities were $391,321,173. *Id.* Because Hillcrest lacked sufficient assets to satisfy the administrative expenses and deposit liabilities, FDIC-R concluded that lower priority claims, such as general unsecured creditor claims, would receive nothing upon liquidation of Hillcrest Bank's assets. *Id.* Accordingly, the FDIC-R deemed "general unsecured creditor claims (and any lower priority claims)" to have "no value." *Id.*

As a result of the No Value Determination, on December 16, 2013, FDIC-R filed the instant motion, arguing that the Court lacks subject-matter jurisdiction. According to FDIC-R, the Court must dismiss the case against FDIC-R because the No Value Determination precludes QCA, as a general unsecured creditor, from recovering on its breach of contract claim.

## Standard

FDIC-R seeks dismissal under Federal Rule of Civil Procedure 12(b)(1). Motions asserted pursuant to Rule 12(b)(1) challenge the Court's power to hear the claims before it. *Giandinoto v. Chemir Analytical Servs., Inc.*, 545 F. Supp. 2d 952, 956 (E.D. Mo. 2007). If the Court finds that jurisdiction is not present, it must dismiss the case. Fed. R. Civ. P. 12(h)(3). Where, as here, the Court's jurisdiction is challenged based upon the face of the pleadings, the standard for determining the 12(b)(1) motion is the same as the standard for Rule 12(b)(6) motions. *Giandinoto*, 545 F. Supp. 2d at 956. Under Rule 12(b)(6), the court assumes that the factual allegations in the complaint are true and construes them in the light most favorable to the plaintiff. *Data Mfg. Inc. v. UPS, Inc.*, 557 F.3d 849, 851 (8th Cir. 2009).

Additionally, in ruling upon the current motion, the court is not limited to the four corners of the complaint. *See Outdoor Cent., Inc. v. GreatLodge.com, Inc.*, 643 F.3d 1115, 1120

(8th Cir. 2011). The court may consider "the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)). This allows the Court to consider the No Value Determination (Doc. 146-1) published in the Federal Register because it is a public record. *See Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) (treating a copy of a Department of Agriculture regulation as a public record).

## Discussion

### I. The Court dismisses the breach of contract claim against FDIC-R for lack of subject-matter jurisdiction.

In support of dismissal, FDIC-R raises a two-pronged argument challenging the Court's subject-matter jurisdiction. First, FDIC-R contends that the Court *must* dismiss the claim against it because it is moot under Article III of the United States Constitution. Second, FDIC-R contends that even if the claim is not moot in the constitutional sense, the Court should still dismiss the claim under the Eighth Circuit-adopted doctrine of prudential mootness.

Under either basis, the substance of FDIC-R's argument is the same. FDIC-R contends that the Court lacks jurisdiction on the breach of contract claim because the No Value Determination precludes QCA from recovering any monetary relief. In particular, FDIC-R posits that the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1811, *et seq.*, sets forth a specific scheme for distribution of a failed bank's assets. Under the scheme, the administrative expenses of the bank and depositor liabilities must be completely satisfied before any distributions are made to general unsecured creditors. According to the FDIC-R, QCA's breach of contract claim qualifies it as a general unsecured creditor, and

since there are insufficient assets to satisfy the higher priority claims, QCA will never receive any assets even if it prevailed on its claim.

Thus, the pertinent issues now before the Court are (1) whether QCA qualifies as a general unsecured creditor within the meaning of the FIRREA distribution scheme, and (2) if so, whether the breach of contract claim is moot in light of the No Value Determination. The Court addresses each issue separately below.

**A. QCA's breach of contract claim is a general unsecured creditor claim.**

Before turning to the issue of whether QCA's breach of contract claims is a general unsecured creditor claim, the Court first outlines the FIRREA provisions that are central to the current dispute.

In 1989, Congress enacted FIRREA "to enable the FDIC…to expeditiously wind up the affairs of literally hundreds of failed financial institutions throughout the country." *MBIA Ins. Corp. v. F.D.I.C.*, 708 F.3d 234, 236 (D.C. Cir. 2013) (internal quotation marks and citation omitted). To facilitate this overarching objective, FIRREA allows the FDIC to act as receiver for the failed institution. *Id.* In this capacity, the FDIC liquidates the remaining assets of the institution and distributes them according a statutory hierarchy scheme. *Id.* This hierarchy scheme, in relevant part, requires the FDIC to distribute assets in the following claim priority:

>   (i)     Administrative expenses of the receiver.
>   (ii)    Any deposit liability of the institution.
>   (iii)   Any other general or senior liability of the institution….
>   (iv)    Any obligation subordinated to depositors or general creditors….
>   (v)     Any obligation to shareholders….

12 U.S.C. § 1821(d)(11)(A).

FIRREA requires the FDIC to make all payments within a tier on a *pro rata* basis, but all claims in a given tier must be completely satisfied before any distributions are made to a lower

tier. *See* 12 U.S.C. § 1821. Consequently, if there are insufficient assets to satisfy all claims at the first and second tiers, then all claims in third tier, which are often referred to as "general unsecured creditor claims," receive nothing. *See MBIA Ins. Corp. v. F.D.I.C.*, 816 F. Supp. 2d 81, 92 (D.D.C. 2011).

QCA asserts that FDIC has failed to demonstrate that its breach of contract claim falls within the tier for general unsecured creditor claims. QCA also intimates that its claim might be properly categorized in either the administrative expenses tier or the deposit liability tier.[2] The Court finds these arguments without merit.

Although QCA implies that its claim might fall within one of the higher priority tiers, the pleadings belie this assertion. First, QCA's breach of contract claim is not a first-tier administrative expense. The administrative expense category only empowers the FDIC to distribute assets for expenses "the receiver determines are necessary to maintain services and facilitates to effect an orderly resolution of the institution." *MBIA Ins. Corp.*, 816 F. Supp. 2d at 93 (internal quotation marks and citation omitted). This narrow category of expenses "may include the payment of the institution's last payroll, guard services, data processing services, utilities and expenses related to leased facilities." *Id.* Here, QCA seeks damages from Hillcrest Bank's pre-receivership breach of contract. Even assuming QCA succeeded on this claim, the damages stemming from such a judgment bear no relation to Hillcrest Bank's physical facilities, human resources, or internal operations. Thus, QCA's claim is not an administrative expense.

---

[2] QCA's argument is unclear. In its Suggestions in Opposition, QCA states that "The FDIC still has not demonstrated that the plaintiff's claim is unsecured. [The Federal Register notice attached to FDIC's motion] does not prove this. Thus, the Court still only has the bare allegations of the FDIC-R that the plaintiff is *merely* a 'general creditor.'" (Doc. 148 at 2) (emphasis added). Although QCA never refers to the "tiers" of distribution, when considered in the context of FDIC-R's briefing and the FIRREA statutory scheme, it appears that the thrust of QCA's argument is that on the current record it is unclear what distribution tier QCA's claim falls under.

7

*See id.* (holding that plaintiff's contract claims arising from the failed institutions pre-receivership breach of loan agreements did not qualify as an administrative expense).

Second, Plaintiff's claim is not a second-tier deposit liability. Plaintiff has never claimed, in Count 11 or in any of its briefing, that it deposited any funds with Hillcrest Bank. On the contrary, as the Complaint makes clear, the Count 11 claim arose from Hillcrest Bank's failure to perform under a contract. This forecloses the possibility that QCA's claim arises under the second tier of distributions.

Eliminating the first two tiers of distribution leads the Court to inescapable conclusion that, at best, QCA's breach of contract claim falls within the third tier which encompasses "*any other general* or senior liability of the institution." 12 U.S.C. § 1821(d)(11)(A)(iii) (emphasis added). Indeed, other courts which have addressed this issue have held similarly. *See, e.g., MBIA Ins. Corp.*, 816 F. Supp. 2d at 93 (holding that were plaintiff to prevail on its breach of contract claims it would still fall within the third tier of the distribution scheme); *Nasoordeen v. F.D.I.C.*, No. 08-05631-MMM, 2010 WL 1135888, at *4 (C.D. Cal. Mar. 17, 2010) (same); *see also F.D.I.C. v. Estrada-Rivera*, 722 F.3d 50, 54 (1st Cir. 2013) (noting that plaintiff's contract claim for a failed bank's pre-receivership breach fell within the lower distribution tier for general unsecured creditors). Accordingly, the Court holds that QCA's breach of contract cause of action qualifies as a general unsecured creditor claim subject to third-tier, or lower, distribution priority under FIRREA.

**B. The No Value Determination renders QCA's breach of contract claim moot.**

The remaining issue is whether given the No Value Determination, QCA's breach of contract claim, as a third-tier priority claim under FIRREA, is moot. The Court holds that it is.

"Two varieties of mootness exist: Article III mootness and prudential mootness." *Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005). Article III mootness arises from the constitutional "case or controversy" requirement. *Id.* Under this requirement, a federal court may only entertain disputes which present a live, justiciable controversy. *See Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 687 (8th Cir. 2012). This requires a claimant to demonstrate standing. *See id.* ("[P]laintiffs must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." (internal quotation marks and citation omitted)). If at any time during the litigation the plaintiff ceases to satisfy the standing requirements, the Court *must* dismiss the dispute as moot, unless the case falls within one of the narrow exceptions to the mootness doctrine. *Id.; St. Louis Fire Fighters Ass'n Intern. Ass'n of Fire Fighters Local 73 v. City of St. Louis*, 96 F.3d 323, 329 (8th Cir. 1996). Article III mootness often arises when a change in circumstance during the case prevents a court from redressing the plaintiff's injury with the requested relief. *Cangemi*, 419 F.3d at 724.

Prudential mootness, unlike its constitutionally-derived cousin, "is a mélange of doctrines relating to the court's *discretion* in matters of remedy and judicial administration." *Id.* (internal quotation marks and citation omitted) (emphasis added). A court *may* dismiss a case as prudentially moot even if an Article III case or controversy remains. *Id.*

Here, even assuming that QCA's breach of contract claim still presents a live case or controversy,[3] the Court holds that the claim is prudentially moot in light of the No Value Determination. Generally, a no value determination regarding general unsecured creditor claims

---

[3] There appears to be a split in authority on the issue of whether a no value determination moots a plaintiff's claim in the Article III sense. Some courts have held that a live case or controversy remains despite the no value determination because the FDIC may still issue receiver's certificates for the value of recovery. *MBIA Ins. Corp.*, 816 F. Supp. 2d at 101. In contrast, other courts have held that a no value determination moots a plaintiff's claim in the Article III sense, because the lack of assets deprives the court of the ability to adequately redress the alleged injury. *Estrada-Rivera*, 722 F.3d at 55. Because the Court exercises its discretion to dismiss under the prudential mootness doctrine, it declines to address this issue.

moots a plaintiff's claim for a failed bank's pre-receivership breach of contract. *See, e.g., MBIA Ins. Corp.*, 816 F. Supp. 2d at 101 (dismissing claims for pre-receivership breaches of contract on the basis of prudential mootness). Courts have reasoned that prudential mootness favors dismissal in these instances because even if the plaintiff prevailed on his or her claim, the lack of funds for general unsecured creditor claims preclude the plaintiff from ever obtaining any meaningful relief. *Adams v. Resolution Trust Corp.*, 927 F.2d 348, 354 (8th Cir. 1991); *Deutsche Bank Nat'l Trust Co. v. F.D.I.C.*, No. 11-56339, 2014 WL 931238, at *1 (9th Cir. Mar. 11, 2014); *see also Estrada-Rivera*, 722 F.3d at 55 (collecting cases that held to the same effect).

Having already determined that QCA's breach of contract claim is a general unsecured creditor claim, the Court holds that the No Value Determination, which effectively means general unsecured creditor will never receive any assets, prevents the Court from awarding QCA any meaningful relief. Accordingly, the Court dismisses the breach of contract claim against FDIC-R on prudential mootness grounds. As the breach of contract claim was the sole remaining cause of action against FDIC-R, the Court also dismisses FDIC-R from this lawsuit.

## II. The Court exercises its discretion under 28 U.S.C. § 1367 to retain jurisdiction over the remaining state law claim asserted against the Former Directors and Officers.

The dismissal of FDIC-R from the lawsuit raises another jurisdictional issue that the Court must now entertain. The Court originally exercised federal question jurisdiction over this dispute based upon a jurisdictional provision in FIRREA. Under 12 U.S.C. §§ 1819(b)(2)(A-B), all lawsuits against the FDIC, including those raising common law claims, "are deemed to arise under the laws of the United States." After the state court substituted FDIC-R for Hillcrest Bank, FDIC-R removed the case to this Court under this provision, and the Court subsequently denied QCA's motion to remand, holding that it possessed federal question jurisdiction. In so doing, the Court also exercised supplemental jurisdiction over the remaining state law claims against the

other defendants. Now that the Court has dismissed FDIC-R from the lawsuit, the issue becomes whether it should exercise its discretion to maintain the supplemental state law claim for conversion against the Former Directors and Officers. The Court holds that it should.

Under 28 U.S.C. § 1367, a district court may decline to exercise continued supplemental jurisdiction over a state law claim if the district court already "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In determining whether to exercise supplemental jurisdiction, the district court must consider a multitude of factors, including "judicial economy, convenience, fairness, and comity." *Brown v. Mortg. Elec. Registration Sys, Inc.*, 738 F.3d 926, 933 (8th Cir. 2013) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). As a part of this analysis, the court may also consider whether "the parties have invested sufficient time, effort, and money into preparing the state law claims for trial…." *Crest Const. II, Inc. v. On Time Auto*, No. 07-0728-CV-W-DGK, 2010 WL 3456690, at *6 (W.D. Mo. Aug. 27, 2010), *aff'd sub nom. Crest Constr. II, Inc. v. Doe*, 660 F.3d 346 (8th Cir. 2011).

In a recent filing (Doc. 147), the Former Directors and Officers request the Court retain jurisdiction over the conversion claim against them in the event that the Court dismisses FDIC-R from the lawsuit. Relying on the above factors, the Former Directors and Officers contend it would be inequitable for the Court to decline jurisdiction over the remaining claim against them because the case has already advanced to the summary judgment stage. The Court agrees.

To begin, judicial economy supports retaining the conversion claim. This Court has already ruled upon numerous motions and mediated several discovery disputes concerning the claim. This familiarity places the Court in a better position than other courts to expeditiously preside over the remainder of the lawsuit.

Similarly, convenience and fairness support retaining the claim. The parties have already extensively litigated the claim in this court for almost three years and dismissing it now would impose undue financial burdens and administrative inconvenience upon the parties, including the need to re-file in another court and potentially re-conduct discovery.

Also, retaining this lawsuit would not offend the notions of comity central to our system of federalism. If the Court dismisses this state law claim, then Plaintiffs would likely re-file in Missouri state court. The remaining claim against the Former Directors and Officers, however, requires the application of either Kansas or Arizona law, not Missouri law (Doc. 91 at 7). Thus, a Missouri state court would be in no better position than this Court to resolve the dispute.

Finally, over the last several years, the parties have expended a significant amount of time, effort, and money litigating in this forum. As this case is rapidly approaching its conclusion, it would be unfair for the Court to decline jurisdiction and require the parties to expend more money and time re-litigating in another forum.

Because all the pertinent factors support retaining jurisdiction over the conversion claim against the Former Directors and Officers, the Court does so.

**Conclusion**

The Court GRANTS FDIC-R's Motion to Dismiss (Doc. 145) because the breach of contract claim asserted against it is prudentially moot. Therefore, the Court dismisses FDIC-R from the case. The Court also retains jurisdiction over the sole remaining claim for conversion asserted against the Former Directors and Officers.

**IT IS SO ORDERED**.

Date: <u>April 29, 2014</u>  /s/ Greg Kays
GREG KAYS, CHIEF JUDGE
UNITED STATES DISTRICT COURT